**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RANDY SQUIRES, et al. )
)
        Plaintiffs, )
)
   v. )     CASE NO. 1:05-cv-01120 (JR)
)
DISTRICT OF COLUMBIA, et al. )
)
        Defendants. )
)
_____ )

**PLAINTIFFS' OPPOSITION TO DEFENDANT DISTRICT OF COLUMBIA'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

      Plaintiffs, by and through the undersigned counsel, respectfully move this Court, pursuant

to Federal Rule Civil Procedure 56 and LCvR 7, to deny the Motion for Partial Summary

Judgment by Defendant District of Columbia.  In support of this Opposition, Plaintiffs state as

follows:

     1.     The District's Motion should fail on procedural grounds.

     2.     Genuine Issues of Material Fact As To Whether A Policy or Custom Violated
            Plaintiffs' Rights Under Sections 1981 and 1983 Preclude Summary Judgment.

     3.     A Memorandum of Points and Authorities and a Statement of Material Facts in
            Dispute accompany this Opposition.

                                 Respectfully submitted,

                                 /s/ Donald M. Temple /s/
                               Donald M. Temple #408749
                               1229 15th Street, NW
                               Washington, DC 20005

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RANDY SQUIRES, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-01120 (JR) |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR OPPOSITION TO DEFENDANT DISTRICT OF
COLUMBIA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.    PRELIMINARY STATEMENT**

Plaintiffs Randy Squires ("Squires"), Louie White ("White"), Wai Tat Chung ("Chung"), Robert Bush ("Bush"), Gregory Johnson ("Johnson"), Joseph Gatling ("Gatling"), and Shakir Muslim ("Muslim") filed claims alleging racial discrimination under Title VII of the Civil Rights Act of 1964 (Counts I, II and III), 42 U.S.C. §1981 (Counts IV, V, and VII), and 42 U.S.C. §1983 (Count VI) against Defendants District of Columbia (the "District") and Lieutenant Robert Atcheson ("Lieutenant Atcheson" or "Atcheson") of the Metropolitan Police Department ("MPD").  Exhibit 1, Second Amended Complaint and Amended Complaint.[1]  This matter is before this court on the partial summary judgment motion of the District, brought pursuant to Fed. R. Civ. P. 56(c), whereby the District seeks summary judgment on Plaintiffs' claims under sections 1981 and 1983, as alleged in Counts IV-VII of Plaintiffs' Second Amended.

---

[1] Paragraphs 1- 80 of Plaintiffs' Amended Complaint are incorporated by reference into Plaintiffs' Second Amended Complaint.

## II.    STANDARD OF REVIEW

The standard for granting summary judgment under Fed. R. Civ. P. 56 is a stringent one. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (U.S. 1986), *citing*, 6 Moore para. 56.153, p. 56-466; 10A Wright § 2727, p. 124.   The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Id.*, *citing*, Fed. R. Civ. P. 56(c).   Whether a fact is "material" is determined by the applicable substantive law, and for a dispute to be "genuine," a reasonable jury must be able to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Only after the moving party adequately demonstrates that no genuine issue of material fact exists does the burden then shift to the nonmoving party to present sufficient evidence to reasonably support a jury verdict in its favor.   *Celotex Corp. v. Catrett*, *supra*, at 324.   In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, *supra*, at 255.   Indeed, the court must always consider the evidence, and the inferences from it, in the light most favorable to the non-moving party.   *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Significantly, the Court's role is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, *supra,* at 248.  In sum, "[if] . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment . . . ." *Id.* at 331, *citing, In re Japanese Electronic*

*Products Antitrust Litigation*, 723 F.2d 238, 258 (3rd Cir. 1983), *rev'd on other grounds* by *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## III.    FACTUAL BACKGROUND

As referred to in Plaintiffs' complaint, Plaintiffs are minority police officers employed by MPD.  See Exhibit 1.  Other than Plaintiff Chung, who is Asian American, each plaintiff is African American.  Plaintiffs worked in either the Environmental Crimes Unit ("ECU") or Warrant Squad Unit ("WSU") under Lieutenant Atcheson ("Atcheson"), a Caucasian male assigned to supervise Plaintiffs.  Throughout his supervision of Plaintiffs, Lieutenant Atcheson continually discriminated against Plaintiffs by taking numerous adverse actions against them designed to humiliate and embarrass them with the ultimate goal of causing their removal, voluntarily or involuntarily from the ECU or WSU.  Defendant Atcheson's actions were above and beyond the scope of ordinary tribulations of the workplace and negatively affected the terms and conditions of Plaintiff's employment with the MPD.

