# EXHIBIT #3

used coarse and profane language while addressing Investigator Wai Tat Chung.

The Chief reduced the penalty of removal to a thirty workday suspension, effective on April 9, 2006, and removed Employee from his position within Operational Support Command.

On May 1, 2006, Employee filed an appeal with this Office. The parties convened for a pre-hearing conference on September 13, 2006. Employee was also granted a *de novo* evidentiary hearing. In the matter of *D.C. Metropolitan Police Department v. Elton Pinkard*, 801 A.2d 86 (D.C. 2002), the D.C. Court of Appeals held that the collective bargaining agreement between Agency and Employee precluded a *de novo* hearing before this Office for union members. The Court referred to a provision of the agreement stating that "[i]n cases where a Departmental hearing has been held, any further appeal shall be based solely on the record established in the Departmental hearing." In accordance with the *Pinkard* ruling, many appeals from union police officers have been decided by this Office based solely upon the evidentiary record created at the Agency level. However, Employee was not a union member.

According to the testimony of union representative Detective Mary Bonacorrsy, only employees who are "under the rank of lieutenant . . . any sergeants and below . . . " and pay union dues are members of the Fraternal Order of Police, the police union. Employee was a Lieutenant in the Metropolitan Police Department. Therefore, the *Pinkard* ruling did not apply to preclude him from a *de novo* evidentiary hearing before this Office.

From the initiation of this appeal until shortly before the convening of the evidentiary hearing, John Berry, Esq. represented Employee. At that point, Gene Smith, Esq. entered her appearance as Employee's new representative. She also filed several motions for summary relief alleging harmful procedural errors in Agency's investigative process and adverse action proceedings. This Judge denied those motions, finding that Agency acted timely in initiating proceedings against Employee and concluded them within a reasonable time.

This Judge also determined that Agency properly notified Employee of the names of his accusers and granted him the opportunity to confront them at the hearing before the Trial Board. The parties submitted witness lists for approval before the hearing convened by this Office. Agency later moved to add more witnesses. For good cause shown, that motion was granted. Employee then sought an equal increase. However, Employee was not allowed to amend his witness list merely to match Agency's number.

Employee also sought an order from this Office sanctioning Agency for making a late submission. Employee asked this Judge to limit Agency's record in this appeal to only the "Designation of Agency Representative" form. This Judge denied that request, concluding that Agency's failure did not warrant such a severe sanction. Both parties were afforded the opportunity to develop a full record of testimonial and documentary evidence.

1601-0055-06
Page 4

## JURISDICTION

The Office has jurisdiction in this matter pursuant to D.C. Official Code § 1-606.03 (2001).

## ISSUES

The issues presented by this appeal are as follows:

I.   Whether Employee committed the acts with which he was charged.

II.  Whether the acts constitute cause for adverse action.

III. Whether the penalty was reasonable.

## BURDEN OF PROOF

OEA Rule 629.3, 46 D.C. Reg. 9317 (1999) provides that "[f]or appeals filed on or after October 21, 1998, the agency shall have the burden of proof, except for issues of jurisdiction." Pursuant to OFA Rule 629.1, *id.*, the applicable standard of proof is a "preponderance of the evidence." OEA Rule 629.1 defines a preponderance of the evidence as "[t]hat degree of relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to find a contested fact more probably true than untrue." Accordingly, Agency has the burden of proving, by a preponderance of the evidence, that there was legal cause to suspend Employee for thirty days and that the penalty was commensurate with the offense.

## EVIDENCE PRESENTED BY THE PARTIES

In order to resolve the factual disputes presented by this appeal, an evidentiary hearing was convened on Wednesday, November 1, 2006; continued on Friday, November 3, 2006; and concluded on Wednesday, November 15, 2006. Throughout the hearing, Employee was present with his representative, Gene Smith, Esq. Attorney Smith was accompanied by her consultant and business partner, Harry Brandon.[1] Thelma Brown, Esq. represented the agency.

The hearing was confined to acts alleged to have occurred during Employee's supervisory tenure over the complainants. Testimony was accepted into the record about events between January 26, 2000, when Employee was appointed as the commanding official of the Warrant Squad, until November 5, 2004, when Agency issued the notice of proposed adverse action. This also comprehends Employee's time as the supervisor of the Environmental Crimes Unit. Employee supervised the Paternity Warrant Squad (PWS) as well. However, the record does not contain any complaints from that unit.

---

[1] Attorney Smith entered her appearance a few days before the hearing. Prior to that, Employee was represented by John V. Berry, Esq.

SUMMARY OF TESTIMONY OF AGENCY'S WITNESSES

**Commander Cheryl Pendergrast, Commanding Officer of the Maurice T. Turner Institute of Police Science (the Training Academy) (Transcript Volume I, Pages 43 – 76)**

Commander Pendergrast, with twenty-five years of experience with the MPD including three at the Training Academy, described Agency's process for training police officers. Each member of the police force is expected to learn the content of the MPD's general orders, the D.C. Municipal Regulations, the police manual and other relevant guidelines through training exercises.

"In-service training" is presented at the beginning of each shift. At daily roll call, the supervisor gives out assignments, presents crime statistics for the previous 24 hours, distributes court notifications and presents information on a topic for the day. The topics are drawn from the MPD general orders. Pendergrast said that, it is "possible [for an officer] to be familiar with every order, but it's hard to know every order."

Officers are also trained in "communication":

> [MPD General Order] 201.26 talks about conduct towards your coworkers and talks about conduct towards citizens. Also, we teach DCMR 6A, which tells us how we are to conduct business with one another, it tells us how we are to address superior officers or our subordinates by rank. It tells us how we are to conduct ourselves on and off duty . . .

Agency also teaches "customer service." "And customer service to the training Academy means how we conduct business with one another and also our partners and also the citizens." Pendergrast said that "one of the things you're informed never, ever, positively don't do when you are an instructor, that you don't use profanity." While peer to peer profanity might be exchanged between employees who are comfortable with one another, a supervisor who cursed might frighten or intimidate an employee.

