Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 30

4 investigators with the intention of expanding the Warrant Squad to 12 investigators (Attachment 3).

***Performance Evaluation.*** Lieutenant Atcheson denied influencing or ordering Sergeant Darley to lower the performance ratings of everyone in the Warrant Squad. Lieutenant Atcheson had no influence on Sergeant Darley's rating of his subordinates (Attachment 3).

Lieutenant Atcheson stated that he was not sure if Sergeant Darley had been in the office for at least 90 days when he did the evaluations but he thought Sergeant Darley was there for a "reasonable amount of time." Lieutenant Atcheson stated that, even though Sergeant Darley had been in the office for a short period of time when he did the evaluations, Sergeant Darley is "pretty sharp" and capable of doing the evaluations. Sergeant Darley did not give anyone a poor rating. Lieutenant Atcheson considers "Below Average" a poor rating and "Average" a standard rating (Attachment 3).

Lieutenant Atcheson contrasted the performances of Sergeants Darley (W/M) and White (B/M). According to Lieutenant Atcheson, Sergeant Darley was an excellent sergeant, "on a scale of 1 to 10, he's an 11." In contrast, Lieutenant Atcheson described Sergeant White as "intellectually challenged ... he does not have the intellectual ability to fulfill his tasks" (Attachment 3).

As example of Sergeant White's inability to complete his work assignments, Lieutenant Atcheson described an occasion when Sergeant White was assisting the Warrant Squad raid a house. Lieutenant Atcheson noticed that the laces on Sergeant White's combat boots were untied and he ordered him to tie them for safety reasons. Lieutenant Atcheson observed Sergeant White bend down and assumed that he tied his laces. Once the operation was concluded, Lieutenant Atcheson observed Sergeant White's laces untied, "which only could lead me to believe that either he did not tie his shoes or he did not know how and that would frankly describe his ability to lead a unit." Based on that incident, Lieutenant Atcheson surmised that Sergeant White was "intellectually challenged" (Attachment 3).

When asked to offer other evidence that Sergeant White was "intellectually challenged," Lieutenant Atcheson stated that Sergeant White has failed to do everything that he has asked him to do. According to Lieutenant Atcheson, Sergeant White is incapable of doing reports. Sergeant White would give him reports on diskettes to edit them. If he had to rank Sergeant White's performance on a scale of 1 through 10, Lieutenant Atcheson would rank him 2 (Attachment 3).

When asked if he every counseled Sergeant White, Lieutenant Atcheson stated that he never counseled him in writing. Lieutenant Atcheson considered that "a waste of time." According to Lieutenant Atcheson, he counseled the previous official, Sergeant Muslim twice a week for 1 ½ years and "the only thing it did was got him promoted" (Attachment 3).

Lieutenant Atcheson was asked if he threatened Sergeant Muslim because he did not agree with his rating of members of ECU. Lieutenant Atcheson was informed of Sergeant Muslim's allegations that, after he rated Investigators Squires, Johnson and Kurgan "Above Average", Lieutenant Atcheson told him to lower those ratings and give Investigator Kurgan only an "Above Average" rating. Sergeant Muslim alleged that Lieutenant Atcheson told him that if he did not lower the ratings, he would lower Sergeant Muslim's performance rating (Attachment 3).

Lieutenant Atcheson denied threatening Sergeant Muslim that he would lower his rating if he did not comply with his directive to change the ratings of ECU members. Then Lieutenant Atcheson stated that he told Sergeant Muslim "something that he may have thought I was getting at." According to Lieutenant Atcheson, he questioned Sergeant Muslim's rating of Investigator Kurgan. He asked Sergeant Muslim how he could give Investigator Kurgan, who arrests hundreds of people, the same rating as people who arrest 3 people a year. Sergeant Muslim defended his rating as based on the number of citizen complaints made against Investigator Kurgan. Lieutenant Atcheson told Sergeant Muslim that Investigator Kurgan received so many complaints because he locked up so many people. Lieutenant Atcheson also told Sergeant Muslim that if he did not correct Investigator Kurgan's performance rating, then he "would have to hit his (Sergeant Muslim's) performance evaluation." Lieutenant Atcheson stated that Sergeant Muslim's rating of Investigator Kurgan was "grossly negligent and I made that part of his performance evaluation." According to Lieutenant Atcheson, Sergeant Muslim was a "piss poor rater, next to Louie White, he's gotta be one of the most incompetent people" (Attachment 3).

