Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 45

Based on the aforementioned, the investigation finds that there is a preponderance of evidence that Lieutenant Atcheson:

- ▸ regularly and excessively used profane language in the workplace and when addressing subordinates;

- ▸ verbally abused Investigator Chung during a meeting in 2003 to discuss overtime compensation.

- ▸ threatened to retaliate in the workplace against Investigator Chung for seeking the assistance of a union representative to resolve the overtime compensation issue; and,

- ▸ Falsely denied verbally abusing and threatening Investigator Chung.

## OVERTIME/VEHICLES - ALLEGATIONS.

The allegations are that Lieutenant Atcheson:

(1) Improperly selected Warrant Squad members to be part of the FBI Task Force;

(2) Denied Warrant Squad members access to overtime and take home vehicles while allocating these resources to members outside the Warrant Squad;

(3) Prohibited members of ECU except Investigator Kurgan from working overtime with the Warrant Squad

***Allegation #1:    Improper Selection of FBI Task Force Members.***

Witnesses state that Lieutenant Atcheson:

(i) initially told members that he would make the selections based on seniority; and,

(ii) refused to select Investigator Bush to the task force even though he had more seniority than the member selected because he personally disliked Investigator Bush.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 46

(i) *Selection of Task Force Members Based on Seniority.* The statements of Investigators Bush, McFadden, Britt and Reese confirm that Lieutenant Atcheson stated in a staff meeting that membership in the FBI task force would be determined based on seniority. During his interview, Lieutenant Atcheson initially stated that he made the selections based on merit. When presented with evidence that several witnesses heard him announce at a staff meeting that the selections would be based on seniority, Lieutenant Atcheson retreated from his initial statement. Lieutenant Atcheosn stated that, at one point he told his subordinates the selections "might be" based on seniority but later changed his mind. Lieutenant Atcheson stated that he told everyone that the selections would be based on merit because "if you do more you should get more." However, that statement is contradicted by the statements of Investigators Bush, McFadden, Britt and Reese. These members all agree that, during a staff meeting, Lieutenant Atcheson told Warrant Squad members that he would select members of the FBI task force based on seniority and that the selections made were based on seniority only.

(ii) *Refusal to Select Investigator Bush to Task Force.* Investigator Bush alleged that Lieutenant Atcheson did not select him for membership in the FBI task force because he did not like him. Investigator Bush informed Lieutenant Atcheson that he should be selected for the task force because he had more seniority than Investigator Gatling. Investigators Bush, McFadden and Britt agree that when Investigator Bush challenged Lieutenant Atcheson's seniority calculation, Lieutenant Atcheson refused to reconsider. Investigator Bush stated that Lieutenant Atcheson informed them that he had submitted the list of names of task force members to the FBI and they would not allow him to substitute a name. Investigator Bush was not made a member of the task force.

In response to this office's request for information after the filing of the complaint, Lieutenant Atcheson submitted a memorandum dated December 5, 2003, in which he described his selection process. Lieutenant Atcheson stated that, based on the Memorandum of Understanding (MOU) signed by the Department and the FBI, he could select 5 Warrant Squad members to be part of the new D.C. Violent Crimes/Fugitive Task Force. Lieutenant Atcheson stated that those members would have access to overtime and utilize the take home vehicles provided by the FBI (Attachment 6).

In his memorandum, Lieutenant Atcheson stated that, in an effort to make the process impartial and objective, he based his selection on merit. Lieutenant Atcheson stated that the selection criteria he used were members past performance in responding to callbacks, working extended tours of duty and reliability. Lieutenant Atcheson stated that all members were chosen based on the same criteria. Lieutenant Atcheson stated that, based on those criteria, he

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 47

selected Investigators Garcia, McFadden, Reese, Vazquez and Gatling. According to Lieutenant Atcheson, these members exhibited "a history of reliability and ... prov[ed] themselves to be worthy of recognition and additional responsibility that is inherent in a federal task force" (Attachment 6).

Lieutenant Atcheson stated that Investigators Bush and Chung did not meet the selection criteria. Lieutenant Atcheson stated that Investigators Bush and Chung consistently failed to respond to callbacks or make themselves available for extended tours of duty. Lieutenant Atcheson stated that both investigators consistently offered a variety of excuses for their failure to respond to callbacks or extend their tours of duty. According to Lieutenant Atcheson, these excuses included not receiving the page that was sent out to all Warrant Squad members, lack of babysitters for their children, conflicts with part-time work at Union Station or need to attend college classes. According to Lieutenant Atcheson, these habitual excuses made both members "inaccessible and unreliable...it is also highly unlikely that their habitual excuses of why they cannot stay over the normal tour of duty or why they cannot respond for an emergency callback will not change in the near future" (Attachment 6).

