# EXHIBIT #5

664

GOVERNMENT OF THE DISTRICT OF COLUMBIA
METROPOLITAN POLICE DEPARTMENT
POLICE TRIAL BOARD

- - - - - - - - - - - - - - -x
                              :
In the Matter of:             :   VOLUME III
                              :   0417-04
Lieutenant Robert Atcheson    :   CS-03-1566
Third District                :
                              :
                              :
- - - - - - - - - - - - - - -x

Room 212
801 Shepherd Street, N.W.
Washington, D.C. 20011

Friday, August 5, 2005

9:03 a.m.

A hearing in the above-entitled matter was held pursuant to notice before:

Commander Evelyn Primas
Inspector Diane Groomes
Captain Melvin Scott

APPEARANCES:

For the Department

Thelma Chichester Brown
Wendy Butler Curtis
Assistant Attorney General

For the Respondent

Robert Deso, Esquire

**ABLE REPORTING**                              (301) 627-8210

665

C O N T E N T S

| WITNESSES: | EXAMINATION BY | PAGE |
|---|---|---|
| Investigator Gregory Johnson | Captain Scott | 667 |
| | Inspector Groomes | 692 |
| | Chairman Primas | 719 |
| | | |
| Investigator Carl Ruleman | Direct | 731 |
| | Cross | 751 |
| | Captain Scott | 797 |
| | Inspector Groomes | 823 |
| | Chairman Primas | 856 |
| | | |
| Investigator John Reese | Direct | 869 |
| | Cross | 898 |
| | Captain Scott | 922 |
| | Inspector Groomes | 935 |
| | Chairman Primas | 961 |

**ABLE REPORTING**                                    (301) 627-8210

666

C O N T E N T S  [Continued]

E X H I B I T S

| EXHIBIT NO. | MARKED | RECEIVED |
|---|---|---|

Department's:

[None.]

Respondent's:

No. 2    Performance Evaluations        832

P R O C E E D I N G S

CHAIRMAN PRIMAS: Good morning. It is Friday, August 5th about 9:03 a.m. This is a continuation in the matter concerning Lieutenant Robert Atcheson. Before we begin, we have another member in the courtroom. Would you please identify yourself for the record?

MR. SPAKE: My name is Bob Spake, S-P-A-K-E.

CHAIRMAN PRIMAS: When we broke on Wednesday, we were in the middle of interviewing Investigator Gregory Johnson and we left off with the Board. Whereupon,

INVESTIGATOR GREGORY JOHNSON

was recalled as the witness, and having been previously duly sworn by the Chairman, was examined and testified further as follows:

Captain Scott?

CAPTAIN SCOTT: Good morning.

THE WITNESS: Good morning.

668

1  CAPTAIN SCOTT: In your testimony you stated
2  that Investigator Kurgan referred to Lieutenant Atcheson
3  by the name of Hitler. Can you describe for me in what
4  way that term was used, meaning was it a sarcastic
5  comment, an endearing comment or how was it used and what
6  term was it used?
7  THE WITNESS: When we went to the office,
8  before he said it -- when we entered the office, me and
9  Squires at the time, I recall he was standing at his desk
10 and he made a comment and he said -- and when he made
11 this comment, he said, Hitler, wants you all to write a
12 119. We were puzzled and we looked at him and he said,
13 yeah, he needs you all to give him a 119. I mean, he was
14 serious. I mean, he wasn't laughing, he wasn't -- you
15 know, I would have took it as being sarcastic if he would
16 have been laughing or joking, you know, smiling. But he
17 said it with a straight face and that's why I was so
18 puzzled, you know. I could have took it as -- I could
19 have took it better if he was like -- not even took it
20 better, but I would say if he was laughing at the time,
21 being sarcastic, but he was straight-faced.

ABLE REPORTING                    (301) 627-8210

1  CAPTAIN SCOTT: Had you heard that term being
2  used to describe Lieutenant Atcheson before?
3  THE WITNESS: No.
4  CAPTAIN SCOTT: How did it come that
5  Investigator Kurgan was asking you to provide a
6  statement?
7  THE WITNESS: I guess Lieutenant Atcheson
8  contacted him. Sergeant Muslim wasn't there -- Sergeant
9  Muslim wasn't there at the time. I don't know if he had
10  a role -- at the time when he mentioned it, I don't think
11  he was in an acting sergeant status then, he was just
12  contacted -- Lieutenant Atcheson contacted him, I guess,
13  to get a message to me and Squires.
14  CAPTAIN SCOTT: You also testified that you
15  confronted Lieutenant Atcheson about his use of his
16  profanity and if that -- if I heard you correctly, he
17  denied using profanity to describe you or towards you?
18  THE WITNESS: Yes, I called him on the phone.
19  I talked to him on the telephone conversation which I
20  asked him. I wanted -- I told him that I was hearing
21  that he was referring to us -- myself and others as

1  motherfuckers and I wanted him to explain what was he
2  referring to. Was that actually happening. And he was
3  like, no, I never said that. I need to look into that to
4  find out who said that.
5      As a matter of fact, he asked me who said that
6  and I said, well, what difference does that makes. And
7  then he went into, I have to find out what is going on.
8  Who said that and everything because I didn't say it.
9  He denied it.
10     CAPTAIN SCOTT: Did one person tell you that or
11  several people told you that?
12     THE WITNESS: Several people.
13     CAPTAIN SCOTT: Were these people inside of
14  your unit or outside of unit?
15     THE WITNESS: Outside.
16     CAPTAIN SCOTT: Were these people who were
17  inside the MPD or outside the MPD?
18     THE WITNESS: Inside the MPD.
19     CAPTAIN SCOTT: You also said you had a meeting
20  with Commander Barrett. Who was at that meeting?
21     THE WITNESS: Commander Barrett, myself and