Atcheson's conduct revealed a plan and pattern designed to impede, demote or fire minority officers.  During evaluation periods, it was common for Lieutenant Atcheson to manipulate the assessment of Plaintiffs by stating that Paul Kurgan, a similarly situated Caucasian officer, was "outstanding" while Plaintiffs Johnson and Squires were classified as lazy and worthless, or even "mopes".  Defendant Atcheson created a pervasive and harsh, racially hostile working environment for Plaintiffs, treating them with disproportionate abusiveness and callousness that Atcheson did not inflict upon the Caucasian officers in his squad.  Despite knowledge of Lieutenant Atcheson's unlawful and impermissible discriminatory conduct, none of his supervisors took measures to prevent or curtail his behavior.  Even after Plaintiffs filed an EEO complaint against Atcheson and he was found guilty of discrimination, the Chief of Police

dismissed the charges and failed to enforce Atcheson's proposed termination or otherwise discipline him for his discriminatory conduct.

Specifically, Defendant Atcheson subjected each of the Plaintiffs to the following forms of impermissible and illegal discriminatory acts:

**RANDY SQUIRES**

Plaintiff Squires began his employment with MPD in October 1998. Under the supervision of Defendant Atcheson at ECU, Squires was forced to endure a variety of adverse actions taken against him as a result of Defendant Atcheson's racially motivated and ultimately retaliatory campaign of hatred against him. Squires was subjected to disparate treatment based on race, which worsened after he complained to the EEOC. Squires was subjected to continuous discriminatory and hostile treatment and retaliatory conduct in several respects, including but not limited to assignments, evaluation, overtime, disciplinary action, aggressive interrogation sessions, excessive use of abusive and demeaning language, disparate access to and use of police vehicles and emergency breathing equipment.

For instance, Lieutenant Atcheson inflicted continuous, demeaning verbal abuse on Squires and other non-white officers, calling Plaintiffs, among other derogatory names, "worthless" and "useless pieces of shit." Squires was denied training opportunities offered to similarly situated Caucasian police officers. His gun and badge were seized without any legitimate reason. Defendant Atcheson refused to allow Squires to take a police car home while allowing a similarly situated Caucasian officer to do so. Atcheson falsely accused Squires of taking vehicles home without authorization, then demanded Squires sign a "confession" of having done so. Atcheson refused to grant Squires access to emergency breathing equipment while granting access to similarly situated Caucasian officers. Atcheson consistently denied

Squires overtime opportunities while affording overtime opportunities to similarly situated Caucasian officers, and under threat of personal action against those writing Squire's evaluations, he demanded that Squire's evaluations be reduced.

**LOUIE WHITE**

Plaintiff White maintains that Lieutenant Atcheson deliberately and willfully gave him a poor annual performance evaluation, not based upon any objective criteria, subjected Plaintiff White to higher performance criteria than that to which similarly situated Caucasian officers were subjected, and repeatedly subjected him to intense interrogation sessions, never visited upon similarly situated Caucasian officers. Lieutenant Atcheson also targeted Plaintiff White for disparate treatment on the basis of his race, including but not limited to intimidation, threats, and concerted efforts to impede Plaintiff White's career advancement and force him out of his job.

For example, before 2001, Plaintiff White's evaluations ranged between above average to outstanding. Whenever Plaintiff White attempted to question the validity of Defendant Atcheson's orders, Atcheson would humiliate, denigrate and demoralize Plaintiff by deliberately forcing him to write and rewrite the circumstance of the events on PD 119s, just before the end of the workday. In October 2003, Defendant Atcheson deliberately and willfully gave Plaintiff White a poor annual performance evaluation (in the prior year, Plaintiff White received an above average performance rating). Defendant Atcheson ordered Plaintiff White to meet with Captain Brito under the pretext of discussing Plaintiff's allegedly poor performance. At that meeting, sanctioned by Defendant's supervisors, Atcheson presented Plaintiff with a "choice" which in reality proffered no option: either voluntarily leave ECU or participate in a Performance Rating Improvement Plan (PRIP). However, if Plaintiff White selected the second "option" and failed, he would not have had the opportunity to voluntarily leave the unit. Defendant Atcheson drafted

and presented a PRIP that was deliberately overbroad, vague and burdensome so as to ensure Plaintiff White's failure.