In order to achieve a higher rank within the department, an officer must successfully complete tests that evaluate his readiness for promotion. The "in box, in basket," is "a timed exercise where the candidates must figure out what's in their box of work, how to make it work, how to prepare and give assignments out under extreme conditions." There is also an "oral board" administered by a panel of assessors. The officer is given a scenario and must figure out how to handle it based on the rank for which they are competing.

Discipline at Agency is administered at different levels depending on the kind of action being effected. A commanding officer can administer a corrective action. Adverse actions go outside of the command structure to Agency's Disciplinary Review Office. Penalties are chosen from Agency's disciplinary order which sets out a list of infractions and a range of penalties. In accordance with the structure, improprieties in a supervisor-supervisee relationship were not reported to Pendergrast as commanding officer. Instead, those complaints went up the chain of command.

1601-0055-06
Page 6

Pendergrast worked with Employee for about a year and a half. They both held the rank of Lieutenant. She described her interaction with him as "friendly, pleasant" and said they "didn't have any problems."

## Inspector Dierdre Porter, Director of Agency's Disciplinary Review Division (Transcript Volume I, Pages 80 – 128)

Inspector Porter issued the notice of proposed adverse action to Employee on November 5, 2004. Once a notice issues, an employee can request a hearing before the Trial Board which presents findings and recommendations to the Disciplinary Review Division. The matter then goes to the Assistant Chief of Human Services who issues a final notice of adverse action. The employee can appeal to the Chief of Police.

According to Agency's policy and practice of progressive discipline, the range of penalties for the first offense of conduct unbecoming an officer is "[s]uspension for three days to removal." For a second offense, it is "[s]uspension for five days to removal." "Removal" is suggested for a third offense. A penalty is chosen with mitigating factors including the seriousness of the offense in mind. As an example, for a "very minor" violation such as a uniform issue like not having one's shoes shined, Agency would start with a PD-750 (a reprimand). For a second offense, Agency could "progress with the discipline up to a letter of prejudice and official reprimand." However, Porter noted that "there's no steadfast rule or no written policy that says you must start with the lowest level of discipline." In determining the level of discipline, Agency considers repeated derelictions and how the behavior is perceived by the public.

According to a history of discipline of employees similarly situated to Employee, three officers of the rank of Sergeant or above were disciplined for individual incidents of using profane language (as distinguished from continuous patterns). One officer received an official reprimand. Another was suspended for ten days. One officer had previously been served with an official reprimand for profane reference to another member and an official reprimand for inappropriate comment regarding the member's lifestyle. That officer was suspended for fifteen days.

## Investigator, Joseph M. Gaitling, Member of the Warrant Squad (Transcript Volume I, Pages 190 – 230)

Investigator Gaitling served at Agency for 17 – 18 years and spent most of that time on the Warrant Squad. "If a warrant was issued [by Agency's detectives], we do our homework in the office, computer work, leg work, interviews, then you know, we're out there trying to capture the subject."

Employee came to the Warrant Squad in 2000 and supervised Gaitling for three or four years. Employee met with the squad weekly about administrative matters. "He would curse in the meetings." "He would talk to different people, try to degrade them . . ." Employee would "chastise people and make them feel, you know, awful bad." He said "Fuck, he said that a lot."

For example, "[h]e would disrespect Corpy [Corporal] Garcia by saying 'F'[uck] and he wasn't this and he was going to kick his butt if he don't do this . . ." Employee complained of Corporal Garcia, "he's not getting his cases done or he's not working" and used the words "mope" and "slap" to refer to officers. Gaitling also heard Employee speak badly of Sergeant Louie White and Investigator Chung. Employee said of Lt. Shakir Muslim and Investigator Gregory Johnson that he was "going to get rid of their fucking asses." He described Johnson and the unit as a whole as "fucking worthless." Gaitling said that the conversations of which he spoke were after October of 2002. He used to hear Employee speak that way, "[e]very, every day."

Gaitling also heard Employee make similar comments about members of the Environmental Crimes Unit. "He would cuss, he would just cuss, he would just cuss, cuss, cuss about the ECU unit . . . He wanted somebody else to take over that unit, he wanted everybody out of that unit, except for Paul Kurgan. He loved Paul Kurgan."

Investigator Gaitling acknowledged that members of the unit use profanity among themselves but described it as different from the way Employee spoke to them:

> [W]e're just fellas, we're just talking, shooting the breeze. We don't degrade each other, we don't degrade like, "You're fucking worthless," we don't say stuff like that to each other . . . We don't talk to disrespect or downgrade or hurt anybody's feelings. It's different with Lieutenant Atcheson.

Employee called Gaitling at home while he was out recovering from an injury to ask how he was doing. Employee also talked to him about Investigator Chung saying, "I'm going to get rid of his fucking ass because I don't like him." Later Chung told Gaitling that he was going to the Paternity Unit.

The witness also heard Employee speaking of his mother-in-law who had been in an accident, "That's a strong, old bitch. Why don't she go ahead and die?" Later, when she did pass away, Employee said, "Well, we've got to go back down and kick some dirt on her." Employee also commented, when speaking of his wife's requests, that he didn't want "another fucking cat" or "another fucking baby."

Gaitling described the work atmosphere as depressing. While he used to love to come to work, it became terrible. The majority of the time, Employee was "ticked off at them because they didn't get their paper work in on time or they did something or the investigator was doing it wrong." Hearing Employee speak that way about others made Gaitling wonder how Employee felt about him.