It was pointed out to Lieutenant Atcheson that he permitted Sergeant Darley to rate his subordinates with no input from him even though Sergeant Darley had limited time to evaluate them but he threatened Sergeant Muslim's performance evaluation because he disagreed with his rating of Investigator Kurgan. Lieutenant Atcheson agreed there was a discrepancy but explained that he disagreed with Sergeant Muslim's reasoning and the factors he based his performance evaluation on, i.e., Investigator Kurgan's complaints (Attachment 3).

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 32

When asked what standards he used to evaluate employees, Lieutenant Atcheson responded that it depended on the unit. He evaluates employees based on several factors. The first factor is numbers and quality of arrests, i.e., legal valid arrests that make good cases. The second factor is dependability, i.e., being able to rely on them, doing callbacks. Investigator Kurgan gets high marks in both factors. According to Lieutenant Atcheson, on a scale of 1 through 10, the other members of the ECU "are not even a 1" (Attachment 3).

Lieutenant Atcheson stated that he evaluated members of the Warrant Squad based on the quality of their investigations, i.e., he expected diligent and professional work product; and, their dependability. According to Lieutenant Atcheson, the best performers, such as Investigators Reese and Vasquez locked up the fewest number of people while the poorest performers, such as Investigators Bush, Garcia and Chung, locked up the largest number of people (Attachment 3).

When asked if complete, quality investigations would lead to more lockups, Lieutenant Atcheson responded "no." According to Lieutenant Atcheson, the more difficult cases go to more experienced, better investigators such as Investigators McFadden, Reese, Britt and Vasquez. Some fugitives can be evasive by sleeping in a different place every night and switching cell phones every 3 days. He could not give those cases to Investigators Bush, Chung or Garcia. Lieutenant Atcheson stated that "you must really want to get those guys" which meant working weekends, working overtime, responding to callbacks (Attachment 3).

According to Lieutenant Atcheson, catching the more evasive fugitives takes a more responsible person and those three were not capable. Investigator Garcia responded to callbacks but Investigators Chung and Bush always made excuses for not responding. Investigator Chung typically went to school at night or on weekends. Additionally, he lives with his parents who are in need of care. School and family obligations are Investigator Chung's usual excuses. Lieutenant Atcheson called Investigator Bush to respond to a callback while he was working his part-time job at Union Station and he said he could not come because he had to go to church. Investigator Bush is a deacon in his church. According to Lieutenant Atcheson, Investigators Chung and Bush always offered excuses for not responding to callbacks and "that's why they don't get some of the perks I mentioned earlier" (Attachment 3).

When asked to clarify his meaning of a top performer, Lieutenant Atcheson described that person as someone who gets the most difficult cases and conducts more complete investigations. Lieutenant Atcheson stated that person would not have a lot of easy cases even though they might have a lot of lock-ups. Lieutenant Atcheson stated that when Sergeant Darley gets an easy

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 33

case, he gives it to Chung or Bush. Lieutenant Atcheson stated that the easy cases are "dummied down" i.e., the targets are easy to find, such as people who are more likely at their mother's house. Lieutenant Atcheson stated that when Sergeant Darley gets a tough case, he gives it to Investigators Britt, Vasquez or Reese (Attachment 3).

When asked to define a difficult case, Lieutenant Atcheson gave the example of a recent case assigned to the unit that involved 4 targets. Lieutenant Atcheson stated that the sergeant paged everyone in the unit, however, only 3 people responded. Lieutenant Atcheson stated that 4 different locations were set up and members maintained surveillance of the targets for 3 days, often working overtime. Lieutenant Atcheson stated that this was a high profile case, the kind of case that he would give to Investigators Reese, Britt or McFadden. Lieutenant Atcheson stated that this was not the kind of case he could assign to Investigators Bush or Chung, "too much church meetings, school" (Attachment 3).