This investigation found no violation of EEO law or Department regulations in Lieutenant Atcheson's selection of task force members. The members selected reflect an appropriate diversity of race and gender. The language of the MOU signed by the FBI and the Department grants MPD discretion in selecting task forces members. That was reinforced by Agent Shivers, who stated that the FBI had no role in selecting MPD members of the task force. Agent Shivers stated that the FBI's only expectation was that MPD would select the best investigators available to participate as task force members. As the MPD representative to the task force, Lieutenant Atcheson was vested with the authority to select task force members who, in his judgment, best represented the Department.

However, Lieutenant Atcheson's stated selection process raises several management issues. A review of the TACIS records of selectees and non-selectees reveals an inconsistent application by Lieutenant Atcheson of his stated selection criteria. During the pay period ending January 12, 2002 through the pay period ending December 28, 2002, all members listed below participated in a prior interagency initiative, the Joint Fugitive Task Force. For the pay periods in question, Investigator Bush worked 318 overtime hours and was held over for Continuation of Tour of Duty on one occasion and responded to no callbacks; Investigator Chung worked 196 overtime hours, was on sick leave June 3 through July 18, 2002, was not held over for Continuation of Tour of Duty and responded to no call backs; Investigator Reese worked 260.5 overtime hours, was held over for Continuation of Tour of Duty on 2 occasions and responded to one callback; Investigator McFadden worked 333 overtime

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 48

hours, was held over for Continuation of Tour of Duty on one occasion and responded to no call backs; Investigator Garcia worked 352.5 hours, was not held over for Continuation of Duty and responded to no callbacks; and Investigator Gatling worked 357 hours, was not held over for Continuation of Duty and responded to one call back (Attachments 7, 8, 9, 10, 11, 12).

This review indicates that, while working on the Joint Fugitive Task Force, none of the selectees to the subsequent FBI task force demonstrated a history of reliability or ability to respond to callbacks or work extended tours of duty. Investigators Bush and Chung performed in a manner consistent with the selectees. Investigators Reese and Gatling responded to callbacks and Investigators Bush, Reese and McFadden were held over for Continuation of Duty. Investigators Bush, Chung, McFadden and Garcia did not respond to callbacks and Investigators Chung, Garcia and Gatling were not held over from Continuation of Duty (Attachments 7, 8, 9, 10, 11).

Despite his assertions to the contrary, the TACIS records demonstrate that Lieutenant Atcheson failed to adhere to any objective criteria when selecting members of the new FBI task force. Sergeant White stated that Lieutenant Atcheson made the selections based on his personal likes and dislikes. Several witnesses stated that Lieutenant Atcheson seemed to dislike Investigators Bush and Chung and often made derogatory comments about them. Taken together, these facts suggest no credible management reason for refusing to place Investigators Bush and Chung on the FBI task force.

**Allegation #2:** **Denied or Limited Warrant Squad Members' Access to Overtime and Take Home Vehicles in Favor of non-Warrant Squad Members**

Witnesses state that Lieutenant Atcheson:

(i) Denied Warrant Squad members access to overtime while permitting non-Warrant Squad members to work overtime.

(ii) Denied Warrant Squad members access to take home vehicles while allocating those resources to non-Warrant Squad members.

(iii) Limited Investigator Garcia's overtime to 10 hours per week while allowing Officer DeSantis to work unlimited overtime

*(i) Denial of Overtime to Warrant Squad Members in Favor of Non-Warrant Squad Members.* Investigators Bush and Chung allege that Lieutenant Atcheson denied them access to overtime while permitting Investigator Kurgan and Officer DeSantis to work overtime.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 49

Warrant Squad members assigned to the FBI Task Force (Operation Gotcha) received overtime from the pay period ending June 28, 2003 to the pay period ending October 4, 2003, approximately. After Operation Gotcha was renewed through the FBI Violent Crimes Task Force, task force members received overtime from the pay period ending December 13, 2003 through the pay period ending May 29, 2004, the last date of the available TACIS records.

A review of the TACIS records of Investigators Bush and Chung does not support their allegation that Lieutenant Atcheson denied them access to overtime in favor of Investigator Kurgan and Officer DeSantis. Investigator Bush was on sick leave from the pay period ending March 29, 2003, through the pay period ending July 11, 2003. He worked overtime on Operation Gotcha for the pay periods ending September 20, 2003 through the pay periods ending October 4, 2003. Investigator Bush was detailed from the Warrant Squad to the Forensic Science Unit in August 2003 (Attachment 7).

Investigator Chung worked overtime on Operation Gotcha from the pay period ending June 28, 2003 through the pay period ending October 4, 2003. From the pay period ending January 10, 2004 through the pay period ending February 7, 2004, Investigator Chung worked overtime on the Violent Crimes Task Force. He received compensatory time from the pay period ending February 21, 2004 through the pay period ending May 15, 2004 (Attachment 8).

Investigator Kurgan worked with the Warrant Squad on Operation Gotcha from the pay period ending June 14, 2003 through the pay period ending September 20, 2003. Investigator Kurgan received 211 hours of overtime. Investigator Kurgan performed no work on the Violent Crimes Task Force (Attachment 13).