1  Investigator Randy Squires.

2      CAPTAIN SCOTT:  And what was discussed at that
3  meeting?

4      THE WITNESS:  We discussed in reference to was
5  we going to be removed the unit, in which he said that
6  wasn't going to happen and then he went into the story --
7  he went into explaining that an attempt was made by
8  Lieutenant Atcheson along with the director of DPW, David
9  Dyer, to try to remove us from the unit and then he also
10  stated it was also denied by him because it sounded like
11  it was racially motivated.  It was called to our
12  attention.

13      CAPTAIN SCOTT:  You also testified that or
14  mentioned that there was a number of requests for
15  statements from you that went nowhere.  Can you tell me a
16  little more about that?

17      THE WITNESS:  Well, he would -- the statements
18  -- he would ask for like 119 statements.  Like a couple
19  statements were like at one time we were going to --
20  whatever we was going through on the Department, we all
21  had to be in Class A uniforms.  I think I was coming from

672

1  court one day. I had a Class A on, but I had a cover
2  over top. He seen me in passing in reference, you know,
3  going back and forth to court. I was going to a witness
4  conference, as a matter of fact. And he asked -- he seen
5  me, he spoke one day. And when I got back to the office,
6  Sergeant Muslim said, he needs a 119 on why you didn't
7  have your nylon jacket on or something like that. Or not
8  answering the page with a 62Es. A statement for that
9  there were no arrests in November at that time in
10 reference to when Kurgan made his statement. 119s for --
11 I mean, I wrote a numerous amounts of 119s under his
12 tenure. I mean, I couldn't go into everything of what it
13 was, but it was like -- and I would never see anything
14 back. I wouldn't even see 750s back. I don't know what
15 the statements were for. I mean, I'd write statements
16 and I wouldn't hear anything else from him.
17         CAPTAIN SCOTT: Have you received any
18 commendations since you've been in the unit?
19         THE WITNESS: Yes.
20         CAPTAIN SCOTT: Approximately how many?
21         THE WITNESS: Maybe three, maybe.

673

1  CAPTAIN SCOTT: Did you receive any
2  commendations while Lieutenant Atcheson was commander of
3  the unit?
4  THE WITNESS: No.
5  CAPTAIN SCOTT: Can you describe for me the
6  duties and responsibilities at the trash transfer station
7  overtime?
8  THE WITNESS: Well, when we work the trash
9  transfer station it wasn't overtime, it was comp time. We
10 received comp time. We wouldn't receive overtime, but we
11 would set up operations like with DCRA. Sergeant
12 Schaefer and their scales unit and everything else. We
13 would set up roadblocks. It could be at BFI. I mean,
14 BWI. Along 3rd Street, Southeast down there, that
15 Eastern Trans Waste facility and we would stop vehicles.
16 They would check the weight -- the weighing of the
17 vehicles. We would do the CDOA and see if they had a
18 solid waste license. Our counterparts that work for DPW,
19 they would write like NOV, notice of violations, if they
20 were in violation. If they were in like no D.C. permit,
21 we would lock them up or no D.C. permit or anything else

674

and document all the trucks that we stopped and everything else and what their role was in reference to coming to these trash transfer facilities.

It came to a point in time, I had to do a search warrant in reference to like -- they was doing -- dumping medical wastes at ETW at one time and we had to follow up the investigation or a couple of times I had to follow up the investigation over at ETW. Write search warrants, go out to their Maryland facility, get their records, documents and everything else because they was doing stuff like that. That was really why -- I think that is really why it was set up to do that because some of these companies were receiving medical waste and they weren't supposed to. I think that's how ID came into play.

CAPTAIN SCOTT: Was it a duty assignment that was appropriate for Environmental Crimes to work?

THE WITNESS: Yes, I would say so.

CAPTAIN SCOTT: And if I hear you right, you said you received compensatory time for working that?

THE WITNESS: Comp time, right.

ABLE REPORTING                    (301) 627-8210

675

1   CAPTAIN SCOTT:  Did you ever have an occasion
2   to have unlimited overtime available to you?
3         THE WITNESS:  No.
4         CAPTAIN SCOTT:  Did you work any overtime
5   outside of the unit with the Warrant Squad or any other
6   squad?
7         THE WITNESS:  No, never.
8         CAPTAIN SCOTT:  Was that made available to you?
9         THE WITNESS:  No, not at all.
10        CAPTAIN SCOTT:  After you filed your EEOC
11  complaint or your EEO complaint, how was your
12  relationship with Lieutenant Atcheson?
13        THE WITNESS:  I would say the same.  After
14  filing, it was -- you know, there was no relationship at
15  all between him and me -- him and I.  But I think around
16  the time where I think the Department was notified or he
17  knew, he kind of turned it up -- he kind of turned it up
18  a little bit.  I mean, I remember phone calls that I
19  would receive.  I mean, he would call and a couple times
20  -- I mean, I remember a phone he received -- matter of
21  fact, Investigator Squires received a phone call in

ABLE REPORTING                              (301) 627-8210