Defendant Atcheson repeatedly and continuously demanded that Plaintiff White apply disparate treatment, based on race, to the officers under Plaintiff White's direct supervision. When he refused to do so, Atcheson routinely undermined Plaintiff White's authority. Defendant Atcheson created a racially hostile environment where White was subjected to continuous discriminatory treatment and retaliatory conduct including but not limited to lowered evaluations, denial of overtime requests, denial of training requests, unjustified discipline, aggressive interrogation sessions and excessive use of profane, racially abusive language.

**WAI TAT CHUNG**

Defendant Atcheson created a racially hostile environment for Plaintiff Chung when Atcheson refused to allow Chung to return to WSU after completing a ninety-day assignment with the Narcotics Strike Force, and retaliated against Plaintiff Chung after he complained to his union representative. Atcheson refused to sign Plaintiff Chung's compensation form without Chung reducing his reported time, actions to which similarly situated Caucasian officers were not subjected. Atcheson required Chung to complete meaningless tasks under the constant threat of termination, and Atcheson denied him overtime while providing the same to similarly situated Caucasian officers. Lieutenant Atcheson further subjected Plaintiff Chung to continuous verbal abuse and profane language while not addressing similarly situated Caucasian officers in the same manner, and Atcheson gave Plaintiff an unjustifiably low performance evaluation.

**ROBERT BUSH**

Defendant Atcheson caused Plaintiff Bush to be removed from the unit and replaced him with Caucasian officers who were given more favorable treatment. As with other minority

officers, Defendant Atcheson lowered Bush's performance evaluations and routinely subjected him to profane verbal abuse. Defendant Atcheson continuously subjected Bush to a racially hostile work environment by demeaning and degrading minority officers in his presence using insulting and profane language in stark contrast to Atcheson's vocabulary with similarly situated Caucasian officers. For example, Defendant Atcheson routinely referred to Plaintiffs as "all pieces of "shit", "a bomb needs to be deployed over there in [ECU]."

Defendant Atcheson expressed his intention to "get rid of" non-white officers. In September 28, 2003, when Plaintiff Bush was off-duty, but on "limited duty" and the WSU was undermanned, Defendant Atcheson deployed Bush to another unit. Once he had deployed Bush, Defendant Atcheson gloated about "getting rid" of him. Atcheson subsequently recruited two Caucasian officers from another unit, gave them overtime work and a departmental vehicle, in stark contrast to Plaintiff Bush's requests for overtime and use of a take-home cruiser, requests Atcheson denied.

**GREGORY JOHNSON**

Defendant Atcheson deprived Plaintiff Johnson of access to and use of certain emergency breathing equipment and caused his performance evaluations to be lowered in 2002 and 2003, while not subjecting similarly situated Caucasian officers to the same treatment. Atcheson subjected Plaintiff Johnson to disparate treatment based on race when he denied Plaintiff's requests for overtime and subjected Plaintiff to crude and profane racially charged language, threatening to "get those motherf…kers." Similarly situated Caucasian officers were granted overtime on a routine basis and not subjected to such profane language. On at least one occasion, Defendant Atcheson challenged Plaintiff Johnson's request for emergency leave to

attend to his ailing father, demanding to know the nature of his ailment. Similarly situated Caucasian officers were not treated in this manner.

**JOSEPH GATLING**

Defendant Atcheson subjected Plaintiff Gatling to a racially hostile work environment by continuously demeaning minority officers in his presence, using profane, crude and racially charged language in stark contrast to Atcheson's treatment of Caucasian officers. Defendant Atcheson stated that he "does not treat all people equal, because all people are not equal."