Gaitling was questioned about his knowledge of certain management concerns. He knew about Employee's efforts to break up his partnership with Jack Reese. However, he got angry with Reese rather than Atcheson. He said, "when I got back [from sick leave], Jack Reese didn't say two words to me." Gaitling had no knowledge about a loss of funding for the unit or Employee's efforts to remedy that. He was aware that the Warrant Squad received some commendations under Employee's leadership. When asked to compare Employee's management style with that of another supervisor, Lieutenant Patrizio, Gaitling

said, "I mean we loved that guy. I wish he was still here, actually." He said that he did not see that the squad had improved more under Employee's supervision than Patrizio's.

Gaitling did not care for Employee because of his demeanor, his attitude and the way he talked to others. He did not file a complaint against Employee for a long time and believed that no one else did because they felt that Employee "had Commander Costa in his back pocket, he had Captain Brito in his back pocket." He and some colleagues finally decided to speak with Employee thinking that, after that, Employee wouldn't use so much profanity and chastise them so much, but it didn't do any good.

### Investigator Gregory Johnson, Member of the Environmental Crimes Unit (Transcript Volume II , Pages 324 – 369)

At the time of the hearing, Johnson had been with the Department for 17 years. His job was investigating "illegal dumping, hazardous waste, things of that nature." Johnson recalled that Employee undertook supervision of the Environmental Crimes Unit in 2001, met with the unit once and then supervised them from another location with on-site supervision provided by another officer.

Investigator Johnson's only personal meeting with Employee was about a disciplinary matter three or four months after Employee arrived. Johnson requested emergency leave but Employee served him with notice that he was being charged AWOL.

Johnson said that he heard Employee use profanity in general conversation, "Just talking, I mean in passing, maybe say "fuck" or "mother," "shit." Johnson heard other supervisors use profanity but not directed at any one person. He found it degrading when such language was directed at an individual. Johnson acknowledged that Employee never used profanity when speaking directly to him.

Johnson described how he heard from his colleagues that Employee used profanity to refer to him and others in his unit:

> Every time I used to see the guys from the Warrant Squad, which would maybe be almost on a daily basis . . . they would come back and say things to me about how he was referring to us as 'motherfuckers' and, 'I'm going to get these motherfuckers,' 'I'm going to fuck them up on . . . ,' this and, ' . . . fuck them up on . . . ,' that." "He'd refer to us as like "fucking mopes" and other stuff. Johnson understood mope to mean "lazy and shiftless."

He named Detective Gaitling, Detective Chung, Detective Britt, Detective Bush as the officers who told him what Employee said.

Johnson called Employee on the phone and confronted him about calling him a "motherfucker." Employee denied saying it and asked who told Johnson that. Employee told him, "I'm going to do an investigation and find out what's going on." After that, the entire unit was convened as a unit and Employee was present. Johnson said that "it was just

a sit-down and hope we all can get along meeting" with no clear agenda or outcome. Johnson met separately with Captain Brito and Captain Reese to report what he had heard. Johnson and some of the other unit members prepared written statements against Employee when Detective Bonacorrsy asked them to provide documentation of their complaints.

Johnson also heard Employee speaking ill of other employees. Once, when Johnson lost an ID folder, Randy Squires, in his capacity of acting sergeant, prepared a report. Johnson was working with Lieutenant Lorraine Kittrell to finalize the report when Employee said, "Is he [Squires] that fucking incompetent that he can't do a PD-43?" Lieutenant Kittrell looked at him and said, "His mouth is going to get him in trouble one day."

Johnson explained that part of his job was to compel compliance with notices of violation issued by the Department of Public Works and address failures. Arrest was one mechanism used to address violations. Johnson said that his record of arrests was on par with everyone except Paul Kurgan who "worked 24 hours a day."

## Detective Mary Bonacorrsy of the D.C. Metropolitan Police Department Intelligence Section (Transcript Volume I, Pages 129 – 190)

Detective Bonacorrsy met Investigator Wai T. Chung when he was detailed to the Intelligence Section and they worked together on the International Monetary Fund (IMF) assignment. Investigators come every year to the IMF and different units help monitor the demonstrations. Investigator Chung was her partner for the demonstration in April, 2003. They rode together to "monitor the bridges" and take note of "any unusual activity that was occurring by the demonstrators" so that they could report it.

Bonacorrsy also served as Secretary for the Fraternal Order of Police ("the FOP" or "the union"). She said that, at the end of their tour of duty, Chung saw her in the hallway and asked to talk to her about the overtime request that Employee denied. She noted that they had "all received overtime pay for the detail." She explained that he had the option of an informal meeting rather than filing a grievance immediately.

Employee agreed to meet with Bonacorrsy and Chung in his office. Detective Bonacorrsy verified that Chung had worked that day. However, Employee responded that he was not going to sign for Chung's overtime pay. Bonacorrsy did not recall a lot of conversation between Employee and Chung at the meeting. After asking Chung if he would be comfortable if she left them together, she returned to her office. She went back when she remembered that she needed to give Chung her contact information so that he could pursue the grievance process if he chose to.

Employee's office, while sized like an average room, was designed like a cubicle. The walls did not reach the ceiling. As she opened the door, she heard Employee saying to Chung, "You went to the fucking union," and "I can't believe you went to the fucking union. You went to the fucking union," "fuck," "fuck," "fuck," a lot of "fucks." Bonaccorsy was shocked and appalled. It "sounded like he was chastising him and like it was degrading to me." She was also embarrassed because she had never heard an official speak that way to someone below his rank, "I just couldn't believe it." The tone he was using was angry rather than the professional tone he used in their earlier meeting.

Detective Bonacorrsy became concerned that the situation would escalate and went to get help. She explained, "When I hear that type of language, it usually escalates and turns into a fight, in my experience, whether it was on the streets or between two employees." She went to get Captain Victor Brito, her immediate supervisor, and urged him to hurry with her, but when they got there, it was over. She continued, however, in an excited and loud tone, to try and explain what had happened. She said Employee "may have said something to me about my voice being loud or I'm loud, but again, I'm a loud person and especially if I'm excited, my voice may elevate." Captain Brito told her to calm down.