Lieutenant Atcheson was asked when was the last time he gave a case to one of the people he stated could not handle complex cases. Lieutenant Atcheson responded with the example of Investigator Chung. About 9 months ago, Investigator Chung was assigned cases that he could not solve. Members of the Marshall's Service kept calling the Warrant Squad office asking if they could work the case. Lieutenant Atcheson agreed to let the Marshall's Service members work on the case and they found the fugitive in 2-3 days (Attachment 3).

Lieutenant Atcheson stated that some members of the Warrant Squad are less talented. When asked if he has documented this, Lieutenant Atcheson stated that he had not. Lieutenant Atcheson admitted that he could counsel members who perform poorly, however, he stated that he supervises approximately 30 people and he does not have the time to write 62Es on everyone. For an extended period of time, no sergeant was assigned to the Warrant Squad. Lieutenant Atcheson stated that he is a lieutenant and he is not supposed to do 62Es (Attachment 3).

When asked how he makes a determination that someone has improved their performance if he always gives the more complex cases to members he considers his top notch investigators, Lieutenant Atcheson stated that some people, like Investigator Britt, have gotten better. Lieutenant Atcheson stated that he has worked with these people for years and he knows their capabilities. He is not going to give them difficult cases because he is accountable to Chief Ramsey and Executive Assistant Chief Fitzgerald (Attachment 3).

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 34

Lieutenant Atcheson admitted that several members should not be in the unit. Lieutenant Atcheson stated that he has taken no steps to replace people who cannot handle the more difficult cases because "it is difficult to get rid of these guys." As example, Lieutenant Atcheson pointed to Sergeant Muslim. He wrote approximately 7 inches of paper on Sergeant Muslim, including 62Es, Official Reprimands, etc., and "nothing happened" (Attachment 3).

**Retaliation.** Lieutenant Atcheson was presented with the allegation that after the complaint was filed he made the statement that he was getting an attorney and he would "get" the guys who filed the complaint against him. Lieutenant Atcheson denied making that statement directly or any statement to that effect. When told that there were witnesses to him making that statement, Lieutenant Atcheson admitted that he might have said something that sounded like retaliation. Lieutenant Atcheson stated that the words he chose were that he intended to get an attorney and "deal with this the way it should be dealt with." According to Lieutenant Atcheson, "I can't tell people how to think but it could probably have been easy to be interpreted like that but that was not my intent. My intent is to follow this through and make sure things are done the way they are supposed to" (Attachment 3).

**General Comments.** Lieutenant Atcheson was asked about the current situation where Investigator Kurgan and his wife work together as partners. Lieutenant Atcheson stated that he saw a conflict of interest in the beginning, but then "someone in the chain of command" told him that they work well together. Lieutenant Atcheson stated that he was told that they do more working together than other investigative teams. Lieutenant Atcheson stated that he was told that, if he was considering reassigning them, he should think about their performance "before you piss them off" (Attachment 3).

Lieutenant Atcheson complained about the complaint process. According to Lieutenant Atcheson "so far this has been handled kind of odd." Short of sexual harassment and hostile work environment complaint, members have an obligation to handle this type of complaint in an informal manner. In this case, members did not use the chain of command and went directly to the EEO office. According to Lieutenant Atcheson, that is the wrong procedure (Attachment 3).

Lieutenant Atcheson stated that the complaint was "absolute garbage." According to Lieutenant Atcheson, his words and actions have been "twisted to get rid of me because I require people to come to work and do their J-O-B." Lieutenant Atcheson offered his opinion that he has been singled out because of his skin color. According to Lieutenant Atcheson, the complainants got together to play the race card against him. Lieutenant Atcheson stated that he does not know of anyone who has been removed from their command after a

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 35

hostile work environment complaint was filed against them. Lieutenant Atcheson stated that this complaint has nothing to do with his treatment of his subordinates or their work environment because he always treats them fairly (Attachment 3).