Officer DeSantis worked 280 hours of overtime with Operation Gotcha from the pay period ending June 14, 2003 through the pay period ending September 20, 2003. Except for the pay period ending January 24, 2004, Officer DeSantis received compensatory time for the pay period ending October 4, 2003 through the pay period ending March 6, 2004 (see Attachment 14).

The TACIS records indicate that Investigators Bush and Chung had access to Operation Gotcha overtime similar to Investigator Kurgan and Officer DeSantis. Although Investigator Bush was detailed out of the Warrant Squad in August 2003, the records show that Investigator Chung had greater access to overtime than Investigator Kurgan and Officer DeSantis. Once funding for overtime from Operation Gotcha ceased, Investigator Chung received overtime from the Violent Crimes Task Force. However, Investigator Kurgan performed no work

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 50

on the Violent Crimes Task Force and Officer DeSantis received compensatory time only from that task force.

*(ii) Denial of Take Home Vehicles to Warrant Squad Members in Favor of Non-Warrant Squad Members.* Investigators Bush and Chung allege Lieutenant Atcheson refused to assign them FBI take home vehicles while they worked on Operation Gotcha while Investigator Kurgan and Officer DeSantis were assigned take home vehicles provided by the FBI.

Although incomplete, records retrieved from Lieutenant Atcheson's files indicate that Investigator Kurgan was assigned a take home vehicle. Although there is no record of when he received the car, the records indicate that, up until July 21, 2003, he was assigned a 2004 Dodge Stratus. On July 21, 2003, Investigator Kurgan returned that car and took receipt of a 2004 Chrysler 300M with mileage of 2,196. In a memo dated September 9, 2003, Lieutenant Atcheson requested a gas key for that car and indicated the mileage was 4,408. However, there is no other record that car was assigned to Investigator Kurgan or any subsequent assignee (Attachment 15, 16).

Lieutenant Atcheson's records indicate that at least from November 7, 2003 through December 2, 2003, Officer DeSantis was assigned a Dodge Intrepid from the U.S. Marshall's Service. However, Investigator Chung did not receive a car until at least November 25, 2003. According to these records, Investigator Bush never received a vehicle for the time he worked on Operation Gotcha (Attachment 17).

Lieutenant Atcheson's records raises questions about his management of the FBI resources assigned to the Warrant Squad. Lieutenant Atcheson stated that the Warrant Squad investigators were assigned 5 FBI cars. However, his records indicate that only 4 cars were assigned to Warrant Squad investigators. The records indicate that Officer DeSantis was assigned a U.S. Marshall's car. However, Officer DeSantis stated that Lieutenant Atcheson assigned him the FBI vehicle intended for Investigator Gatling after Investigator Gatling was shot in October 2003. Furthermore, in his memo of September 9, 2003 to Fleet Management, Lieutenant Atcheson requested gas keys for several vehicles; however, his records reflect that several of those vehicles were not assigned to the Warrant Investigations Section. Based on these records, it is impossible to determine whether the vehicles were assigned consistent with the MOU's signed by the Department and the FBI and Marshall's Service and whether the gas keys were allocated consistent with Department regulations (Attachments 16, 17).

Lieutenant Atcheson stated that he did not recall whether he assigned Officer DeSantis a take home vehicle. Lieutenant Atcheson's records indicate that the

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 51

U.S. Marshall's car assigned to Officer DeSantis was not a take home vehicle. However, Officer DeSantis stated that Lieutenant Atcheson assigned him the car and authorized him to drive it home. Despite Lieutenant Atcheson's faulty recollection, it is highly unlikely that Officer DeSantis would take it upon himself to take a vehicle home without authorization from an official.

*(iii) Limits Placed on Investigator Garcia's Overtime.* Investigator Garcia alleged that Lieutenant Atcheson limited his overtime to 10 hours per week while permitting Officer DeSantis to receive unlimited overtime. However, a review of TACIS records does not support this allegation.

Both Officer DeSantis and Investigator Garcia worked overtime on Operation Gotcha for the pay periods ending June 14, 2003 through the pay period ending September 20, 2003. After the Violent Crimes Task Force was funded, both members worked on that project. However, Investigator Garcia received overtime for work on that task force while Officer DeSantis received compensatory time only (Attachments 11, 14).

A review of TACIS records does not support Investigator Garcia's allegation. For the relevant pay periods, Officer DeSantis worked on Operation Gotcha for 16 weeks for a total of 280 hours of overtime at an average of 17.5 hours per week. Officer DeSantis took 113 hours of leave. During that same time, Investigator Garcia worked on Operation Gotcha for 14 weeks for a total of 163.5 hours of overtime at an average of 11.7 hours per week. Investigator Garcia took 120 hours of leave (Attachment 11, 14).