**SHAKIR MUSLIM**

Defendant Atcheson subjected him to unjustified discipline, intimidation, threats, and negative evaluations. Moreover, Atcheson retaliated against Plaintiff Muslim when he refused to leave the unit and subjected Muslim to a more strenuous review than that to which similarly situated Caucasian officers were subjected. Muslim suffered disparate treatment based on his race, including but not limited to intimidation, threats, and efforts to impede Plaintiff Muslim's career advancement. Atcheson repeatedly and continuously demanded that Plaintiff Muslim mete out disparate treatment to minority officers. Atcheson repeatedly and continuously inflicted retribution, punished and retaliated against Plaintiff Muslim whenever he objected or refused to execute Atcheson's directives to apply different treatment, based on race, to the officers under Muslim's direct supervision. Plaintiff was deliberately and continuously intimidated, frustrated, patronized and offended in a racially hostile environment and workplace where he was subjected to disparate treatment based on race, thus impeding his ability to be productive.

## IV.    ARGUMENT

According to the District, Plaintiffs have failed to allege and "indeed cannot prove" that a District custom or policy caused Plaintiffs' injuries.    District's Motion at pp. 6-7.    Based thereupon, the District argues that Plaintiffs' sections 1981 and 1983 claims, alleged in Counts IV-VII, should be dismissed on summary judgment.    *Id.* at 7.    Notwithstanding the District's contentions, for the reasons to follow, summary judgment is improper.

### A    <u>The District's Motion Should Fail On Procedural Grounds.</u>

The District filed its subject partial motion for summary judgment pursuant to Fed. R. Civ. P. 56(c), which in this jurisdiction is further defined by LCvR 7(h).  Rule 7(h) requires that:

> Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement.

In support of its Motion, the District submitted a memorandum of points and authorities consisting of sections entitled, "Preliminary Statement", "Statement of Facts", and "Standard of Review".    In its "Statement of Facts", the District merely sets forth the improper discriminatory acts engaged in by Defendant Atcheson against Plaintiffs, concluding "Plaintiffs do not allege have not proven [sic] that a District policy or custom was the moving force that caused them injury."    Conspicuously and fatally absent in the District's memorandum of points and authorities is any statement of material facts as to which the District contends there is no genuine issue.    Without a statement of facts in dispute, the District's Motion fails to meet the requirements of a summary judgment request.    More importantly, this fatal flaw prevents this court from assessing the District's Motion under a summary judgment standard, which burdens the moving party with demonstrating the absence of any genuine issue of material fact.  *Celotex*

*Corp. v. Catrett*, *supra*, at 324. Accordingly, the District's Motion is deficient and should fail on procedural grounds.

**B.**    **Genuine Issues of Material Fact As To Whether A Policy or Custom Violated Plaintiffs' Rights Under Sections 1981 and 1983 Preclude Summary Judgment.**

In *Jett v. Dallas Independent School District,* 491 U.S. 701 (1989), the Supreme Court, affirming the "custom and policy" analysis announced in *Monell*,[2] held that in order to prevail on claims asserted against a municipality under sections 1981 and 1983, a plaintiff must show that his injuries were caused by a custom or policy approved by a policymaker. *Jett, supra,* at 710-737; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). While the District would like this Court to believe otherwise, *Jett*'s holding, as to what must be proven at trial in order to prevail under sections 1981 and 1983, does not set the standard for what has to be demonstrated to survive summary judgment. Certainly, even the District would agree that the burden of proof required at trial is not the same standard as that which is considered for summary judgment.

This honorable court should be reminded that under the summary judgment standard the moving party has the burden of first demonstrating an absence of a genuine issue for trial before the burden ever shifts to Plaintiffs to present sufficient evidence to support a jury verdict in their favor. *Celotex Corp. v. Catrett*, *supra*, at 324. In this regard, the District only identified portions of Plaintiffs' complaint that it believes lacks details and exact language as to the policy or custom causing Plaintiffs' injuries under sections 1981 and 1983. District's Motion at p. 10. The District failed to meet their summary judgment burden by demonstrating the absence of any material fact regarding the issue of a District policy or custom, while Plaintiffs can point to a number of genuine issues of material fact in dispute. See Plaintiffs' Statement of Material Facts

---

[2] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

in Dispute accompanied herewith.  Significantly, the District ignores the discovery on file in this matter that clearly shows a genuine issue as to whether Plaintiffs' injuries where caused by the District's deliberate indifference in acquiescing to Atcheson's conduct and otherwise failing to adequately supervise and discipline Atcheson.

> 1. **The District acquiesced to Atcheson's discriminatory conduct when the Chief of Police chose not to discipline Atcheson for discriminating against Plaintiffs**.