Detective Bonacorrsy said that Employee was her supervisor for roughly two years or so and she had no previous negative experiences with him. However, she did hear, from Detective Thomas Sydnor, the Executive Steward of the Fraternal Order of Police, that Employee intended to file an insubordination complaint against her. Employee approached her "a day or so after the meeting" with Detective Chung and Captain Brito outside of Headquarters" to discuss it, saying to her, "Well, I understand you're going to file a complaint against me . . . Well, I'm not going to file a complaint against you . . . Truce." She understood him to be saying "You drop your complaint against . . . me and I'll drop my complaint against you." Bonacorrsy said that she did not consider the threat of an insubordination charge seriously because she did not think she did anything wrong when she met with Employee in her capacity as a union representative.

The Detective was asked if she ever called Lieutenant Atcheson "Hitler." She acknowledged having told Employee "You cannot run a unit by intimidation and fear," in front of Captain Brito. She was also questioned about a variation difference in the number of times to which she testified that Employee used the word "fuck" in a report that she wrote in 2004 and her live testimony. In the report, she said that he used the word "two or three times." She acknowledged the difference and conceded uncertainty about the length of the incident and the distance she traveled between offices.

Detective Bonacorrsy was also questioned about her involvement in the EEO complaint against Employee. She acknowledged that she was aware of that union investigation before the incident with Chung. She processed several complaints from Employee's supervisees. Because there were constant issues in Employee's unit, she thought she should report it.

### Investigator Wai Tat Chung, Member of the Warrant Squad (Transcript Volume II, Pages 369 – 448)

Investigator Chung testified that, between the years of 2000 and 2004, he was assigned to the Warrant Squad under Employee's supervision. Employee met weekly with the Warrant Squad and Chung heard him use profanity "[v]ery frequently." For example, when Corporal Garcia would ask a question, Employee might respond, "You stupid . . . ," "F[uck]," "Can't you get this straight? Let the other members of the unit tell you because I ain't going to say it again." Chung also heard Employee refer to Garcia as a "[d]umb ass." Employee berated Corporal Garcia pretty badly when he came to make an arrest with a folder in his hand. Employee told him his actions were not tactically sound and said, "You

1601-0055-06
Page 11

dumb ass, why did you bring this with you? Where are you going to put it? I ain't holding this for you." Chung described Employee's approach as "degrading."

Chung also heard Employee speak profanely about members of the ECU saying "Those dumb asses can't investigate, they're not doing their work, they're not carrying their weight." Chung said that when Employee was going to another state to testify against Randy Squires, he said "I'm going to have to tear him a new asshole after I finish testifying . . ." Chung told other employees when he heard Employee speak of them. Chung differentiated between peer-to-peer use of profanity and supervisor-supervisee exchanges.

Chung also heard Employee say, about his deceased mother-in-law, "I've got to go back and kick some dirt over this old lady." He found it upsetting. "Being Asian, I am very respectful to my elders, especially my parents and other people's parents. So when somebody talks poorly about their parents or someone else's parents, it affects me."

Chung recounted a disturbing story that Employee told him about shooting a dog:

> This dog had gotten old and was no longer useful, so he went and got a gun and came back and shot the dog. And the thing was that he got a small caliber gun, so the dog was not killed after the first shot, so he just kept shooting the dog and shooting the dog . . . In that story he told me . . . I was that dog and I was no longer useful for him in this unit and that I was going to be removed or discarded."

Chung said that he was detailed out of the unit repeatedly.

Investigator Chung presented Employee with a "PD-1130" requesting "30 minutes" of overtime after working on a detail. Employee denied the request saying that Chung reported at a different time than he was supposed to. Chung mentioned the matter to Detective Mary Bonacorrsy after they patrolled together as partners. She came with him, in her capacity as a union representative, to a meeting with Employee where "[t]hey got into a little argument where she just stepped out and left."

Employee called Chung back to his office. Chung said that he "didn't get a chance to say much, it was all one way, like the meetings." Chung recalled that Employee said to him, "I try to help you guys out a lot, all the time giving you leave, and you stab me in the back, you dumb motherfucker, you shouldn't." Employee warned him, "I can make your life a daily hell if you pursue this matter." Chung tried to explain that he was detailed to another unit where he got different reporting instructions for the IMF event. He said that he ended the meeting feeling "raped" and like there was no one to turn to. Chung said that he did not continue to pursue his claim for 30 minutes of overtime.

Chung acknowledged that Employee helped to recover 360 hours of sick leave for him and approved his request to be excused from duty to take a class. However, he said that Employee's support of that request did not change his feelings about his use of profanity.

SUMMARY OF TESTIMONY OF EMPLOYEE'S WITNESSES

**Michael J. Fitzgerald, Executive Assistant Chief of the Metropolitan Police Department (Transcript Volume II, Pages 451 – 461)**

Assistant Chief Fitzgerald testified as the number two official responsible for the day-to-day running of the Police Department. He knew of Employee through daily crime briefings and had contact with him "between two or three times a year up to ten times a year." He had never heard Employee use profanity and recalled that "Acosta [Employee's supervisor] .. had high praise for the Lieutenant."

During his 35 year tenure, he has heard other police officers using profanity and has used it himself when his orders weren't followed. He described an incident in which a uniformed officer had on a jacket intended only for vice officers. He explained calmly the first time, he cursed at the person wearing the jacket:

> At which time then I started addressing the whole command
> staff and at first, I started off with the 'G[od] and the d[amn]'
> and said, 'How many times have I got to tell you this?'
> Needless to say, since that time, no one wears those jackets at
> inappropriate times.

Fitzgerald said it is not common for police officers to use profanity when speaking to those in subordinate positions. He said that the goal of a supervisor is to motivate people not belittle or antagonize them.