Lieutenant Atcheson indicated that, during his tenure, he has had Captain Brito's unconditional support. Lieutenant Atcheson stated that, on several occasions, members have complained to Captain Brito about actions he has taken. Lieutenant Atcheson stated that Captain Brito has counseled him or attempted to mediate the dispute. Although Lieutenant Atcheson admitted that some of the members had legitimate complaints, he dismissed them as evidence of these members resistance to change. Lieutenant Atcheson stated that it is difficult for members who have worked in the Warrant Squad for 12 years to tell them that he cannot get overtime now when they were used to getting overtime before. Lieutenant Atcheson stated that once he explained to Captain Brito what he did and why he did it, Captain Brito "concurred with everything I've done and I'm justified with everything I have done" (Attachment 3).

### Statement of Sergeant Kathryn Hammond (W/F), Major Violators Unit, SIB.

Sergeant Kathryn Hammond was interviewed on June 3, 2004 by this writer and Agent Greg Wells at the Office of Internal Affairs. Sergeant Hammond stated that she has been a member of the Department for 20 years. Sergeant Hammond stated that, since April 11, 2004, Lieutenant Atcheson has been her direct supervisor. Sergeant Hammond stated that, since March 29, 2004, she has been Ms. Bryant's direct supervisor. Sergeant Hammond stated that Ms. Bryant had been detailed to OSD from Major Narcotics and was returned to that unit on May 30 because OSD no longer had need for her skills. Sergeant Hammond stated that she has a strictly professional relationship with Lieutenant Atcheson and Ms. Bryant.

Sergeant Hammond stated that, while under her supervision, Ms. Bryant endured the illness and subsequent death of a close relative and a series of health-related setbacks. Ms. Bryant often took leave to deal with these matters. Sergeant Hammond stated that Ms. Bryant notified her each time she took leave and she documented her leave in TACIS.

Sergeant Hammond stated that Lieutenant Atcheson closely monitored Ms. Bryant's absences. Sergeant Hammond stated that, on several occasions when he did not see Ms. Bryant in the office, he alleged she was AWOL and wanted her disciplined. Sergeant Hammond stated that she was puzzled by Lieutenant Atcheson's interest in Ms. Bryant's time and attendance because, around the

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 36

beginning of May, Lieutenant Atcheson informed her that Ms. Bryant was not in his chain of command.

Sergeant Hammond stated that Lieutenant Atcheson issued her a P.D. 62E for failing to manage Ms. Bryant's attendance appropriately. Sergeant Hammond stated that she asked Lieutenant Atcheson why he was so interested in Ms. Bryant's time and attendance and he responded that she was one of the complainants in the EEO complaint filed against him. Sergeant Hammond stated her opinion that Lieutenant Atcheson was using her to retaliate against Ms. Bryant because he believed she filed a complaint against him (Attachment 4).

### Interview with Calvin Shivers (B/M), Supervisory Special Agent, FBI.

Agent Shivers was interviewed by Agent Diana Rodriguez and this writer on June 8, 2003, at the Washington Field Office of the FBI. At Agent Shivers' request, the interview was not taped.

Agent Shivers stated that he supervised the FBI task force and worked with Lieutenant Atcheson and Warrant Squad members on task force operations. Agent Shivers stated that MPD had sole responsibility for selecting task force members and assigning vehicles provided by the FBI to those members. No list of names was required. The FBI assumed that MPD would select their best personnel to be members of the task force.

Agent Shivers recalled meeting with Investigator Bush regarding his non-selection to the task force. Agent Shivers stated that he informed Investigator Bush that the FBI would not get involved in the selection of task force members or the assignment of cars.

Agent Shivers stated that the FBI assumed that the vehicles assigned to the task force were take home vehicles. Agent Shivers stated that the FBI expected that the cars would be assigned to task force members and used for official purposes only.