**Allegation #3:    Prohibited Most ECU Members from Working Overtime with the Warrant Squad.**

Investigators Johnson and Squires stated that Lieutenant Atcheson prohibited them from working overtime with the Warrant Squad. However, Investigator Kurgan was permitted to work unlimited overtime with the Warrant Squad. A review of the TACIS records of Investigators Johnson and Squires confirm that they worked no overtime for the various task forces staffed by the Warrant Squad. Investigator Kurgan's TACIS records indicate that he worked overtime for Operation Gotcha only (Attachments 13, 18, 19).

The investigation was unable to confirm that Lieutenant Atcheson denied Investigators Johnson and Squires the opportunity to work overtime with the Warrant Squad. Other than their allegations, Investigators Johnson and Squires present no evidence, documentary or otherwise, that they requested to work overtime with the Warrant Squad and were denied that opportunity by Lieutenant Atcheson.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 52

## OVERTIME/VEHICLES – FINDINGS

Based on the foregoing, the investigation finds there is a preponderance of evidence that Lieutenant Atcheson:

▶ Denied Investigators Bush and Chung access to take home vehicles assigned to the Warrant Squad in favor of non-Warrant Squad members.

The investigation found insufficient evidence that Lieutenant Atcheson:

▶ Denied Investigators Bush and Chung access to overtime in favor of non-Warrant Squad members;

▶ Limited Investigator Garcia to 10 hours per week of overtime while permitting Officer DeSantis to work unlimited overtime; and,

▶ Prohibited Investigators Johnson and Squires from working overtime with the Warrant Squad.

## DISCIPLINE - ALLEGATIONS

The allegations are that Lieutenant Atcheson:

(1) Detailed members out of the Warrant Squad as a method of discipline;

(2) Disciplined minority members of ECU more severely than Caucasian members; and,

(3) Disciplined Investigator Squires because he was African-American.

### Allegation #1:   Detail of Members as Discipline.

Investigators Gatling, Chung and Bush allege that Lieutenant Atcheson detailed members outside the Warrant/ Squad as a method of discipline. Investigator Gatling stated that, even though the Warrant Squad was short-staffed at the time, Lieutenant Atcheson detailed Investigator Chung to the Paternity Warrant Squad because he did not like him. Investigator Chung makes the same allegations. Investigator Bush alleges that, when he was on limited duty, Lieutenant Atcheson detailed him to the Forensic Science Unit because he did not like him. Investigator Bush also alleges that Lieutenant

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 53

Atcheson detailed Investigator Chung out of the unit also because he did not like him and he wanted "to get him out of the way."

The investigation found insufficient evidence that Lieutenant Atcheson detailed members outside the Warrant Squad as a method of discipline. Lieutenant Atcheson stated that he detailed Investigator Chung to the Paternity Warrant Squad to assist that unit in developing their computer system. Investigator Chung admits that was the reason given to him for the detail. Captain Brito stated that Investigator Chung was detailed to that unit to assist them in improving their warrant procedures.

Lieutenant Atcheson stated that he detailed Investigator Bush to the Forensic Science Unit consistent with a policy established by Commander Barrett. According to Captain Brito, the policy of detailing members in a limited duty status was implemented by Assistant Chief Broadbent. Although Lieutenant Atcheson and Captain Brito differ somewhat in their explanation of the details of Investigator Bush and Chung, they both provide legitimate non-discriminatory administrative reasons for the details of these members.

**Allegation #2:**   *Disparate Discipline of Minorities.*

Sergeants White and Muslim stated that, in general, Lieutenant Atcheson disciplined minority members more severely than non-minorities. As example, Sergeant White stated that, after Investigator Kurgan missed a week of redeployment, he received a P.D. 750. In comparison, when Investigator Johnson was late notifying Sergeant White that he sustained an injury, a relatively minor offense, he received a P.D. 750. According to Sergeant White, a P.D. 62E or verbal counseling would have been more appropriate. Additionally, Lieutenant Muslim stated that African-American members only were disciplined for tardiness.

The investigation found insufficient evidence that, in general, Lieutenant Atcheson disciplined minorities more severely than non-minorities. Investigator Kurgan failed to appear for his scheduled redeployment the week of August 5, 2003. According to Investigator Kurgan, all ECU members were working on a major hazardous dumping case that week. Sergeant Bridget Newkirk, also of Operations Command, stated that Investigator Kurgan made up his redeployment assignment the week of August 26, 2003. Investigator Kurgan received a P.D. 750 for failure to attend that duty assignment when scheduled. According to Captain Kevin Keegan of Operations Command, missing a week of redeployment is considered unit level discipline and a P.D. 750 an appropriate sanction (Attachment 20).