Where plaintiffs can prove that the violation of their constitutional rights was caused by acquiescence by policymaking municipal officials in previous unconstitutional conduct by city employees, the municipality may be held liable for the constitutional violation.  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987), *cert. denied sub nom. City of Fayetteville v. Spell*, 484 U.S. 1027 (1988).  Even the District acknowledges that plaintiffs can establish a *Monell* "custom and policy" by:

> the explicit setting of a policy by the government that violates the Constitution, the action of a policy maker within the government, the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,' or by the failure of the government to respond to a need (for example, training of employees) in such a manner as to show '**deliberate indifference**' to the risk that not addressing the need will result in constitutional violations.  (Emphasis added.)

District's Motion at 9 (citing *Baker v. District of Columbia*, 326 F.3d 1302, 1306-7 (D.C.Cir. 2003).

In other words, municipal liability may lie where a subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials."  *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992).  Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a "deliberate choice," that acquiescence

may "be properly thought of as a city 'policy or custom' that is actionable under § 1983 [and §1981]." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). The summary judgment evidence in this instance clearly demonstrates that the Chief of Police, an indisputable policymaker for the MPD, either constructively and/or expressly acquiesced in Lieutenant Atcheson's practice of discriminating against Plaintiffs based upon their race. Accordingly, a jury may reasonably find that the District is liable for Lieutenant Atcheson's conduct.

More specifically, the summary judgment evidence in this matter reveals that on November 12, 2003, based upon Plaintiffs' complaints that Lieutenant Atcheson discriminated against them in violation of their civil rights, Gregory Greene, Chairman of the Fraternal Order of Police, presented a request to the Chief of MPD for an investigation into Plaintiffs' allegations of discriminatory misconduct by Atcheson.[3]   On September 13, 2004, Debbie Anne Burt, an EEO Investigator, presented a report of the investigation, which included that Lieutenant Atcheson's "conduct violated Department regulations and federal law" when he "discriminated against minority members" of his command by giving higher rating to non-minorities." Exhibit 4, EEO Report at pp. 59-60. The EEO Report further stated that Lieutenant Atcheson's use of profanity "amounted to abuse" in the case of Plaintiff Chung and he violated Plaintiff Squires' civil rights "when he targeted Investigator Squires for discipline and created a hostile work environment for Investigator Squires based on his race." *Id*. The EEO Report also stated that Lieutenant Atcheson "abused his authority as an official and placed his personal agenda before his professional obligations as an official." *Id*. at p. 60.

Following an extensive MPD trial board hearing, the board also concluded that Atcheson's actions were racially discriminatory against Plaintiffs. Exhibit 3, Employee Appeals

---

[3] See Exhibit 3, *In the Matter of Robert Atcheson v. Metropolitan Police Department*, OEA Matter No. 1601-0055-06, dated September 12, 2007 ("Employee Appeals Decision") at p. 1; Exhibit 4, Report of EEO Investigation dated September 13, 2004 ("EEO Report") at p. 1.

Decision at p. 2.  A three-member MPD Trial Board panel found Lieutenant Atcheson guilty of all of the charges and unanimously recommended his termination.  *Id.*  By memorandum dated November 5, 2004, Assistant Chief Shannon P. Cockett of Human Resources notified Lieutenant Atcheson that the Agency proposed to terminated his employment, charging him with using coarse and profane language, committing acts of racial discrimination, improperly influencing and intimidating complainants and potential witnesses and making untruthful statements during the investigation.  Exhibit 3, Employee Appeals Decision at p. 2.  It is Plaintiffs' view that Atcheson's use of harsh and abuse vulgarity selectively towards and about Plaintiffs constituted a racially fueled hostile workplace environment.  However, upon Lieutenant Atcheson's appeal, Chief of Police Charles Ramsey ("Chief Ramsey") dismissed the charges of discrimination, untruthful statements and improper influences and intimidation against Atcheson and refused to enforce Atcheson's termination or otherwise discipline Atcheson for his discriminatory conduct. *Id.*

According to the District of Columbia Municipal Regulations, Title 6A, §800.3, and as admitted by the District in its Motion, the Chief of Police is one of MPD's policymakers. District's Motion at pp. 9-10.  In this case, Chief Ramsey knew of Lieutenant Atcheson's conduct and the EEO finding that Atcheson discriminated against Plaintiffs in violation of their civil rights.  Exhibit 3, Employee Appeals Decision at pp. 1-2.  Notwithstanding such knowledge, Chief Ramsey made a conscious and deliberate choice to dismiss the charges of discrimination against Lieutenant Atcheson and forego enforcing any discipline upon Atcheson for his discriminatory conduct. *Id.*