**Willie Dandridge, Assistant Chief of the East Region, the Sixth and the Seventh Districts in Ward 7 and Ward 8 (Transcript Volume II, Pages 461 – 473)**

Dandridge described the Warrant Squad as "one of the most dangerous jobs on this Department, along with homicide, really." It takes "[e]xtensive training, trustworthiness and diligence." ECU includes arrests when assessing productivity. He explained, "it's my opinion that a police officer must be productive in making an arrest; abatement is a part of it, as well." His "opinion of [ECU] was not very favorable because [he] couldn't get any productivity out of them over in Ward 7." "[W]hen . . . Kurgan and his partner are the only two that are actually abating things, it's a problem."

He determined a lack of productivity by "Community complaints, the same complaints that were never abated or no arrests were made." He also rode the streets for four to six hours per day so that he'd have firsthand knowledge of what was going on.

Assistant Chief Dandridge discussed his concerns about productivity with Employee. Employee said that he "was going to put the hammer down on them for not doing any work." Dandridge warned Employee to be careful of their response. "You know you're about to get set up, because once you make them do something, you're going to have problems . . ."

1601-0055-06
Page 13

Dandridge described the progressive discipline process and said that he was not aware of any case, during his tenure, in which the use of profane language exceeded district level discipline.

## Lieutenant Robert Atcheson, Former Supervisor of the Felony Warrant Squad and Environmental Crimes Unit (Transcript Volume III, Pages 538 – 683)

Employee testified about his professional history prior to and after joining the force. Before joining the MPD, Employee spent four years in the Marine Corps traveling the world on assignment. When he joined the MPD in 1989, he "was assigned to the First District patrol unit for a couple of years." He was then given an opportunity to join the Paternity Warrant Squad as an investigator for one year. After that, he joined the Felony Warrant Squad for the next three years. He was promoted to the rank of sergeant and went to the Sixth District's Patrol Section for about a year and a half. He led the Tactical Unit over there for about the last year, until he was promoted to the rank of lieutenant and assigned to the Second Police District Patrol Division. He remained there for two years and then was reassigned to the Third District Patrol Unit to head up a police service area. After that, he was reassigned as a lieutenant to the Felony Warrant Squad under Commander Jose Acosta. He remained there for three years and ten months, until he was relieved of his command in December of 2003. Employee was detailed through a couple of assignments until he was permanently reassigned to the Sixth Police District. At the time of the hearing, he was serving in the Focus Mission Unit, more commonly referred to as the Vice Unit.

Employee started working with the environmental crimes unit "in February of 2001." The unit was responsible for "investigating and arresting and prosecuting violators of environmental crimes. Typically, 90 percent of the time, that had something to do with folks dumping trash in our city illegally." They "did everything from abate nuisance problems to writing notice of violations . . ." His goal for the officers under his supervision in this unit was to "increase their arrest or closure rate of various problems that they were encountering on the street, various issues, violations of the law, the illegal dumping law." Employee met with the unit monthly for about an hour. He said that he did not use profanity at those meetings. Other than the monthly meetings, he "typically would meet with the sergeant, not the officers."

The greater portion of Employee's time, nearly 80 per cent, was spent on his assignment with the "Felony Warrant Squad." He described training as follows:

> A couple of times a year, we would go down to the FBI Academy and practice everything from investigative techniques, interview techniques, to clearing rooms in a home, practice raiding homes, things of that nature. The Marshal's Service was good about giving us a variety of training, as well. But training was several times a year and we did it all as a unit because of the nature.

A typical work day went like this:

1601-0055-06
Page 14

> We'd come in at 5:30 in the morning. We'd conduct roll call,
> we'd give briefings about the places that we were going to
> raid that morning -- typically, we raided three places -- and
> that usually lasted about 20 to 30 minutes. Then we'd go out,
> we'd raid about three homes a day for the first three or four
> hours, and then I would typically respond back to the office
> to do various administrative matters.

Employee said that profanity was used "casually in the general course of conversation . . .
but I wouldn't say it was typically used, no." "I mean you may say, 'Hey, man, what the fuck
are you doing,' you know . . . "

Lieutenant Atcheson described the "folder" incident with Corporal Garcia:

> I looked over at Corpy and he's got both of his hands on a
> manila folder, what we call a case jacket, it's a manila folder.
> And he's the first one in the door and realized, obviously, that
> his hand should have, one of his hands should have
> contained a gun and the other one should have contained a
> flashlight, we're going into a dark apartment. That was just
> against everything we've ever been taught to do with respect
> to our training and whatnot. And after the raid, after we got
> everything settled down, we got the guy hand-cuffed, called
> for transport, I met Corpy out by his vehicle . . . And you
> know, I chewed him out, I chewed him out real good. I
> remember saying something to the effect of, 'Corpy, what in
> the fuck were you thinking?' And that startled him, woke him
> up, got him to not do it again . . . It never happened again . . .
> thank God.

Employee testified that when he felt that Garcia was not putting forth the effort he should
have been to locate the subject of a warrant, he spoke to him about. At a meeting,
Employee said, "You know, you don't want me chewing you a new ass next week during this
meeting if you ain't got him located by that time.'"

Employee knew, because the walls of his office were partially open, that his
conversations with "[v]arious sergeants, the captain, commander, assistant chief . . . " could
be heard by others. He said things about his supervisees like "I've got to get these guys off
their ass" or "His problem is his supervisors, you know, let him get by with murder," "I
can't believe the fucking guy is lazy, or something to that effect." He said that "things like
that would not be real uncommon for me in describing my dissatisfaction with people who
were not performing." His counterpart with the Department of Public Works, David Dyer,
complained to him about the officers in ECU.

Atcheson recalled that he called Gaitling while he was convalescing from a gunshot
wound to "ask him how his wife was doing, how his kids were doing, what kind of grades
they got, how he was doing, what kind of pain he was in, just things of that nature. They
were pretty short conversations." He denied using any profanity.