### Statement of Captain Victor Brito (W/M), Special Events Branch, Special Operations Division.

Captain Victor Brito was interviewed on June 29, 2004, by Agent Gregory Wells and this writer at the Office of Internal Affairs. Captain Brito has been a member of the Department for approximately 15 years. Captain Brito was assigned to SIB June 2001 to January 2004 and he supervised Lieutenant Atcheson.

**Language/Conduct.** Captain Brito never personally observed any inappropriate language or conduct by Lieutenant Atcheson to his subordinates.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 37

Members never complained to him directly. Captain Brito did not recall Investigators Squires and Johnson complaining to him that Lieutenant Atcheson referred to him as "motherfuckers," however, he recalled that they stated that he treated them unfairly.

Captain Brito never noticed that Lieutenant Atcheson treated minorities differently. Coming from a family of first and second generation immigrants, Captain Brito is very sensitive to those issues and would never tolerate that. Captain Brito was interviewed about the complaint filed by Investigators Squires and Johnson. Both investigators felt that Lieutenant Atcheson treated them differently. Based on his observation he did not see merit to their allegations.

Captain Brito was not present during the conversation between Investigator Chung and Lieutenant Atcheson. Detective Bonnacorsy told him that she did not like Lietuenant Atcheson's behavior towards Investigator Chung. Captain Brito recalled Detective Bonnacorsy coming to get him and going to Lieutenant Atcheson's office after the incident was over.

He recalled that there was some conflict between Lieutenant Atcheson and Detective Bonnacorsy, however, he did not recall the particulars of the situation. He recalled that Detective Bonnacorsy seemed agitated, however, he did not think her agitation rose to the level of insubordination. He does not recall directing Lieutenant Atcheson to not write up Detective Bonnacorsy for insubordination.

Captain Brito described Lieutenant Atcheson as a dedicated, fair and task oriented supervisor. Lieutenant Atcheson had the skills to supervise a diverse group of people, however, his rigidity often made it difficult for him to communicate effectively with his subordinates. He, Commander Barrett and Lieutenant Atcheson's previous supervisors had several conversations with Lieutenant Atcheson about being more flexible and sometimes tailoring his communication to the individual and not to the group as a whole.

***Vehicles/Overtime.*** Investigator Bush approached him when he was not selected for membership in the task forces and did not receive a take home vehicle. Lieutenant Atcheson told Captain Brito that he selected people for membership based on their reliability, particularly those who consistently responded to callbacks. Lieutenant Atcheson told him that Investigator Bush was not dependable about responding to callacks. Captain Brito told Investigator Bush that he left the selection process to Lieutenant Atcheson.

***Discipline.*** Lieutenant Atcheson told him that he believed that Investigator Squires was taking a vehicle home without authorization. Captain Brito told

him that, based on the facts he presented, he did not have enough information to proceed with the investigation. Captain Brito did not recall telling Lieutenant Atcheson to "back off."

Members were detailed outside the unit consistent with policy set by Assistant Chief Broadbent. Members who were on limited duty were placed in areas within the Special Services command where there was a need for personnel to provide, for example, administrative support. Based on this policy, Investigator Bush was detailed to the Forensics Science unit. Members in full-duty status were also detailed to fulfill specialized needs. About a year ago, Investigator Chung was detailed to the Paternity Warrant Squad to assist them in developing a system for handling warrants.

### Statement of Officer Dorian DeSantis W/M, Institute of Police Science

Officer DeSantis was interviewed on July 13, 2004, by Agent Guillermo Rivera and this writer at the Office of Internal Affairs. Officer DeSantis has been a member of the Department for 14 years. He has been assigned to IPS as a Range Instructor for the past 5 years.

***Language/Conduct.*** Officer DeSantis observed a "slip up of a colorful adjective here, a colorful adjective there" by Lieutenant Atcheson but never observed him use profanity in a derogatory manner towards his subordinates.

Officer DeSantis had a positive experience working for Lieutenant Atcheson. Lieutenant Atcheson is a motivator who is "about the job, about the business." He is a fair manager and Officer DeSantis never observed him give preferential treatment to any of his subordinates. He is the kind of manager who works with his team. Unlike most lieutenants Officer DeSantis has seen, Lieutenant Atcheson would be on the street with the troops during an operation. That set a good standard for people to follow. It was refreshing for Officer DeSantis to work with someone with such managerial zeal and it motivated him to do a better job.