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 54

By comparison, there is insufficient evidence that Investigator Johnson received an unduly harsh penalty for late notification. As Investigator Johnson's commander, Lieutenant Atcheson had discretion on whether to verbally counsel Investigator Johnson or issue him a P.D. 62E or a P.D. 750. The choice of a P.D. 750 is within the boundaries of appropriate discipline for Investigator Johnson's infraction. Absent any evidence of improper motive, this investigation is reluctant to second-guess this command decision.

Similarly, the investigation was unable to determine that African-American members of ECU were written up for tardiness while non-African American members were not. A review of the Adverse Action files of Investigators Johnson and Squires reveals no adverse actions or other disciplinary actions for tardiness. Lieutenant Muslim provided no specific dates these actions were allegedly taken. Disciplinary actions are maintained in personnel folders for a limited time, however, without documentary evidence, this investigation is unable to make a finding as to this allegation.

**Allegation #3:** *Discipline Imposed on Investigator Squires Based on Race.*

Investigator Squires states that Lieutenant Atcheson disciplined him frequently and without justification because he is African-American. As example, Investigator Squires points to Lieutenant Atcheson accusing him of unauthorized use of a government vehicle in August 2001 and lying to an official in February 2002.

During his interview, Lieutenant Atcheson admitted that he had no evidence that Investigator Squires used a government car without authorization and that he deliberately lied to Investigator Squires to prompt him to admit to an offense he did not commit. Lieutenant Atcheson's unusual zeal to discipline Investigator Squires for the typographical error on the P.D. 50 was noted by his superiors. Assistant Chief Broadbent attached a handwritten note to Lieutenant Atcheson's investigation indicating his opinion that the investigation was personal (Attachment 5).

Furthermore, on several occasions, Lieutenant Atcheson intervened in the case against Investigator Squires in Oriental, North Carolina in an apparent attempt to ensure an outcome adverse to Investigator Squires. Prior to the dismissal of the criminal case, Lieutenant Atcheson contacted the investigating officer and offered a negative character assessment of Investigator Squires. Lieutenant Atcheson also offered to testify for the defense in Investigator Squires' civil complaint against the Oriental Police Department and again offered a negative assessment of Investigator Squires during a deposition.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 55

From 2001, Lieutenant Atcheson exhibited a pattern of conduct towards Investigator Squires that violated Title VII. Lieutenant Atcheson's attempts to discipline Investigator Squires and influence the criminal and civil cases in North Carolina were sufficiently severe and pervasive to alter the terms and conditions of Investigator Squires' employment and create a hostile work environment for Investigator Squires based on his race. Lieutenant Atcheson's actions may be explained by his expressed dislike of Investigator Squires. Lieutenant Atcheson also expressed his dislike of Investigator Ruleman. However, he did not attempt to discipline Investigator Ruleman in the same manner and with the same frequency as he disciplined Investigator Squires. Since the only difference between Investigator Ruleman and Squires is their race, Lieutenant Atcheson's conduct raises an inference of discriminatory conduct based on Investigator Squires' race.

## DISCIPLINE – FINDINGS

Based on the foregoing, the investigation finds there is a preponderance of evidence that Lieutenant Atcheson:

▶   Disciplined Investigator Squires based on his race.

The investigation found insufficient evidence that Lieutenant Atcheson:

▶   Detailed Investigators Chung and Bush outside the Warrant Squad as discipline; and,

▶   Generally, disciplined minority members of ECU more severely than non-minority members.

## RETALIATION - ALLEGATIONS

Complainants and witnesses state that Lieutenant Atcheson retaliated against the members who filed the complaint against him and improperly influenced or intimidated witnesses when he:

(1)   Stated in January 2004, while in the Warrant Squad office, that he was going to get a lawyer and "get the guys who were doing this to him"

(2)   Accused Investigator Garcia of being a complainant and telling him that the EEO complaint was "a double edged sword."

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 56

(3) Retaliated against Ms. Bryant by issuing Sergeant Hammond a P.D. 62E so that she would discipline Ms. Bryant for her frequent absences from the office.

**Allegation #1:   *Retaliation and Improper Influence/Intimidation.***

Investigator McFadden stated that, in early January 2004, she was present when Lieutenant Atcheson stated that he was going to get a lawyer and "get the guys who were doing this to him." Ms. Bryant confirms that, in early January 2004, Investigator McFadden told her that she overheard Lieutenant Atcheson's comments. Lieutenant Atcheson's statements were well known throughout the Warrant Squad. Investigators Britt and Chung stated that they heard that Lieutenant Atcheson threatened the complainants.

When confronted with the allegation about the retaliatory comments, Lieutenant Atcheson's denials were contradictory and not credible. Initially, Lieutenant Atcheson denied stating that he was getting an attorney and that he would "get" the guys filing the complaint against him. When told there were witnesses to him making that statement, Lieutenant Atcheson continued to deny making the statements, instead stating that the words he chose were that he intended to get an attorney and "deal with this the way it should be dealt with." In the face of repeated questioning, Lieutenant Atcheson continued to deny making statements of retaliation or statements that could be interpreted as retaliation. Lieutenant Atcheson, stating "I can't tell people how to think but it could probably have been easy to be interpreted like that but that was not my intent."