According to the court in *Britton v. Maloney*, 901 F. Supp. 444, 450 (D. Mass. 1995), "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of

a policymaker, a custom develops from the bottom-up.  Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it."  The District claims that neither the Chief of Police nor the Mayor set or created a policy that violated Plaintiffs' constitutional rights.  District's Motion at p. 10.  That being as it may, the issue here is not creation of policy, but tolerance or acquiescence by Chief Ramsey, in particular, of Atcheson's discriminatory behavior.  Considering that the District contends that the Chief of Policy did not set a policy that violated Plaintiffs' constitutional rights and Plaintiffs submit that there is evidence of Chief Ramsey's acquiescence of Atcheson's discriminatory conduct, the issue is ripe for the jury to decide.

**2.     The District failed to adequately supervise Atcheson after being put on notice of allegations of Atcheson's discriminatory conduct.**

To prove deliberate indifference, plaintiffs may also show that the need for more or better supervision to protect against constitutional violations was obvious.  *See Canton, supra*, at 390.  An obvious need may be established through proof of repeated complaints of civil rights violations and deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to prevent further incidents.  *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).  Notwithstanding the District's contention otherwise, the means of establishing deliberate indifference vary given the facts of the case and need not rely on any particular factual showing.    The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a "conscious choice" rather than mere negligence.  City of Canton, supra, at 389; *see also, Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).

One way for Plaintiffs to proceed in proving the District's inaction was a conscious choice is to prove a series of prior unconstitutional violations by Atcheson and then prove that no discipline was imposed on him. *See, e.g., Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988); *McKenna v. City of Memphis*, 785 F.2d 560 (6th Cir. 1986); *Roman v. City of Richmond*, 570 F.Supp. 1544 (N.D. Cal. 1983). Notably, Plaintiffs' evidence must establish only that a policymaking official had notice of a *potentially serious* problem of unconstitutional conduct, such that the need for corrective action or supervision was "obvious." (Emphasis added.) *Vann, supra* at 1049.

When Lieutenant Atcheson was in charge of assigning members to an FBI Task Force, he informed Warrant Squad members, including Plaintiffs that the FBI Task Force would receive overtime and a take-home vehicle and that membership selection would be based on seniority. Exhibit 4, EEO Report at p. 3. Plaintiff Bush had more seniority than member(s) Atcheson assigned to the FBI Task Force; however, Atcheson did not and further refused to assign Bush to the Task Force. *Id.* Additionally, Atcheson permitted Investigators Kurgan and DeSantis to receive overtime and take-home vehicles funded by the Task Force; however, Atcheson did not and further refused to allow Plaintiff Bush to receive overtime and a take-home vehicle funded by the Task Force. *Id.* Bush asked Captain Brito to investigate his non-selection to the FBI Task Force, but Bush never received a response to his request. *Id.*

Considered under this standard, the facts are sufficient to withstand summary judgment because in two instances, to wit during the EEO investigation and the MPD trial board hearing, the District found that Atcheson discriminated against Plaintiffs based on their race. This pervasive conduct was certainly serious enough to obviously warrant corrective action or supervision. However, none was taken, despite the fact that policymakers including, but not

limited to Chief Ramsey and Captain Brito knew of the same.  Although the District submits that the Chief of Police and the Mayor are MPD's only policymakers, the District is not the deciding authority on identifying those individuals who constitute policymakers for the purpose of the *Monell* "customs and policy" analysis.  As Justice White stated in Jett, "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett, supra*, at 737.  Therefore the trial judge may also consider, as Plaintiffs' maintain, that individuals in addition to the Chief of Police, such as Captain Brito, had power to make official policy concerning relevant matters.

Once the trial judge identifies those officials with policymaking authority, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue.  *Monell*, *supra*, at 661, n.2.  Again, Plaintiffs maintain that a factual question delegated to the authority of the jury does not warrant summary judgment if the non-moving party proffers sufficient evidence to support a conclusion in its favor.  As Plaintiffs demonstrated, *supra*, the discovery on file here certainly reveals the existence of a number of genuine issues of fact as to the deliberate indifference on the part of policymakers, including the Chief of Police.  Accordingly, Plaintiffs' section 1981 and section 1983 claims should be considered by a jury and not adjudged as a matter of law.