1601-0055-06
Page 15

Employee said that Investigator Chung presented him with a form requesting 30 minutes of overtime explaining that he thought Employee told him to get to work at 5:30. Employee responded, "No, I told you and your 30 coworkers to be here at 0600, not 0530." Employee told Chung that he would not give him the time because he didn't authorize it. At the end of the meeting, Chung said that he felt that he was still entitled and said that he would be consulting a union rep.

A few minutes later, Detective Bonaccorsy "came storming" into his office with Ivestigator Chung and "insisting in a very loud tone" that Employee sign the form. As Employee tried to explain his position, "she just kept getting louder and louder." Employee and Chung tried to get her to calm down. And at one point, Bonaccorsy said to him, "You're just like fucking Hitler, you rule by fear and I'm not afraid of you." He ordered her to leave his office and escorted her out.

A little later, Employee, Captain Brito, Investigator Chung and Detective Bonaccorsy gathered in Employee's office. Brito also told Bonaccorsy to calm down as she began to scream at him that Employee was being uncooperative. She was "just being extremely disrespectful and insubordinate." Bonaccorsy left the office angry and, using a nearby phone, called the union. She continued to scream into the phone

Later, Chung came back to Employee's office and asked to talk to him about their working relationship. Chung told Employee that he had been "fucking him" because he detailed him "across the street to work with the Marshal's Service and various other issues." Employee reminded Chung that he helped him to get 365 hours of overtime or sick leave reinstated, which greatly assisted him with taxes. Atcheson said that he also allowed Employee to shift his entire tour of duty on numerous occasions to attend college because he thought that Chung's goal was admirable. He also tried to explain to Chung that his decision to detail him to the Marshal's Service was not based on whether he personally liked him, but on his lack of zest and productivity within the Warrant Squad.

Employee acknowledged that he cursed at Chung. "When he first came into the office, I remember shaking my head and saying, 'Chung, what in the fuck are you doing going to the union over 30 fucking minutes of comp time that you weren't even authorized to receive?'" Employee said that their meeting ended amicably with them shaking hands. His recollection was that both he and Chung "said a few curse words" but neither of them was disrespectful to the other.

Atcheson said that he did try to file a complaint about Bonaccorsy with Brito but was told that her behavior did not rise to an actionable offense. When he ran into Bonaccorsy later, he reached out and shook her hands and said, "Look, I hope there's no hard feelings about our conversation the other day.

Employee generally denied that the members of his squads complained about him and his language. However, he did recall that Johnson called him on the phone to confront him about calling him a "motherfucker." Employee said that he never made the comments about his mother-in-law that were attributed to him.

Employee testified about his history of meetings with Paul Kurgan. He said that he met with him once, as he did with all members of ECU to discuss their individual performance and productivity. On other occasions, he met with Kurgan briefly to respond to work requests and inquiries.

## OTHER EVIDENCE

This Judge also allowed into the record of this matter the prior sworn testimony of Commander John Barrett, Commander Michael Anzallo and Investigator Corpus Garcia at the Trial Board hearing of this matter. Employee presented his performance evaluations for the years 2001 through 2004. The record also contains various documents presented through the testimony of witnesses including, *inter alia,* internal agency rules, regulations and guidelines.

## FINDINGS OF FACT

Agency alleges that Employee, while supervising the Warrant Squad's Special Investigations Branch and the Environmental Crimes Unit, regularly used profanity and an unduly harsh tone when speaking to his subordinates. Agency also alleges that Employee spoke inappropriately to a supervisee, Wai Tat Chung, when Chung presented him with an overtime request.

Employee denies these allegations. Employee maintains that he was a good leader who was supportive of his squad. He characterizes those who made claims against him as unhappy employees who resented his efforts to increase their productivity. According to him, he had infrequent direct contact with those who lodged complaints against him and, they had little opportunity to observe his behavior. Employee also contends that the complaints should be given little merit because they waited so long to report them.

Commander Cheryl Pendergrast, the commanding officer of Agency's training academy, testified that officers at Agency are trained in how to address one another properly. She acknowledged that peer to peer profanity is tolerated when two employees are comfortable communicating in that way. However, she was clear that it is considered unacceptable for a superior officer to curse at a subordinate one. Officer Porter, Director of Agency's Disciplinary Review Division, testified that Agency has a history of disciplining officers who use profane language inappropriately.

Investigator Gaitling testified that he heard Lieutenant Atcheson speak profanely and degradingly to other employees. Gaitling recalled that other members of the unit used profanity but distinguished it as casual conversation rather than delivering insults. He testified that, in a phone conversation with him, Employee spoke in a degrading way about another employee. He also heard Atcheson speak disparagingly of his own family members.

Investigator Johnson acknowledged that Lieutenant Atcheson never addressed him directly using profanity. Employee noted that Investigator Johnson did not testify that Employee used profanity during meetings. However, he testified to hearing Employee use profanity "in passing, maybe say 'fuck' or 'mother,' 'shit,' certain stuff like that . . . but not

directed toward anyone in particular, just in general conversation." He said that he was told by colleagues that the Lieutenant called him a profane name and confronted Employee about it.

Investigator Chung testified credibly that he heard Employee use profanity very frequently in meetings and when scolding employees for work deficiencies. He noted the incident with Corporal Garcia in which Lieutenant Atcheson became angry with him for carrying a folder to make an arrest and cursed him out. Chung also heard Employee speak in an insulting way about his family and repeat to him a disturbing, violent story that caused Chung to be uneasy because he understood it to be, in metaphor, a threat to his professional presence.

Employee denied the claims that he cursed at meetings saying, "[A]s a general course, I don't curse. When I hold a conversation, in most of my meetings, I do not curse." However, Employee did acknowledge that "[i]n the Warrant Squad in particular there was casual cursing . . . by everybody, I mean everybody cursed . . . except Robert Bush." In general, Employee attributed this to the "stress level" for Warrant Squad operations.