***Overtime/Vehicles.*** While at IPS for training, Lieutenant Atcheson approached him about working with his subordinates. Due to his past experience with SWAT, Officer DeSantis previously provided training in interior work to other units. This training included how to clear a room and look for suspects in a house. During the course of their conversation, Officer DeSantis asked Lieutenant Atcheson if he could work with the Warrant Squad to get some investigative experience. Lieutenant Atcheson agreed and told him that an overtime detail would be coming up soon. When overtime became available, Officer DeSantis began working with the Warrant Squad on the Operation Gotcha program.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 39

When Officer DeSantis began working with the Warrant Squad, he was trained by Investigator Reese. His duties include interviewing the investigator who initially swore out the warrant on the fugitive, coordinating with the U.S. Attorney's office, searching through telephone and financial records, interviewing the fugitive's associates, tracking e-mails and setting up surveillance. Prior to working with the Warrant Squad, Officer DeSantis had some experience with surveillance while working with ERT as a sniper and doing turn-ups while he worked in a district.

While working with the Warrant Squad, Lieutenant Atcheson assigned Officer DeSantis a vehicle and a telephone. Initially, Officer DeSantis drove a Chrysler, however, that was subsequently assigned to Sergeant Darley. Officer DeSantis then drove a Volvo and then a Dodge Intrepid. Officer DeSantis was not sure how long he drove each car, however, he drove the Intrepid for approximately 2 months.

The Dodge Intrepid was a take home vehicle. Officer DeSantis drove the car home if he thought he would be working overtime with the Warrant Squad. On the days that he was not working overtime or on leave, he would park the car at IPS. Officer DeSantis returned the car to Investigator Gatling when he returned to full duty.

While working with the Warrant Squad, Officer DeSantis sensed that some people were upset that he was able to work overtime and was assigned a car, however, no one said anything to him directly.

## ANALYSIS

### APPLICABLE LAW

Title VII provides, in pertinent part, that "it shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-3(a).

Additionally, Title VII prohibits an employer or co-workers from engaging in discriminatory conduct that creates a hostile work environment based on one or more of the enumerated factors. A hostile work environment is one in which the workplace is permeated with discriminatory employment actions or other verbal or physical conduct such as intimidation, insults or ridicule. A hostile work environment claim may be filed by the individual who is the target of

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 40

harassment, or by a third party who has observed or is made aware of the harassment.

Title VII does not prohibit all verbal or physical harassment in the workplace. Intimidation, insults or ridicule do not automatically create a hostile work environment based on race just because the words used or actions taken have racial content or connotations. The critical issue, as the statute's text indicates, is whether the words or actions have a negative impact on the employee's terms, conditions or privileges of employment.

This impact is determined by looking at the totality of the circumstances. That includes an evaluation of the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating to the employee, and, whether it unreasonably interferes with an employee's work performance. Isolated or incidental usages of racial epithets or derogatory comments that engender offensive feelings in an employee do not sufficiently alter the terms and conditions of employment to constitute a violation of Title VII.

## INVESTIGATIVE FINDINGS

### LANGUAGE/CONDUCT - ALLEGATIONS

The allegations are that Lieutenant Atcheson:

(1) regularly and excessively used profanity in the workplace; and,

(2) verbally abused and threatened Investigator Chung during a meeting in 2003 to discuss overtime compensation for Investigator Chung during the IMF meetings.