When questioned about the statements overheard by Investigator McFadden, Lieutenant Atcheson's denials were contradictory and unconvincing. Initially, Lieutenant Atcheson flatly denied stating that he planned to get an attorney and "get" the complainants. Lieutenant Atcheson retreated from this denial only after being informed that witnesses overheard him make that statement. Lieutenant Atcheson subsequently made several attempts to re-characterize the nature of the statement, however, he eventually allowed that he "may" have said something that could have been interpreted as retaliation

Lieutenant Atcheson's temporizing does not cancel out the evidence provided. Investigator McFadden's statement is corroborated by Ms. Bryant. Investigators Britt and Chung indicate that Lieutenant Atcheson's comments were well known throughout the Warrant Squad. At the time Lieutenant Atcheson made that statement in early January 2004, Investigator Chung was a complainant, however, Investigators Britt and McFadden were not yet witnesses. Although Investigators Britt and McFadden subsequently expressed some dissatisfaction with Lieutenant Atcheson, they are not complainants

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 57

therefore, they are presumed to be somewhat more removed from the complaint. Lieutenant Atcheson spoke very approvingly of Investigators Britt and McFadden, in particular, referring to them as top performers and provided them with resources unavailable to Warrant Squad members he expressed dissatisfaction with. They state Lieutenant Atcheson never cursed at them and reported no problems with discipline or their performance evaluations. Therefore, presumably, Investigators Britt and McFadden have less of "an axe to grind" and were merely responding to questions posed to them, further legitimizing the information.

*Allegation #2:    Retaliation Against Investigator Garcia.*

The investigation is unable to determine that Lieutenant Atcheson retaliated against Investigator Garcia. Investigator Britt stated that he observed Lieutenant Atcheson warn Investigator Garcia that the EEO complaint was a "double edged sword," implying that Investigator Garcia was a complainant. In a telephone conversation with this writer on July 21, 2004, Investigator Garcia stated that he did not recall Lieutenant Atcheson making that statement to him.

*Allegation #3:    Retaliation Against Ms. Bryant.*

The investigation is also unable to determine if Lieutenant Atcheson attempted to retaliate against Ms. Bryant through Sergeant Hammond because he thought she was a complainant. Sergeant Hammond's statement that Ms. Bryant was not in Lieutenant Atcheson's chain of command is contradicted by Captain Michael Reese, SIB. In a telephone conversation on July 19, 2004, with this writer, Captain Reese stated that, Lieutenant Atcheson was Ms. Bryant's second-line supervisor. Captain Reese stated that Ms. Bryant's time and attendance was a problem for office operations because she was often absent and Sergeant Hammond often seemed unaware of Ms. Bryant's whereabouts. Based on this information, Lieutenant Atcheson's actions in monitoring and counseling Sergeant Hammond on her handling of Ms. Bryant's absences may be seen as legitimate and consistent with his duties as Ms. Bryant's second-line supervisor.

The investigation is unable to independently verify Sergeant Hammond's statement that Lieutenant Atcheson told her that he monitored Ms. Bryant so closely because she was a complainant. Captain Reese stated that Sergeant Hammond was very upset because Lieutenant Atcheson issued her a P.D. 62E. This may suggest an alternate motive that calls into question the reliability of Sergeant Hammond's comments. Sergeant Hammond states that Lieutenant Atcheson made that comment during a private meeting in his office, with only she and Lieutenant Atcheson present. On re-interview, Lieutenant Atcheson is

unlikely to confirm that he so plainly stated to Sergeant Hammond his intent to retaliate against Ms. Bryant.

## RETALIATION - FINDINGS

Based on the foregoing, the investigation finds there is a preponderance of evidence that Lieutenant Atcheson:

► Retaliated against complainants and improperly influenced and/or intimidated witnesses when he stated in early January 2004 that he was going to get an attorney and "get" the guys who filed the complaint against him; and,

► Falsely denied making that statement.

The investigation found insufficient evidence that Lieutenant Atcheson

► Retaliated against Investigator Garcia; and,

► Retaliated against Ms. Bryant.

## PERFORMANCE EVALUATIONS - ALLEGATIONS

The allegations that Lieutenant Atcheson:

(1) Gave non-minority members of his command higher performance evaluations than minority members; and,

(2) Gave Investigators Bush and Chung unfair performance evaluations.

### Allegation #1: Disparate Performance Evaluations.

The investigation found that Lieutenant Atcheson gave non-minority members of his command higher performance evaluations than minority members. A review of performance evaluations for the rating period October 1, 2002- through September 30, 2003 indicates that the ratings were skewed in favor of non-minority members. Of the three Sergeants under his command, both Caucasians received a rating of "Outstanding." The only minority Sergeant received a rating of "Average." Within the Warrant Squad, Investigator Reese, the only Caucasian male investigator, received a rating of "Above Average." Investigators McFadden (B/F), Britt (B/M) and Vazquez (H/M) were the only minority member who received a rating of Above Average. The other four

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 59

minority members, Investigators Bush, Chung, Garcia, Gatling and Johnson, received a rating of "Average." No Caucasian member received a rating of "Average" (Attachment 21).