## V.    CONCLUSION

Based upon the foregoing and for any other reasons that may appear to this Honorable Court, Plaintiffs respectfully requests that the District's Motion for Partial Summary Judgment be DENIED.

Respectfully submitted,

/s/ Donald M. Temple /s/
Donald M. Temple #408749
1229 15th Street, NW
Washington, DC 20005

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RANDY SQUIRES, et al.                 ) | |
|                                  ) | |
|               Plaintiffs,         ) | |
|                                    ) | |
|          v.                       ) | CASE NO. 1:05-cv-01120 (JR) |
|                                    ) | |
| DISTRICT OF COLUMBIA, et al.    ) | |
|                                    ) | |
|             Defendants.        ) | |
|                                    ) | |
| _____ ) | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN DISPUTE

1.     Once Lieutenant Atcheson took command of ECU, he informed ECU members that overtime would not be allowed, but he made an exception for Caucasian Investigator Paul Kurgan ("Kurgan"), who was allowed to work unlimited overtime with the Warrant Squad. Exhibit 4, Report of EEO Investigation ("EEO Report), dated September 13, 2004.

2.     Plaintiff Johnson "occasionally worked overtime, however, he did not have easy access to overtime like Investigator Kurgan, who seemed to work unlimited Warrant Squad overtime and received a take home vehicle." *Id*. at p. 6.

3.     Plaintiff Johnson never had the occasion to work unlimited overtime like Kurgan. Exhibit 5, *In the Matter of Lieutenant Robert Atcheson*, 3rd District, Case No. CS-03-1566, Statement of Inspector Gregory Johnson, August 5, 2005 at p. 675.

4.     Further, Plaintiff Johnson was required to provide Defendant Atcheson with "a plan of action to justify the overtime." Exhibit 4, EEO Report at p. 8.

5.     Likewise, when Plaintiff Squires attempted to work overtime, he was required to put a request in writing and receive pre-approval by Lieutenant Atcheson. *Id*.

6.      As a result, Plaintiff Squires worked overtime only about six times per year once Lieutenant Atcheson took command of ECU.  Exhibit 4, EEO Report at p. 8.

7.      While Atcheson was in charge, Plaintiff Chung "received compensatory time only." *Id*. at p. 8.

8.      Lieutenant Atcheson basically made his decision to award overtime and take-home vehicles on his personal likes and dislikes.  *Id.* at pp. 6-7.

9.      Consequently, unlike Kurgan and Dorian DeSantis, Plaintiffs White, Bush and Chung did not receive overtime and take-home vehicles.  *Id.* at pp. 7, 9.

10.      When Lieutenant Atcheson was in charge of assigning members to an FBI Task Force, he informed Warrant Squad members, including Plaintiffs that the FBI Task Force would receive overtime and a take-home vehicle and that membership selection would be based on seniority.  *Id.* at p. 3.

11.      Plaintiff Bush had more seniority than member(s) Atcheson assigned to the FBI Task Force; however, Atcheson did not and further refused to assign Bush to the Task Force.  *Id.*

12.      Additionally, Atcheson permitted Investigators Kurgan and DeSantis to receive overtime and take-home vehicles funded by the Task Force; however, Atcheson did not and further refused to allow Plaintiff Bush to receive overtime and a take-home vehicle funded by the Task Force.  *Id.*

13.      Bush asked Captain Brito to investigate his non-selection to the FBI Task Force, but Bush never received a response to his request.  *Id.*

14.      Plaintiff Bush not only had significant seniority, he also led the Warrant Squad in number of arrests and he had received a P.D. 751 for his performance in a high profile homicide case; nonetheless, two days after Bush was not selected for the FBI Task Force, Atcheson

20

informed him that "if he had to rate him on job performance, he would rate him as a 'disappointment' and that 'numbers mean absolutely nothing to him'." Exhibit 4, EEO Report at pp. 3-4.

15.    Lieutenant Atcheson threatened to give White a poor evaluation if White did not lower their ratings to "Below Average" because, as Atcheson said, "they are worthless." *Id.* at p. 7.