Employee also acknowledged cursing about his employees when he did not think they were working up to their ability. Employee maintains that he was just expressing dissatisfaction with employee performance and trying to motivate his squads and repair their reputation as low performers. Employee quotes Commander John Barrett who described him as a "performance-based supervisor who was all about getting the job done." According to Barrett's Trial Board testimony, over 3 years time, he and Employee had many conversations about the members of the Environmental Crimes Unit in which Atcheson expressed that they were "not working up to their ability and were not performing the functions that he had set out for them to do." Employee maintains that he was responding to external complaints including those from Assistant Chief Alfred Broadbent, from the Department of Public Works (DPW), and from the Deputy Mayor's Office.

Commander Michael Anzallo, before the Trial Board, described Employee as a "hands-on supervisor" who was an "excellent police official … very professional, very dedicated . . . day or night . . ." Anzallo acknowledged that Employee used profanity, "in private between him and I." Employee also conceded that a phone conversation might include saying 'the fucking guy is lazy,' or something to that effect . . . would not be real uncommon for me in describing my dissatisfaction with people who were not performing."

Employee also asserts that complaints of his behavior were exaggerated, stating that sometimes one remark he made might be repeated several times. He explained that if, for example, he said the work "fuck" on the phone to a superior or sergrant and it was repeated ten times, it doesn't mean he said it ten times. Employee also remarked that cursing "needs to be taken in the context that it is a litany filled with exaggeration, with no specific dates or occasions." Employee noted the hostility of some of the witnesses against him. Employee also contends that the complaints are not valid because the employees waited so long to make them.

It is true that witnesses could not often remember the specific dates on which Employee made objectionable remarks. However, it is not reasonable to think that they

would. Behavior is only noted as a pattern when it has occurred over a period of time. By the time the pattern is established several incidents have already occurred. Therefore, this Judge will not discredit the testimony of any witness for being unable to remember the specific dates on which they heard Employee speak inappropriately. This Judge also does not find that any witness was motivated by hostility toward Lieutenant Atcheson to lie about what happened. And the record shows that Johnson did approach Employee with a complaint. Agency cited testimony of Corporal Garcia from the Trial Board transcript asking the Lieutenant why he cursed at their meetings. According to Garcia, Employee said "Yeah, my wife tells me the same sometimes. I'm supposed to stop cursing, but it is not below me." Ultimately, several of Atcheson's supervisees filed formal complaints against him for a pattern of behavior observed over the course of years.

In addition, Employee's testimony justifying his actions does not outweigh the voluminous and consistent statements that Employee, with regularity, spoke inappropriately to his supervisees. While that is an admirable goal for a manager to set high standards for his supervisees' performance and encourage productivity, the negative reinforcement that he used is not sanctioned by any agency rule, regulation or guideline. In fact, the use of profanity is a form of discourteous treatment that is expressly disallowed.

It is common for some adults to use profane language in casual conversation with their peers. The testimony of record supports a finding that this behavior is part of the culture of the MPD. However, the use of insulting language phrased with profane words in scolding a supervisee or describing him or her to others is not comprehended by that cultural expectation. This Judge finds as a fact that Employee used inappropriate language as charged when speaking to and about his supervisees.

Employee also sought to prove that the officers who spoke against him had ill motivations. He asserts that Bonacorrsy lied about hearing him curse at Chung to deflect attention from the adverse action that she believed he was going to take against her for insubordination. The evidence, however, does not support that finding. This Judge is not convinced that she feared insubordination. Even assuming, for the sake of argument that she did, her testimony that she heard Employee curse at Chung was firmly supported by Employee's own admission. Chung testified credibly that, to his chagrin, his efforts to gain approval of a request for overtime were met with anger expressed with profane comments by Employee. Employee scolded Chung, a supervisee, inappropriately for making a proper request for overtime. The testimonial evidence from Chung, Mary Bonacorrsy and even Employee support this finding.

This Judge also finds that Employee spoke inappropriately to Investigator Wai Tat Chung. Chung himself testified credibly that Employee cursed at him in anger after Chung reported a dispute over overtime pay to the Detective Mary Bonacorrsy in her capacity as a union representative. This conclusion does not go to whether the request should have been granted- - -only to Chung's right to approach his supervisor and ask for it and to consult a union representative when he felt that it was wrongly denied. No employee should be made to feel insulted or professionally threatened for handling a work matter in accordance with appropriate protocol. This Judge finds as a fact that Employee used coarse and profane language while addressing Investigator Wai Tat Chung.

Employee also offended others at the workplace by speaking disparagingly of his family. While he denied it, the cumulative evidence supports a finding that he did. While it is

certainly Employee's right to have negative feelings about his family and to express them under appropriate circumstances, spewing negative commentary about one's personal concerns in front of others is no way to create an appropriate work environment. As a leader, Employee's obligation was greater than any one else's to set an appropriate tone.

## ANALYSIS AND CONCLUSIONS

Employee maintains that, even if this Office finds as a fact that he acted as alleged, his behavior did not rise to the level of an actionable offense. Employee also contends that any acts imputed to him should be merged into one specification rather than characterized as a pattern of behavior and addressed with a penalty commensurate with the lesser offense.

As noted in DC Government Personnel Regulations, Section 1603.5, (Chapter 16, Part I), "No employee may be subject to a corrective or adverse action under this chapter for a *de minimis* violation of the cause standard contained in this section."  "Cause" is defined in DC Government Personnel Regulations, Section 1603.3 (Chapter 16, Part I), as follows:

> For the purpose of this chapter, "cause" means a conviction (including a plea of *nolo contendere*) of a felony at any time following submission of an employee's job application; a conviction (including a plea of *nolo contendere*) of another crime (regardless of punishment) at any time following submission of an employee's job application when the crime is relevant to the employee's position, job duties, or job activities; any knowing or negligent material misrepresentation on an employment application or other document given to a government agency; any on-duty or employment-related act or omission that the employee knew or should reasonably have known is a violation of law; any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations; and any other on-duty or employment-related reason for corrective or adverse action that is not arbitrary and capricious. This definition includes, without limitation, unauthorized absence, negligence, incompetence, insubordination, misfeasance, malfeasance, the unreasonable failure to assist a fellow government employee in performing his or her official duties, or the unreasonable failure to give assistance to a member of the public seeking services or information from the government.