**Allegation #1:** *Excessive Use of Profanity.*

According to the witness statements, Lieutenant Atcheson:

▶ "Regularly" and "consistently" used a lot of profanity (Reese);

▶ Used the word "fuck...every five words" during a professional, work-related conversation (Garcia);

▶ Regularly cursed at subordinates, "every three words that comes out of his mouth is a curse word...and that's regular conversation." (Gatling);

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 41

- "Uses foul language...talks down to people sometimes" and often used profanity when speaking to subordinates (McFadden);

- "He cusses, the man cusses, I can't deny that... he curses as a matter of common language...during normal conversation...it's like locker room talk...unfortunately, he has a limited vocabulary and he relies on the cuss words a lot..." (Reese);

- Regularly cursed at him using "fuck you" (Muslim);

- Often addressed Investigator Garcia as "big dumb ass" and "a piece of shit." (Gatling);

- Regularly addressed Investigators Johnson and Squires as "motherfuckers" (Squires);

- Referred to Investigators Johnson and Squires as "motherfuckers", according to other members (Johnson);

- Threatened to "fuck me in the ass" for not locking up a specific fugitive (Garcia);

- Threatened a subordinate during staff meeting, "if you don't find this guy I'm going to chew you a new asshole." (McFadden);

- When referring to Sergeant Louie White, stated, "that fucking guy is incompetent, he doesn't know shit. I'm going to get rid of him" (Garcia);

- When referring to Investigator Squires, stated "I'm going to "fuck this guy, I'm going to fuck him (Garcia);

- Referred to Captain Cleora Sharkey as "that cunt, that bitch" (Garcia);

- Referred to subordinates as "a piece of shit" (Britt);

- Justified his refusal to assign take home vehicles to Investigators Bush and Chung by stating, "I would never give those lazy fucks a vehicle, they don't deserve one" (White); and,

- Threatened to deny Investigator Bush leave if he and Investigator Chung did not give him their cell phone numbers.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 42

Lieutenant Atcheson denied using profanity excessively. Lieutenant Atcheson stated that he does not curse more than the average law enforcement officer. According to Lieutenant Atcheson, "I have never called anyone in my life a name." Lieutenant Atcheson also denied threatening Investigator Bush in order to compel him to provide personal cell phone numbers for himself and Investigator Chung.

The witness statements provide persuasive evidence that Lieutenant Atcheson used profanity excessively in the workplace. Some of the witnesses are complainants and therefore may be presumed to have "an axe to grind." For example, Investigator Johnson states that other unnamed members told him that Lieutenant Atcheson regularly referred to him and Investigator Squires as "motherfuckers." However, Investigator Squires states that Lieutenant Atcheson regularly addressed him and Investigator Johnson as "motherfuckers." Investigator Johnson states that he and Investigator Squires met with Captain Brito to discuss Lieutenant Atcheson's conduct, however, Captain Brito has no recollection of that meeting. While these inconsistencies may be reflective of the divergent interests of the various witnesses, the statements suggest a common theme that Lieutenant Atcheson regularly and consistent used profanity when addressing subordinates and when discussing subordinates and officials of higher rank.

The investigation is unable to independently verify that Lieutenant Atcheson threatened Investigator Bush in order to compel him to provide personal cell phone numbers for himself and Investigator Chung. Investigator Chung makes no mention of that threat to Investigator Bush in his statement. Lieutenant Atcheson denies threatening Investigator Bush and there are no independent witnesses to their conversation.

### *Allegation #2:   Verbally Abused and Threatened Investigator Chung.*

Investigator Chung stated that, he and his FOP representative, Detective Mary Bonnacorsy, attended a meeting in Lieutenant Atcheson's office to discuss Lieutenant Atcheson's refusal to approve Investigator Chung's request for 30 minutes of overtime compensation for the 2003 IMF meetings. Investigator Chung stated that, after Detective Bonnacorsy left the meeting, Lieutenant Atcheson calling him "an ungrateful asshole" and screamed:

- ▶ "You aren't shit";

- ▶ "You don't want me to be on your ass everyday, you stupid fuck";

- ▶ "You don't know how many ways that I can fuck you if you pursue this matter";

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 43

- "I helped you guys all the time letting you take leave, and you stab me in the back";

- "So you better make the right choice, if you know what I mean"; and,

- "If you try to use this against me, I will lie and deny it...you don't have a witness...it's just your word against mine and I am a Lieutenant. Who do you think they would believe?"