Lieutenant Atcheson rated the 3 sergeants under his command. The investigation was unable to determine who made the initial rating of Warrant Squad members. However, Lieutenant Atcheson, as the Commander of the Warrant Squad, is responsible for the final rating assigned to each member. He is also responsible for ensuring that all members are rated in a fair and non-discriminatory manner. The investigation found that he failed at this task.

**Allegation #2:  *Unfair Performance Evaluations for Investigators Bush and Chung.***

Investigators Bush and Chung allege that their evaluations were unfair. They allege that the ratings they received did not adequately reflect their performance during the rating period. Both investigators received a rating of "Average" (Attachment 21).

Since the investigation determined that Lieutenant Atcheson discriminated against minority members ECU and the Warrant Squad, it is unnecessary to deal with this allegation separately.

### PERFORMANCE EVALUATION - FINDINGS

Based on the foregoing, the investigation finds a preponderance of evidence that Lieutenant Atcheson discriminated against minority members of his command, including Investigators Bush and Chung, in determining their performance evaluations. Lieutenant Atcheson gave higher ratings to non-minority members.

### CONCLUSION

The investigation found that Lieutenant Atcheson's conduct violated Department regulations and federal law. The investigation found that Lieutenant Atcheson consistently used profanity when addressing subordinates and discussing other members of his command. All members interviewed indicated that some use of profanity was tolerated within the confines and culture of the Department. However, most members indicated that Lieutenant Atcheson's use of profanity was excessive. Many described it as demeaning and unprofessional. In the case of Investigator Chung, it amounted to abuse.

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 60

Lieutenant Atcheson violated Title VII of the Civil Rights Acts, as amended, when he targeted Investigator Squires for discipline and created a hostile work environment for Investigator Squires based on his race. Lieutenant Atcheson similarly violated Title VII when he granted higher ratings for non-minority members during the 2002-2003 rating period and retaliated against the Warrant Squad complainants and attempted to improperly influence witnesses.

Lieutenant Atcheson's conduct is a matter of grave concern. The investigation revealed a limited, authoritarian and power-centered management style by Lieutenant Atcheson. The comments of several witnesses and Lieutenant Atcheson's own statements reveal a rigid and uncompromising approach to personnel interaction. As a manager, Lieutenant Atcheson seemed incapable or unwilling to assist subordinates that he considered sub-standard to improve their performance to a level he considered acceptable. Instead, he seemed more interested in penalizing them by denying them resources to perform their job. Alternately, he would dismiss them as "piss poor," "incompetent" or "intellectually challenged."

During the course of his interview, Lieutenant Atcheson repeatedly rejected any effort to acknowledge or respect individual differences. Lieutenant Atcheson seemed to dismiss this effort as permitting the individual to "play the race card." This determined obliviousness to understanding and accepting the expanded possibilities and obvious limits placed on him by managing a diverse staff makes Lieutenant Atcheson's interaction with his subordinates unpredictable and increases the likelihood that he will be subject to repeat allegations of misconduct.

The investigation also revealed a pattern of poor judgment in discharging his duties as an official of this Department. In addition to the aforementioned violations of Department regulations and federal law, Lieutenant Atcheson abused his authority as an official and placed his personal agenda before his professional obligations as an official of this Department. Lieutenant Atcheson denied Warrant Squad members he disliked access to resources granted to the Warrant Squad by the FBI in favor of non-Warrant Squad members whom he favored. Lieutenant Atcheson's conduct over the span of his command of the Warrant Squad and ECU has poisoned the well of trust and cooperation between himself and subordinates he is supposed to motivate. Members of both squads repeatedly express fear of retaliation by Lieutenant Atcheson. His failure to maintain an atmosphere of dignity and mutual respect in the Warrant Squad and ECU has had a negative effect on the morale and operations of both these units. It is highly unlikely that, upon his return to command these units, any member would be willing to extend themselves towards excellence for him.