16.    White refused to acquiesce to Atcheson's unjustifiable and illegitimate demands and consequently Atcheson rated White only one point above "Average." *Id.*

17.    Similarly, Lieutenant Atcheson threatened Plaintiff Muslim when he refused to revise unit members' ratings from "Above Average" to "Average." *Id.* at p. 12.

18.    Plaintiff Muslim refused to acquiesce to Atcheson's demands and in turn received an evaluation of "Below Average."[4] *Id.*

19.    When Sergeant Darley arrived to ECU, Lieutenant Atcheson directed Darley to give each person an average rating. *Id.* at p. 8.

20.    Consequently, Plaintiff Chung received an average rating, even though Chung had averaged two arrests per week, more than anyone else in ECU. *Id.*

21.    Plaintiff Chung later learned that Sergeant Darley had not completely acquiesced to Atcheson's direction, but had treated certain other ECU members differently and gave them "Above Average" ratings. *Id.*

22.    Under Atcheson's command, Caucasian officers generally received higher performance ratings than African-American officers. *Id.* at p. 11.

---

[4]    Plaintiff Muslim subsequently appealed his evaluation and received an "Average" rating. EEO Report at 12.

22.    Lieutenant Atcheson routinely ordered Plaintiff Muslim to write-up Plaintiff Squires whenever Squires arrived for duty even five minutes late, notwithstanding that other members had a fifteen-minute grace period for late arrival.  Exhibit 4, EEO Report at p. 11.

23.    Lieutenant Atcheson even issued Plaintiff Squires a 62-E "for not answering the telephone."  Exhibit 6, Deposition of Randy Squires, dated July 10, 2007 at pp. 25, 33.

24.    Plaintiff Squires was also reassigned from the ECU and demoted from Investigator to the position of Officer, reassigned to the Fourth District.  *Id.*

25.    Defendant Atcheson falsely accused Plaintiff Squires of taking home a vehicle belonging to the Department of Public Works on or about late 2001 or early 2002.  *Id*. at pp. 48-49.

26.    Concerning this incident, Lieutenant Atcheson demanded that Plaintiff Squires "write down you did it, and you're sorry, and you won't do it again.  That's all I will accept.  Other than that, you've got adverse actions."  *Id*. at p. 52.

27.    During 2002, Lieutenant Atcheson denied Plaintiff Squires' requests to attend training courses, specifically for Emergency Medical Technician recertification consisting of a one-week course and consequently Squires lost his EMT certification.  *Id*. at pp. 73-75.

28.    Additionally, in 2003 or 2004, Lieutenant Atcheson denied Plaintiff Squires' request to attend forty hours of training pertaining to environmental crimes.  *Id*. at pp. 78-79.

29.    Atcheson's conduct, as described herein, violated Plaintiffs' civil rights.  Exhibit 1, Second Amended Complaint.[5]

30.    Chief Ramsey knew of Lieutenant Atcheson's conduct and the EEO finding that Atcheson discriminated against Plaintiffs in violation of their civil rights.  Exhibit 3, *In the*

---

[5] Paragraphs 1- 80 of Plaintiffs' Amended Complaint are incorporated by reference into Plaintiffs' Second Amended Complaint.

*Matter of Robert Atcheson v. Metropolitan Police Department*, OEA Matter No. 1601-0055-06, dated September 12, 2007 ("Employee Appeals Decision") at pp. 1-2.

31.     Notwithstanding such knowledge, Chief Ramsey made a conscious and deliberate choice to dismiss the charges of discrimination against Lieutenant Atcheson and forego enforcing any discipline upon Atcheson for his discriminatory conduct. *Id.*

32.     At all times relevant herein, the District ignored Plaintiffs' complaints of race-based discrimination or demonstrated reckless disregard for the same. Exhibit 1, Second Amended Complaint at ¶83.

33.     Such indifference is evidenced, in part, by the refusal of the District to adequately discipline Defendant Atcheson prior to this litigation. *Id.*

34.     Given the pervasiveness of Atcheson's discriminatory conduct against Plaintiffs, the District's deliberate and/or reckless indifference toward the discrimination suffered by Plaintiffs is the moving force behind the violation of Plaintiffs' constitutional rights. *Id.* at ¶84.

Respectfully submitted,

<u>/s/ Donald M. Temple /s/</u>
Donald M. Temple #408749
1229 15th Street, NW
Washington, DC 20005