Employee's actions violate both the letter and the spirit of Agency's regulations pertaining to communication between employees. Employee knew or should have known that continuously berating his supervisees directly and indirectly by talking about them to one another was unacceptable and an actionable offense.

It is the finding of this Judge that Employee committed acts unbecoming to his position by acting discourteously toward other police officers. Rather than casually using profanity in peer to peer conversation, Employee cursed at and insulted supervisees in a twisted effort to motivate them to greater productivity. Employee also cursed at an officer who, acting within his rights, approached him with a complaint in the company of a union

representative. Agency has met the burden of proving that Employee committed the acts alleged and they do amount to actionable offenses that are not of a *de minimus* nature.

## PENALTY

Employee refers to his record as a commended veteran with consistently high performance ratings in support of his request that this Office order Agency to reverse the penalty. The legal standard for the appropriateness of a penalty was established by the Merit Systems Protection Board in *Douglas v. Veterans Administration*, 5 MSPB 313 (1981). In *Douglas* the MSPB set forth a list of factors to be considered when assessing the appropriateness of a penalty. *Douglas*, at 331-332. The reasoning and factors established in *Douglas* have been adopted by the District of Columbia Court of Appeals in *Stokes v. District of Columbia*, 502 A.2d 1006 (D.C. 1985). The Court in *Stokes* stated:

> Review of an Agency imposed penalty is to assure that the Agency has considered the relevant factors and has acted reasonably. Only if the Agency failed to weigh the relevant factors or the Agency's judgment clearly exceeded the limits of reasonableness, is it appropriate...to specify how the Agency's penalty should be amended. *Stokes*, at 1010.

The penalty of a thirty day suspension falls within Agency's Table of Penalties for a first offense of conduct unbecoming an officer. It also reflects a fair consideration of the *Douglas* factors.

Employee was given the following performance evaluations during the period of time from 2000 to 2004:

- FY – 2000 (10/1/99 – 9/30/00). Rating of 47 out of 50, an Outstanding rating, by Capt. Alton Bigelow.
- FY-2001 (Evaluation to 9/30/01). Rating of 4 out of 5, Exceeds expectations rating, by Capt. [Victor] Brito.
- FY – 2002 (10/1/01 – 9/30/02). Rating of 5 out of 5, Significantly exceeds expectations rating, by Capt Brito.
- FY – 2003 (10/1/02 – 9/30/03). Rating of 5 out of 5, Significantly exceeds expectations rating, by Capt. Brito.
- FY – 2004 (10/1/03 – 9/30/04). Rating of 4 out of 5, Exceeds expectations rating, by Capt. Michael Reese

Excerpts from Employee's performance evaluations indicate that he was rated highly for his integrity and trust, his professionalism, and his approach to teamwork, as well as his leadership and commitment to the job.

Employee earned the following commendations during the period from 2000 to 2004:

- 5/5/04    Commanding Officer's Commendation / Unit Commendation
  (Signed by Capt. Robert Contee)

Employee noted that an excerpt from the commendation stated:  "The rapport that has developed between the violent Crimes Branch detectives and members of the Warrant Investigation Section [Employee's squad] has demonstrated that working together the homicide closure rate will increase in calendar year 2004."

- 1/13/03    Commanding Officer's Commendation / Individual Commendation
  (Signed by Comm. (then - Capt.) Michael Anzallo)

Employee noted that an excerpt from the Commendation stated:  "[Y]our hard work and contributions were realized in a 10% increase in the closure rate for homicides ... and a 14% increase in arrests for homicide from 2001 – 2002 . . . .  I realize that you have made significant personal and family sacrifices during the past year in order to achieve these results.  All members of the department should emulate your professionalism and dedication to duty."

- Undated (c. 2002)  Department Commendation
  Signed by Asst. Chief Alfred Broadbent

- 1/14/02        Unit Citation
  Signed by Chief Charles Ramsey

- 10/21/02      Letter to Employee from Chief Charles Ramsey
  Department Unit Citation Ribbon award (to Warrant Squad)

Neither Employee's record of performance or commendations negates his history of discourteously addressing his supervisees.  Agency presented evidence that the discipline meted out to Lieutenant Atcheson was well within the range of that prescribed and of other penalties imposed in similar circumstances.  Employee suggests that, because he has a stellar record that includes several high ratings and commendations, the penalty is too harsh.  Employee, as a high-ranking official with a strongly visible presence, was bound to maintain an exemplary manner of communication with his subordinates.  No matter how strongly he performed in his other duties, he cannot be excused from that one.  Even an outstanding performance of one or more of one's duties does not excuse an employee for severely failing in another.

Having established that cause exists to discipline Employee, I find that the thirty day suspension is appropriate and warranted in this case to maintain discipline as well as the efficiency of the service and the integrity of its police officers.  In fact, a thirty day penalty for Employee's pattern of discourteous treatment over a period of years strikes this Judge as a moderate consequence of a highly offensive pattern of behavior that clearly impacted the morale of his supervisees.  This Judge fully acknowledges Employee's high level of

1601-0055-06
Page 22

commitment and productivity as reflected in his record. But the Agency's decision to impose a thirty day suspension in this matter was neither arbitrary nor capricious and therefore, should not be disturbed.

<u>ORDER</u>

It is hereby ORDERED that Employee's suspension is UPHELD.

FOR THE OFFICE:

SHERYL SEARS, ESQ.
ADMINISTRATIVE JUDGE

# wai.chung

oea%20r[1].%20atcheson.pdf
07-09-24  10:31