Detective Bonnacorsy overheard a portion only of the conversation between Investigator Chung and Lieutenant Atcheson. According to Detective Bonnacorsy, Lieutenant Atcheson:

- Screamed at Investigator Chung "I can't believe you went to the fucking union";

- Threatened to "get" Investigator Chung and make his life miserable";

- Told Investigator Chung "nobody's going to believe you, it's going to be your word against my word."

According to Detective Bonnacorsy, Lieutenant Atcheson's tirade was generously sprinkled with the word "fuck." Detective Bonnacorsy stated that, as she listened, Investigator Chung never said a word in response.

Lieutenant Atcheson admits that he and Investigator Chung had a confrontation in his office over his refusal to sign Investigator Chung's overtime slip during the IMF demonstrations in 2003. Lieutenant Atcheson states that both he and Investigator Chung used profanity after he granted Investigator Chung permission to speak freely. Lieutenant Atcheson denies making the statements alleged by Investigator Chung, calling them "absolutely a bald faced lie, all of it...I never made anything to that effect nor would I ever talk to somebody like that."

Lieutenant Atcheson attempts to discredit Detective Bonnacorsy's statements as unreliable. Lieutenant Atcheson dismisses Detective Bonnacorsy's description of his interaction with Investigator Chung as "spin." As proof of Detective Bonnacorsy's faulty recollection, Lieutenant Atcheson states that he would never call a person names if he knows someone else is listening. Lieutenant Atcheson describes Detective Bonnacorsy's conduct during their meeting with Investigator Chung as irate, unprofessional, insubordinate. As

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 44

example of Detective Bonnacorsy's outrageous conduct, Lieutenant Atcheson claims that Detective Bonnacorsy referred to him as "Hitler" and accused him of ruling by fear. Lieutenant Atcheson states that he attempted to write up Detective Bonnacorsy for insubordination, however, he was prevented from doing so by Captain Brito.

Lieutenant Atcheson's attempts to discredit Detective Bonnacorsy are defeated by the statements of other witnesses. Lieutenant Atcheson recasts his interaction with Investigator Chung as a "man to man" conversation in which he granted Investigator Chung permission to speak freely and both men used profanity. However, the statements of Investigator Chung and Detective Bonnacorsy describe a one-sided tirade during which Lieutenant Atcheson "yelled and cursed" at Investigator Chung.

Captain Brito's statement does not support Lieutenant Atcheson's characterization of Detective Bonnacorsy's conduct. Captain Brito stated that, while Detective Bonnacorsy appeared agitated during the incident, he did not think her conduct rose to the level of insubordination. Captain Brito stated that he did not recall directing Lieutenant Atcheson to not write Detective Bonnacorsey up for insubordination

Lieutenant Atcheson's contradictory statements serve to compound this defeat. On the one hand, Lieutenant Atcheson states he would never talk to anyone in the manner in which he is alleged to have spoken to Investigator Chung. On the other hand, he states that he would never speak to anyone like that if he knew someone else was listening. The inherent contradiction contained in these statements aside, these statements serve to further weaken Lieutenant Atcheson's credibility. First, the witness statements confirm that he did speak to Investigator Chung in the manner alleged. Second, the witness statements are further legitimized by the fact that Lieutenant Atcheson did not know that Detective Bonnacorsy was listening to him while he was berating Investigator Chung.

Typically, the statements of an official describing the conduct of a lower-ranked member are given great weight. However, Lieutenant Atcheson's credibility is weakened by his previous misstatements and the lack of evidence to corroborate his allegations. Here, Lieutenant Atcheson seems to be confusing Detective Bonnacorsy with Investigator Kurgan. Lieutenant Atcheson previously ordered an investigation of Investigator Kurgan for allegedly making a similar comment about Lieutenant Atcheson, comparing him to Adolf Hitler. Furthermore, Lieutenant Atcheson stated that, prior to this meeting, he had no contact with Detective Bonnacorsy. It is difficult to believe that a lower-ranked member would voice such a highly offensive and inflammatory comment to an official, let alone one she had not previously met (Attachment 5).