When interaction with officials outside the Department, Lieutenant Atcheson has failed to conduct himself in such as manner as to avoid bringing discredit upon himself and the Department. During the course of this investigation, this writer interviewed by telephone FBI Supervisory Special Agent Ronald Chavarro. SSA Chavarro worked with Lieutenant Atcheson and members of the Warrant Squad on an interagency task force and described his personal observations of Lieutenant Atcheson's conduct. SSA Chavarro stated that Lieutenant Atcheson would often undermine his directives, on one occasion telling his subordinates to ignore SSA Chavarro's briefing on FBI safety procedures. According to SSA Chavarro, Lieutenant Atcheson consistently made derogatory comments about his subordinates in the presence of non-MPD task force members. SSA Chavarro stated that Lieutenant Atcheson seemed to delight in disciplining his subordinates, on one occasion, gloating in SSA Chavarro's presence that "he was going to get (unnamed)'s black ass." SSA Chavarro stated that Lieutenant Atcheson was a poor manager who seemed incapable of effectively supervising a diverse group of subordinates. SSA Chavarro refused to be interviewed on tape. While these incidents are not widely known throughout the local law enforcement community, Lieutenant Atcheson's conduct had a negative impact on members of that interagency task force. It is important that the Department maintain a good reputation within local law enforcement circles. The Department's reputation within the law enforcement community is sullied when Department officials are observed engaging in crude and unprofessional behavior (Attachment 22).

## RECOMMENDATIONS

Based on the foregoing, I recommend that:

1. The allegations of excessive use of profanity against subordinates, verbal abuse of Investigator Chung, discipline of Investigator Squires based on race, disparate performance evaluations for minority members for the 2002-2003 rating period and retaliation against Warrant Squad complainants and witnesses be classified as SUSTAINED;

2. Investigator Kurgan and Investigator Chavis of DPW be assigned different partners. Investigator Kurgan has been the subject of numerous citizen complaints, the majority of which have not been sustained. The fact that Investigator Chavis is often his sole witness presents a conflict of interest for the Department;

3. The Special Investigations Branch implement protocols for tracking assignment of vehicles to task force members;

4. The Special Investigations Branch give preference to SIB members who request overtime funded by grants, interagency initiatives, etc. assigned to any SIB unit;

5. Lieutenant Atcheson undergo a Fitness for Duty evaluation conducted by the Police and Fire Clinic. This evaluation should also include a psychological component;

6. Lieutenant Atcheson receive counseling from providers with the Metropolitan Police Employee Assistance Program;

7. Lieutenant Atcheson attend diversity and sensitivity training at the Institute of Police Science; and,

8. Lieutenant Atcheson receive discipline based on the following charges and specifications:

Charge No. 1: Violation of General Order Series 1202, Number 1, Part I-B-12, which provides: "Conduct unbecoming an officer, including acts detrimental to good discipline, conduct that would affect adversely the employee's or the agency's ability to perform effectively, or violations of any law of the United States or any law, municipal ordinance, or regulation of the District of Columbia." This misconduct is also defined in General Order Series 201, Number 26, Part I-C-3, 4, which provides, in pertinent part, "Members shall be courteous, civil and respectful to their superiors, associates, and other persons....[m]embers shall refrain from harsh, violent, coarse, profane, sarcastic, or insolent language. Members shall not use terms or resort to name calling which might be interpreted as derogatory, disrespectful, or offensive to the dignity of any person." This misconduct is further defined in General Order Series 201, Number 9, Part I-A-1(b) and the Workplace Environment Plan which commits the Department to maintaining a workplace

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 63

|  |  |
|---|---|
|  | environment free of discrimination on the basis of race. |
| Specification No. 1 | In that Lieutenant Atcheson regularly and consistently addressed his subordinates using coarse and profane language. |
| Specification No. 2: | In that during a meeting to discuss overtime compensation for the 2003 IMF meetings, Lieutenant Atcheson used coarse and profane language while addressing Investigator Wai Tat Chung and threatened Investigator Chung. |
| Specification No. 3: | In that on several occasions since becoming Commander of ECU, Lieutenant Atcheson discriminated against Investigator Randy Squires by disciplining him based on his race only. |
| Specification No. 4: | In that for the rating period 2002-2003, Lieutenant Atcheson gave minority members of the Warrant Squad lower performance ratings than non-minority members. |
| Specification No. 5: | In that in January 2004 Lieutenant Atcheson improperly influenced and intimidated complainants and potential witnesses within SIB. |
| Charge No. 2: | Violation of General Order Series 1202, Number 1, Part I-B-6, which prohibits members from "willfully or knowingly making an untruthful statement of any kind in any verbal or written report pertaining to his/her official duties as a Metropolitan Police Officer to, or in the presence of any superior officer, or intended for the information of any superior officer, or making any untruthful statement before any court or any hearing." |
| Specification No. 1: | Lieutenant Atcheson stated that, during their meeting to discuss overtime compensation for the 2003 IMF meetings, he never used coarse or profane language while addressing Investigator |

Lieutenant Robert Atcheson
EEO 103-52
CS 03-1566
Page 64

                      Chung and that he never threatened Investigator Chung. Lieutenant Atcheson made these statements knowing them to be false.

**Specification No: 2:**     Lieutenant Atcheson stated that, in January 2004, he never made any statements, directly or indirectly, that he intended to "get" or otherwise retaliate against the members who filed the complaint against him. Lieutenant Atcheson made this statement knowing it to be false.