# EXHIBIT #6

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

RANDY SQUIRES, et al.,          )

       Plaintiffs,          )

       -vs-          )    CA NO.:

ROBERT ATCHESON, et al.,          )    1:05cv1120

       Defendants.          )

Tuesday, July 10, 2007

Washington, D.C.

Deposition of

RANDY SQUIRES

called for examination by counsel for the

Defendants, pursuant to notice, held at the

offices of Corporation Counsel, 441 4th Street,

N.W., 6th Floor South, Room 2 -- 6N106,

Washington, D.C., beginning at 10:01 a.m., before

Bonnie Marcus Olachea, a notary public in and

for the District of Columbia, when were present

on behalf of the respective parties:



Precise Reporting Services
(301) 210-5092
Serving MD, DC. & VA

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

2

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiffs:

 4         DAVID A. JACKSON, ESQUIRE

 5         Office of the Attorney General

 6         One Judiciary Square

 7         441 4th Street, N.W.

 8         Suite 600 South

 9         Washington, D.C.  20001

10         (202) 724-6618

11         (202) 727-3625 fax

12         DavidA.Jackson@DC.GOV

13

14    On behalf of the Defendants:

15         DONALD M. TEMPLE, ESQUIRE

16         Temple Law Offices

17         1229 15th Street, N.W.

18         Washington, D.C.  20005

19         (202) 628-1101

20         (202) 628-1149 fax

21         DMT@templelawoffices.com
```

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

3

1    ALSO PRESENT:

2        Stefanie Vidarte, Intern

3        Shahla Zokaie, Law Clerk

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

4

1                    C O N T E N T S

2

3          EXAMINATION OF RANDY SQUIRES

4

5             BY MR. JACKSON:              5, 208

6             BY MR. TEMPLE:               202

7

8    AFTERNOON SESSION:                    73

9

10

11                   E X H I B I T S

12

13   EXHIBIT                              PAGE

14   1   Second Notice of Deposition      12

15   2   Memorandum                       91

16   3   Settlement Agreement             110

17   4   Officer Performance Rating       122

18   5   Memorandums                      165

19   6   Memorandum                       168

20

21              [EXHIBITS ATTACHED.]

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

5

1               P R O C E E D I N G S

2          Thereupon,

3                    RANDY SQUIRES

4     the Plaintiff called for examination by counsel

5     for the Defendants, and, after having been sworn

6     by the notary, was examined and testified as

7     follows:

8          EXAMINATION BY COUNSEL FOR DEFENDANTS

9     BY MR. JACKSON:

10         Q.    Sir, would you state your full name

11    and spell it for the record, please.

12         A.    Randy Squires, R-A-N-D-Y,

13    S-Q-U-I-R-E-S.

14         Q.    Good morning, Mr. Squires.  My name is

15    David Jackson.  I'm an Assistant Attorney

16    General.  And in this case here that was brought

17    by you and several other members of the

18    Metropolitan Police Department, I am

19    representing the District of Columbia.

20              The purpose of this deposition is

21    for me to ask you questions so I can ascertain

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

6

1    what are the facts that you know and what are

2    the facts that you believe that's important to

3    your claim and the case against the District.

4            Have you ever been deposed before in a

5    civil or criminal matter?

6        A.    Personally against me?

7        Q.    In any capacity either as a witness or

8    personally against you or any capacity.

9        A.    Yes.

10        Q.    As you might recall from that prior

11    deposition, there are certain ground rules that

12    are usually laid out before we start to ask

13    questions.  I just want to go over a few of

14    those ground rules so that you'll be clear on

15    how we will proceed so that there will be an

16    orderly process to this deposition.

17            During the course of this deposition

18    everything that you say and I say is being

19    recorded by the court reporter.  And she can

20    only record one person talking at a time.

21            So during the course of me asking you

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

7

1    a question, would you let me finish before you

2    give the answer?

3        A.    Yes.

4        Q.    And I will also let you finish your

5    answer before I ask you another question.  Is

6    that fair?

7        A.    Yes.

8        Q.    And because everything that you're

9    saying and what I'm saying is being recorded,

10   you have to give verbal responses because nods

11   and shakes of the head cannot be recorded by

12   this court reporter.  So I need you to give

13   verbal responses.  Is that okay?

14       A.    Yes.

15       Q.    If I do ask you a question and you do

16   not understand what my question is, would you

17   ask me to rephrase that please?

18       A.    Yes.

19       Q.    And again if I ask you a question and

20   you give me an answer, then I'm going to assume

21   that you understood what my question was and

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

8

1    that your answer is in direct response to that

2    question.

3              Is that fair?

4         A.   Yes.

5         Q.   If at any time during the course of

6    this deposition you would like to take a break

7    for whatever reason, would you let me know that

8    please?

9         A.   Yeah.

10        Q.   And if I have asked you a question,

11   then I would want you to give me the answer

12   before you do take a break if you need a break;

13   is that fair?

14        A.   Yes.

15        Q.   And also I might as you a question

16   that might start off by saying something to the

17   effect of, tell me everybody who you spoke to.

18   If I ask you to tell me people that you have

19   spoken with, I am not talking about any

20   conversation that you had with your lawyer or

21   anybody from your lawyer's law firm.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

9

1          Is that clear?

2     A.   Yes.

3     Q.   And if at any time during the course

4  of the deposition, Mr. Squires, if you give me

5  an answer and then later realize that your

6  answer might have been incorrect or incomplete,

7  just let me know and I'll give you the

8  opportunity to correct or complete the answer

9  that you think was inaccurate or incomplete.

10          Is that fair?

11     A.   Yes.

12     Q.   Is there any reason why you during the

13  course of this deposition will be unable to give

14  full and complete answers for any questions I

15  might ask?

16     A.   Depends on what the question is.  I

17  don't know until you ask me the question.

18     Q.   Have you taken any medication or drugs

19  that may impair your ability to remember or

20  recall facts?

21     A.   No, I have not.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

10

1      Q.    Mr. Squires, what, if anything, did

2    you do to prepare for today's deposition?

3      A.    Nothing.

4      Q.    Did you review any documents in

5    preparation for today's deposition?

6      A.    No.

7      Q.    Did you talk to anybody other than

8    your lawyer in preparation for today's

9    deposition?

10     A.    No, I did not.

11     Q.    Do you know a Lieutenant Muslim?

12     A.    Yes, I do.

13     Q.    Have you spoken with Lieutenant Muslim

14   at any time since 5:00 yesterday evening?

15     A.    No, I did not.

16     Q.    Mr. Squires, where are you employed?

17     A.    The Metropolitan Police Department.

18     Q.    And what is your rank?

19     A.    Well, officer now.

20     Q.    And how long have you been employed

21   with MPD?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

11

1    A.   Since 1988, 19-1/2 years now.

2    Q.   You said you're an officer now.  What

3  does that mean?

4    A.   I was an investigator.  And now I've

5  been demoted down to officer.

6    Q.   Have you officially been demoted to an

7  officer?

8    A.   I have to go over to property and take

9  my badge over as soon as possible.

10   Q.   Have you received some official papers

11  from the Metropolitan Police Department telling

12  you that you're being demoted from officer to

13  investigator?

14   A.   No written, no.

15   Q.   How did you find out that you were

16  being demoted?

17   A.   Learned about it by my job.  They said

18  that we are officers.  And on my paperwork

19  everything says officer.  Doesn't say

20  investigator.  All paperwork, my schedule, my

21  everything has only officer.  Does not have

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

12

1    investigator at all.

2        Q.    Why are you being demoted?

3        A.    Because I'm back out into patrol.  I'm

4    no longer in the environmental crime unit.

5        Q.    So you had the rank of investigator

6    only during the period of time that you were in

7    the environmental crimes unit?

8        A.    Yes.  We had to fight for that.  We

9    had to fight to get that.

10            MR. JACKSON:  Can I have this marked

11   please Number 1?

12            (Squires Deposition Exhibit Number 1 was

13            marked for identification and attached to

14            the transcript.)

15   BY MR. JACKSON:

16       Q.    As of today is it appropriate or

17   accurate if I call you Officer Squires as

18   opposed to Investigator Squires?

19       A.    That's fine.

20       Q.    Officer Squires, I am showing you a

21   document that has been marked as Exhibit Number

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

13

1    1.  I'm going to ask you to take a look at it

2    and tell me if you have ever seen that document

3    before.

4            For the record let me just say what it

5    is and identify it as the Second Notice of

6    Deposition to Randy Squires, care of Donald

7    temple, Esquire.  Would you just take a look at

8    that and tell me if you ever have seen that?

9        A.   I need my glasses.  I don't have my

10   glasses, kind of blurry.

11       Q.   Have you ever seen that document,

12   Officer Squires?

13       A.   No.

14       Q.   No?

15       A.   Uh-uh.

16       Q.   If you would turn to the third page on

17   the third page it's an Attachment A.  Do you see

18   that at the top there?

19       A.   Yes.

20       Q.   Let me ask you, Officer Squires, where

21   are your glasses?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

14

1    A.    They're in my car.

2    Q.    And where is your car parked?

3    A.    Down the street.

4    Q.    This Attachment A was attached to your

5  Second Notice of Deposition and is requesting

6  that you bring certain documents with you.  I

7  understand that you just said that you have not

8  seen this before but let me just --

9         MR. TEMPLE:  He didn't say that.  He

10  said he had seen the document, not the

11  attachment.

12  BY MR. JACKSON:

13    Q.    Have you seen this Attachment A

14  before?

15    A.    I have not seen this document.  No, I

16  have not.

17    Q.    That would include the second -- that

18  would include all three pages of this document?

19  I mean maybe it's better that we take a break

20  and you go get your glasses, because I have some

21  other things I want you to take a look at.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

15

1      (Whereupon, a short recess was taken.)

2  BY MR. JACKSON:

3      Q.   Officer Squires, you have now had the

4  opportunity to retrieve your glasses from your

5  automobile.  And again I would ask if you would

6  take another look at this document that has been

7  marked as Exhibit Number 1.  It's the Second

8  Notice of Deposition.

9          Take a look at all three pages and

10  tell me now if you recognize this document.

11  Have you seen it before?

12     A.   Yes, I have.

13     Q.   You have seen that?

14     A.   Yes.

15     Q.   The third page of the document is an

16  Attachment A.  And the Attachment A reads,

17  The District demands that the Plaintiff produce

18  before or on the day of the deposition each and

19  every document set forth below.

20          Did you see that?

21     A.   Yes.

16

1    Q.   Let me ask you, Officer Squires, do

2  you maintain a personal file that may contain

3  any documents relating to any of the facts and

4  issues as alleged in the lawsuit against the

5  District of Columbia?

6    A.   I do not have a personal file, but I

7  do have papers in reference to the allegation

8  against Lieutenant Atcheson.  Yes, I do.

9    Q.   And where are those papers maintained?

10   A.   All over my house.  Was at my office,

11  and most of the copies that I have I've

12  forwarded to Donald.

13   Q.   Okay.  Do you also have any documents

14  in a personal folder on your computer?

15   A.   No, I do not.

16   Q.   Number one says, "Copies of all

17  charges of discrimination and/or complaints of

18  discrimination concerning any allegations as

19  alleged in the Second Amended Complaint filed

20  with the Metropolitan Police Department

21  concerning any and all claims of discrimination

17

1   as set forth in the second amended complaint."

2            Did I read that correctly?

3        A.    Yes you did.

4        Q.    What, if anything, did you do to

5   determine whether or not you have any documents

6   responsive to the first request in that regard?

7        A.    Have forwarded.  To the best of my

8   knowledge I have given all those to Donald and

9   also to the EEO.

10       Q.    Do you know exactly which documents

11  that they were that you gave to your attorney

12  that would have been responsive to Request

13  Number 1?

14       A.    Not right offhand.  No, I do not.

15       Q.    Number 2 reads, "Copies of all charges

16  of discrimination and/or complaints of

17  discrimination concerning any allegation as

18  alleged in the second amended complaint filed

19  with the District of Columbia Office of Human

20  Rights concerning any and all claims of

21  discrimination as set forth in the Second

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

18

1    Amended Complaint."

2            Did I read that correctly?

3    A.    Yes, you did.

4    Q.    Can you tell me what if anything you

5    did to search your own files to see if you have

6    any documents responsive to that request?

7    A.    I don't understand your question.

8    Q.    Did you search -- let me rephrase it.

9    Did you search your own file to see if you had

10   any documents that would have been responsive to

11   that request?

12   A.    You said my files.  I don't have

13   files.  I have -- every record I have I searched

14   for those.  I don't have a file.

15   Q.    Okay.  So did you search the papers

16   that you have in your house to see if any of

17   those papers would have responsive to Request

18   Number 2?

19   A.    Yes, I did.

20   Q.    Did you find any papers that would

21   have been responsive to Request Number 2?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

19

1    A.    Whatever I found I have passed on to

2    my attorney, Donald Temple.

3    Q.    Number 3 says, Copies of all charges

4    of discrimination made or complaints of

5    discrimination concerning any allegation as

6    alleged in the Second Amended Complaint filed

7    with the Equal Employment Opportunity

8    Commission, EEOC, concerning any and all claims

9    of discrimination as set forth in the Second

10   Amended Complaint.

11        Did I read that correctly

12   A.    Yes, you did.

13   Q.    Did you search the papers that you

14   have in your house to see if any of those papers

15   would have been responsive to Request Number 3?

16   A.    All papers that I have to the best of

17   my knowledge, best of my ability, I have

18   forwarded to my lawyer, Donald Temple.

19   Q.    So you did find papers that would have

20   been responsive to Request Number 3, which means

21   papers you have at home?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

20

1      A.    All documents that I had at home, that

2    I have had, to the best of my knowledge I have

3    given to Donald.

4      Q.    Number 4 says, Copies of all Right to

5    Sue letters received from the Equal Employment

6    Opportunity Commission, EEOC and/or the District

7    of Columbia Office of Human Rights concerning

8    any and all claims of discrimination as set

9    forth in the Second Amended Complaint.

10          Did I read that correctly

11     A.    Yes.

12     Q.    And did you search -- did you search

13   the documents that you have in your home to see

14   if any of those documents would have been

15   responsive to Request Number 4?

16     A.    I did not search my records for this

17   because the EEO sent a copy directly to Donald,

18   to Donald's office.  They sent it to them.

19     Q.    What about the Office of Human Rights?

20     A.    The District Human Rights?  No, I did

21   not send them a copy.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

21

1       Q.   Do you have any documents in your home

2   from the District of Columbia Office of Human

3   Rights that would have been responsive to

4   Request Number 4?

5       A.   No, I did not.

6       Q.   Number 5 says, "Copies of all

7   performance evaluations from 2000 to the

8   present."

9            Did I read that correctly?

10      A.   Yes.

11      Q.   Did you search the documents that you

12  have at your house to see if any of those

13  documents would have been responsive to Request

14  Number 5?

15      A.   No, I did not.

16      Q.   And is there a reason why you did not

17  search?

18      A.   Yes.  Because the police department

19  has all copies of all my evaluations.

20      Q.   Do you have copies of your

21  evaluations?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

22

1      A.   No, I do not.  No, I do not.

2      Q.   "Copies of all applications for a

3  promotion submitted from 2000 to the present."

4           Did I read that one correctly?

5      A.   Yes.

6      Q.   Did you search the papers that you

7  have in your home to see if any of those papers

8  would have been responsive to Request Number 6?

9      A.   No, I have not.  I'm sure that I

10  can -- my police department has a copy of my

11  promotion from officer to investigator.  I do

12  not have any knowledge of where the paper is but

13  I do have a form -- I think it's called a Form 1

14  -- with my promotion from officer to

15  investigator.

16      Q.   Do you believe that Form 1 is in the

17  papers that you have at home?

18      A.   It's somewhere.  I don't know if it's

19  in the box that I got from my office, but I

20  think I have a copy somewhere.

21      Q.   Would you search the papers that you

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

23

1   have at home or the documents that you have at

2   home to see if you have any documents that would

3   be responsive to Request Number 5 or 6?

4       A.   You can also get those from the police

5   department.  The police department has them for

6   sure.

7       Q.   My question is, will you search the

8   papers that you have in your home to see if any

9   of those documents are responsive to Request

10  Number 5 or 6?

11      A.   Yes, I will.

12      Q.   Number 7, "Copies of all reprimands,

13  notices of adverse action, letter of counseling

14  or any other notice of discipline including

15  proposed notices of discipline, concerning

16  Plaintiff from 2000 to the present."

17           Did I read that correctly?

18      A.   Yes, you did.

19      Q.   And did you search the papers that you

20  have in your house to determine whether or not

21  any of those documents or that you have any

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

24

1    documents that are responsive to Request Number

2    7?

3        A.    The ones that I had that I could find

4    I have turned over to Donald.  And the police

5    department also keeps a record of all of my

6    discipline actions.

7        Q.    And when you say Donald you're

8    referring to your attorney Donald Temple?

9        A.    Yes.  Yes, I am.

10       Q.    And lastly, Officer Squires, Number 8,

11   says, "Copies of all letters, notes, e-mails,

12   memorandum, or any other written document

13   generated by Plaintiff and sent to Commander

14   Broadbent and/or Commander John and/or Captain

15   Brito" -- Brito, spelled B-R-I-T-O -- "regarding

16   any and all allegations as set forth in the

17   Second Amended Complaint."

18           Did I read that correctly?

19       A.    Yes.

20       Q.    And did you search the papers that you

21   have in your home to see if any of those papers

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

25

1    would have been responsive to Request Number 8?

2        A.    No.    I have never sent them an email

3    or a written document.

4        Q.    You have never sent it to any of these

5    individuals?

6        A.    No, I have not.

7        Q.    Now before I asked, started to ask you

8    questions as it relates to the Exhibit Number 1,

9    you were telling me about you have been demoted

10   from investigator to officer; is that correct?

11       A.    Yes.

12       Q.    Do you know of any other investigators

13   who have been demoted to officer who used to

14   work in the environmental crimes unit?

15       A.    I know of Officer Greg Johnson.

16       Q.    What was the effective date of your

17   demotion?

18       A.    I guess about a month or so ago.    I

19   don't know the exact date.

20       Q.    Which official signed off on or

21   ordered your demotion?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

26

1          A.    I don't know.  We never heard it.

2    Just tell us by word of mouth you are now

3    officially -- all my paperwork now, all of it

4    says officer.

5          Q.    Who told you that you were being

6    demoted from investigator to officer?

7          A.    I do not recall who.

8          Q.    This was a month ago?

9          A.    About a month or month and a half ago.

10   No, I do not.

11         Q.    A month or a month and a half ago who

12   was your immediate supervisor?

13         A.    Sergeant White.

14         Q.    Do you recall whether or not Sergeant

15   White told you that you were being demoted from

16   investigator to officer?

17         A.    I don't know who told me.

18         Q.    When you say Sergeant White, is that

19   Sergeant Louie white?

20         A.    Yes.

21         Q.    And is that the same Sergeant Louie

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

27

1   White who is also a Plaintiff in this lawsuit?

2       A.   Are you saying -- when you say

3   Sergeant White, what do you mean Sergeant White?

4   I don't understand it.  What do you mean

5   Sergeant White?  Why are you saying Sergeant

6   White?  What do you mean by that?

7       Q.   Thought you told me that Sergeant

8   White was your immediate supervisor when you

9   were an investigator.

10      A.   Right, yes.

11      Q.   My question to you, Sergeant White, is

12  that Sergeant Louie White?

13      A.   Yes, it is.

14      Q.   And it's the same Sergeant Louie White

15  who is a Plaintiff in this lawsuit?

16      A.   Yes, it is.

17      Q.   Who would have been your second-line

18  supervisor as an investigator?

19      A.   When?  At what period of time?

20      Q.   Just before you were demoted to

21  officer.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

28

1          A.    My next supervisor would have been

2    Lieutenant Douglas.

3          Q.    Douglas?

4          A.    Yeah.

5          Q.    Do you recall whether or not

6    Lieutenant Douglas told you that you were being

7    demoted from investigator to officer?

8          A.    I do not, no.  I don't remember who

9    told me.

10         Q.    Are you in the process of challenging

11   your demotion?

12         A.    I might have to.  We're going to have

13   to file a grievance.

14         Q.    And what is the process of filing a

15   grievance?

16         A.    Talk to the FOP.

17         Q.    Do you know whether or not the

18   grievance -- let me rephrase that.  Do you know

19   whether or not the first person to receive the

20   grievance would be the person that ordered the

21   demotion?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

29

1    A.    No.   I don't know the process.   No, I

2    don't.   Only FOP can tell you that.

3    Q.    What were the reasons given to you for

4    your demotion?

5         MR. TEMPLE:   Objection.

6         THE WITNESS:   I do not know.   You have

7    to ask them.   I don't know.

8    BY MR. JACKSON:

9    Q.    Were you told why you were being

10   demoted?

11   A.    No.   I know that we just was assigned

12   from environmental crime on a Friday.   And on a

13   Sunday we were transferred to the District.

14   Q.    What District are you coming to work

15   for?

16   A.    Four District.

17   Q.    Who is your immediate supervisor?

18   A.    There is no immediate supervisor.

19   Q.    Who do you report to?

20   A.    4-D.   There's more than -- there's

21   like five different sergeants.   And I have five

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

30

1    different sergeants so there's no one

2    supervisor.

3         Q.   Are you now back on patrol --

4         A.   Yes, I am.

5         Q.   What shift do you work?

6         A.   I usually work from 6:00 to 2:30.

7         Q.   Six.  Six in the morning or six in the

8    evening?

9         A.   Yeah, 6:00 in the morning to 2:30.  I

10   mean I'm detailed to what they call the summer

11   youth program or whatever they call it.

12        Q.   And that's at 4-D?

13        A.   Yes, 4-D.

14        Q.   And you've been at 4-D for about a

15   month or month and a half?

16        A.   Maybe a month and a half, maybe two.

17   I'm not for sure exactly of the exact time or

18   how long I've been there.

19        Q.   Now, when you say you have been

20   detailed to the customer youth program, can you

21   explain what you mean by being detailed to the

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

31

1    summer youth program?

2        A.   I will -- it's just youth.  I help

3    youth -- you know they have a summer program

4    where youth are dropped off and we -- we

5    basically take them on trips and take them --

6    they do basketball, they go swimming, and stuff

7    like that.

8        Q.   What are your duties and

9    responsibilities with the summer youth program?

10       A.   To look over them, to be -- I guess

11   just be a police officer just to oversee it.

12   You know, one of the officers oversees the

13   program for kids.

14       Q.   Do you carry a badge?

15       A.   Yes.

16       Q.   And a gun?

17       A.   Yes.

18       Q.   And mace?

19       A.   No.

20       Q.   Handcuffs?

21       A.   No.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

32

1          MR. TEMPLE:  You're talking about

2    presently or during the time within the camp?

3          MR. JACKSON:  I'm talking about his

4    present detail.

5    BY MR. JACKSON:

6          Q.   Do you wear your uniform?

7          A.   No.  We participate with the youth so

8    I get in the swimming pool.  I can't get in the

9    swimming pool if I have my badge and my gun on.

10         Q.   Are there civilians who also work for

11   the summer youth program?

12         A.   Yes.

13         Q.   Are there counselors that work for the

14   summer youth program?

15         A.   I don't know.  The program is big so

16   you have to -- I'm just starting so I have no

17   clue on how many, who, or what.  I can't tell

18   you that because it's more than one camp.  It's

19   all over the city.

20         Q.   Do you know whether or not the summer

21   youth program is a program that's implemented by

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

33

1    the MPD or some other agency or company?

2        A.   I couldn't tell you.  I don't know.  I

3    don't know.  I don't want to tell you.  I don't

4    know.

5        Q.   And prior to going to 4-D where were

6    you assigned?

7        A.   To the environmental crime unit.

8        Q.   How long had you been assigned to the

9    environmental crime unit?

10       A.   Since 1998.

11       Q.   Up until approximately a month and a

12   half, 2 months ago; is that right?

13       A.   Right.

14       Q.   At some point in time while you were

15   at the environmental crime unit, Lieutenant

16   Atcheson was there?

17       A.   Yes.

18       Q.   Did Lieutenant Atcheson have any

19   direct responsibility to supervise you?

20       A.   Yes.

21       Q.   Could you tell me when Lieutenant

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

34

1    Atcheson became responsible for your direct

2    supervision?

3         A.   I think it was April, April or March

4    of 2001.

5         Q.   And prior to April or March of 2001

6    did you know Lieutenant Atcheson?

7         A.   No, I did not.

8         Q.   So is it fair to say then as it

9    relates to this lawsuit any of the allegations

10   against Lieutenant Atcheson will begin sometime

11   in March or April of 2001?

12        A.   Are you saying my allegations or are

13   you saying other people's allegations?

14        Q.   Yours.

15        A.   Yes.

16        Q.   How long was Sergeant White your

17   supervisor?

18        A.   I think Sergeant White came once that

19   Lieutenant -- I mean Sergeant Muslim became

20   Lieutenant Muslim.  And I want to say that's --

21   I want to say 2004 or 2003.  I'm not for sure

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

35

1    exactly which one.

2        Q.   Prior to March or April of 2001, did

3    you have a performance evaluation?

4        A.   Yes, I did.

5        Q.   And who was the individual that

6    evaluated your performance?

7        A.   Sergeant Muslim.

8        Q.   Do you recall what the rating was that

9    Sergeant Muslim give you?

10           MR. TEMPLE:  At which point?

11           MR. JACKSON:  It's just a followup.

12           MR. TEMPLE:  What year?

13   BY MR. JACKSON:

14       Q.   Prior to March or April of 2001.

15       A.   Do I remember what it was?

16       Q.   Yes.

17       A.   No, no way possible.  No, I do not.

18       Q.   How many evaluations if you recall did

19   Sergeant Muslim complete for you prior to March

20   or April of 2001?

21       A.   I don't know if it's every six months

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

36

1    so I guess it's two a year.  I'm not for sure.

2    It might be two a year, but I'm not for sure.

3        Q.   During any of those evaluation

4    processes did Sergeant Muslim indicate to you

5    that he had any problems with your performance?

6        A.   I think he wanted me to be more

7    assertive, you know, more assertive as a person,

8    that I can remember.

9        Q.   Do you recall why Sergeant Muslim told

10   you that he wanted you to be more assertive?

11       A.   I guess -- I don't know.  You have to

12   ask him.  I don't know.

13       Q.   My question was do you recall what he

14   said to you about being more assertive?

15       A.   No, I do not.

16       Q.   Did he raise any other concerns about

17   your performance?

18       A.   Not that I can remember, no.

19       Q.   Prior to April of 2001, did you ever

20   file a grievance or challenge any of the

21   performance evaluations that you received?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

37

1    A.    No, I have not.

2        Q.    Do you recall the first couple of

3    months of Lieutenant Atcheson's becoming your

4    immediate supervisor at the environmental crime

5    unit?

6        A.    You have to be more specific again.  I

7    mean do I recall what?

8        Q.    I just want to know do you recall

9    these first couple of months when he was there?

10       A.    The meetings he had, yes, I do.

11       Q.    Tell me about those couple of months

12   what you recall Sergeant Atcheson --

13       A.    Lieutenant Atcheson.

14       Q.    -- Lieutenant Atcheson either saying

15   or doing that you believe was discriminatory as

16   relates to your lawsuit.

17       A.    He said that he didn't believe in

18   treating people fairly.

19       Q.    Okay.

20       A.    I didn't know what that means, but I

21   took offense to that.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

38

1    Q.    Why did you take offense at that?

2    A.    Because that means that he believes in

3  treating someone else differently than the

4  other, and that's not right.

5    Q.    Did he say that he didn't believe in

6  treating people fairly because of their race?

7    A.    Later on he say -- it was apparently,

8  yes.

9    Q.    What did he say?

10   A.    He said he don't believe in treating

11  people fairly.

12   Q.    Did he say, I don't believe in

13  treating people fairly because of their race?

14   A.    No, he did not.  His actions showed it

15  though.

16   Q.    Did he say, I don't believe in

17  treating people fairly because of their gender?

18   A.    No, he did not.

19   Q.    Did you ask Lieutenant Atcheson what

20  he meant by his statement that he doesn't

21  believe in treating people fairly?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

39

1      A.   No, I did not.

2      Q.   And what type of a -- did Lieutenant

3    Atcheson make this statement in a meeting of

4    some sort?

5      A.   Yes.

6      Q.   Who attended that meeting?

7      A.   All of us, just, you know, whoever was

8    there.  I don't know who was there.

9      Q.   So during this first couple of months

10   do you recall Lieutenant Atcheson saying

11   anything else or doing anything else that makes

12   you believe that his conduct was discriminatory?

13     A.   Not in the first couple of months.

14   No, I did not.

15     Q.   Let me take this approach, Officer

16   Squires.  I'm going to read paragraphs of your

17   complaint and then I'm going to ask you some

18   questions as to what is alleged in the

19   complaint.  And again I am referring to that

20   portion of the amended complaint that has been

21   incorporated into the second amended complaint

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

40

1    starting at --

2         MR. TEMPLE:  Are you going to show me

3    a copy?

4         MR. JACKSON:  I'm just going to read

5    it.

6    BY MR. JACKSON:

7       Q.   Starting at Paragraph 14, it says, "In

8    October of 1988 Plaintiff Squires was employed

9    by the DC MPD;" is that correct?

10      A.   Yes.

11      Q.   "He was later transferred to the ECU;"

12   is that correct?

13      A.   Excuse me?

14      Q.   He was later transferred to the ECU?

15      A.   Incorrect.

16      Q.   Incorrect?

17      A.   Yes.

18      Q.   Why is that incorrect?

19      A.   Because I went from the academy to 7

20   District.  From 7 District then I went to the

21   police academy.  Then from the police academy I

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

41

1   want to the environmental training.

2       Q.   Paragraph 15 reads, "that Defendant

3   Atcheson's supervisors were notified about his

4   conduct.   Atcheson continued to verbally abuse

5   the Plaintiff."

6           Is that true?

7       A.   Yes.

8       Q.   Tell me how did Lieutenant Atcheson

9   verbally abuse you?

10      A.   Basically on a number of occasions the

11  things that he said, the tone of voice, the --

12  just different things that he said when he would

13  call us in and, you know, just different things

14  like that.

15      Q.   What did he say?

16      A.   Well, on different situations, just

17  different situations he would say different

18  things.   There's no in particular situation.

19      Q.   What did he say that makes you believe

20  that his words were discriminatory?

21      A.   I heard him address us -- I heard him

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

42

1    address me.  I was talking to him on the phone

2    about he was harassing me.  He was constantly

3    calling harassing me about the situation that I

4    had in North Carolina, that I would be locked

5    up, that I was a criminal.

6           He also said that I would lose my job,

7    that I was supposed to be locked up.  I don't

8    deserve to be on the police department.  He

9    also -- I heard him saying if that MF don't come

10   down here I'm going to fire him up.

11          What else?

12     Q.    Let me do this.

13     A.    I thought you were going to let me

14   finish.

15     Q.    Oh, yeah, but I'm going to make it --

16   I want to make it easier for you I hope because

17   I wanted to ask you separately about the

18   incident in North Carolina.

19     A.    Exactly.

20     Q.    So I wasn't going to ignore that, but

21   let's deal with that because that's a much more

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

43

1    bigger issue.  But in terms of other kinds of

2    comments that he made that makes you believe

3    that his statements were discriminatory?

4         A.    Those are basically the situations

5    that I felt that he was being discriminatory

6    towards me.

7         Q.    As it relates to the situation.

8         A.    Also, when he addressed me as MF that

9    was because he knew that we had filed an EEO

10   complaint against him and I told him.

11              He would constantly say, you better

12   come down here.  He would call me, like always

13   call me about 4:15 and he would order me down

14   here.  He would use --

15              He was very demanding in what he said,

16   you'd better come down here.  He always said

17   that.  He always said it in a very vulgar manner

18   trying to intimidate.

19         Q.    When you say come down there, what do

20   you mean by that?

21         A.    Come down to his office at 7-D.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

44

1       Q.    And where was your office at?

2       A.    Southeast over at 2750 South Capitol

3   and also 3220 Pennsylvania Avenue.

4       Q.    And when he would order you to come

5   down or come to see him, would you go to see

6   him?

7       A.    Yes.

8       Q.    And what was the purpose of your

9   having to see him?  Did he tell you why?

10      A.    Yes.

11      Q.    What did he tell you?

12      A.    For discipline.  Every time I came to

13  see him it was for discipline.

14      Q.    And tell me what was the discipline

15  for?

16      A.    What was he trying to discipline me

17  for?  Numbers of things, numbers of things.

18      Q.    What did he tell you he was

19  disciplining you for?

20      A.    Gave me a 62, I think it was a 62-E,

21  for not answering the telephone.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

45

1      Q.    What's a 62-E?

2      A.    It's -- it's something bad that they

3   put in your record.  Then he would call me down

4   there for -- he said he accused me of stealing a

5   government card, so he called me down there for

6   that.  He called me down there for missing -- he

7   said I missed, I didn't go to the 40-hour

8   training.

9           I'm trying to think of what else.  I'm

10  sure I'm missing some but those are the ones I

11  can think of right now.

12     Q.    What happened with the 62 E?

13           MR. TEMPLE:  What was that?

14  BY MR. JACKSON:

15     Q.    I said what happened with the 62-E?

16     A.    I had to sign it.

17     Q.    Where does that 62-E go?

18     A.    Supposed to be in my jacket.

19     Q.    Have you had the opportunity to look

20  at your personnel file?

21     A.    There's two personnel files.  There's

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

46

1   not one.  There's two.

2        Q.    Have you had the opportunity to look

3   at one or the other?

4        A.    Yeah, about a couple years -- well,

5   no.  Was it last -- I think it was last year was

6   the last time I saw it, yes.

7        Q.    Did you see a 62-E in there?

8        A.    Not in that one.  No, I did not.

9        Q.    Which one is that one?

10       A.    That's the one that usually follows

11  you.  And wherever you're at there's a jacket

12  that follows you.  And then there's one downtown

13  that's your -- I guess that's your permanent

14  jacket that stays downtown.

15       Q.    Have you ever heard the term, unit

16  file, before?

17       A.    No.

18       Q.    So which one did you look in?

19       A.    The one that was -- that my -- the one

20  that was for me.  That was the one that follows

21  me.  That was the file that follows me.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

47

1     Q.    And you did not see a 62-E in that

2  file?

3     A.    No.

4     Q.    What about the one, the file that's

5  maintained downtown, official file?

6     A.    I've never seen that one.

7     Q.    Have you ever looked in it?

8     A.    No.

9     Q.    Have you ever requested to look in it?

10     A.    I think my lawyers from there in North

11  Carolina subpoenaed it, and I think I might have

12  glimpsed in it.

13     Q.    Do you recall whether or not you saw

14  the 62-E in that?

15     A.    I don't know.

16     Q.    By the way when was the 62-E issues?

17     A.    Sometime in 2001.

18     Q.    Do you remember when in 2001?

19     A.    No, no.

20     Q.    Do you recall whether or not since

21  2001 there have been similar incidences of

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

48

1    Lieutenant Atcheson issuing you 62-E's for any

2    reason?

3        A.    Not that I can recall.  It's more --

4    more severe than the 62-E's.

5        Q.    You also said that he accused you of

6    stealing a government car.

7        A.    Yes.

8        Q.    When was that?

9        A.    That was in -- I think that was 2001,

10    early 2002 I think.

11        Q.    Did Lieutenant Atcheson issue some

12    kind of a report or form?

13        A.    Yeah.  He did a report.  Yeah, he did

14    an investigation.

15        Q.    And have you seen that report?

16        A.    Did I see it?

17        Q.    Yes.

18        A.    I had to write a statement.  I saw my

19    statement.  My union rep was there.  Yes, I saw

20    my statement.

21        Q.    And tell me about the facts

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

49

1    surrounding the allegations that Lieutenant

2    Atcheson was making about you stealing a car?

3        A.    He said that I had took a government

4    car home.  I didn't have permission to take a

5    government car home.  He said he came to my

6    house.  He saw the car at my house.

7            He said he took pictures of the car

8    being at my house.  And that next morning he saw

9    me drive that car to work.

10       Q.    He's talking about a police car?

11       A.    No.  He's talking about a DPW vehicle.

12       Q.    A DPW vehicle?

13       A.    Department of Public Works vehicle.

14       Q.    And in the environmental crimes unit

15   did you work closely with DPW?

16       A.    Yes.

17       Q.    Did you drive a DPW car home?

18       A.    No, I did not.

19       Q.    Was there one parked in front of your

20   house?

21       A.    No, there was not.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

50

1      Q.    Did you drive one to work the next

2   morning?

3      A.    No, I did not.

4      Q.    And do you know what happened as a

5   result of that investigation?

6      A.    No, I don't.

7      Q.    Do you know if the -- did anybody from

8   internal affairs ever talk to you about this

9   alleged stealing of the government car?

10     A.    No, they did not.

11     Q.    Have you ever been disciplined because

12   of this alleged stealing of the government car?

13     A.    Not as of yet.  No, I have not.

14     Q.    When you say as of yet, is there an

15   ongoing investigation into that?

16     A.    A lot of times investigations can take

17   years and you can still be disciplined for them.

18     Q.    Do you know whether or not the

19   investigation or the allegations in the

20   investigation were substantiated or

21   unsubstantiated?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

51

1      A.   I have proof that I drove my own

2  vehicle home.  I had -- Sergeant Muslim and

3  Officer Greg Johnson saw me drive my vehicle

4  home.

5      Q.   Fair enough.  But my question to you

6  as it relates to the investigation, do you know

7  whether or not that investigation or the

8  allegations in the investigation have been

9  substantiated or unsubstantiated by the

10 Metropolitan Police Department?

11     A.   No, I do not.  I never received

12 anything in regard to that.

13     Q.   And this was sometime in 2001 or 2002?

14     A.   Yes.

15     Q.   Is that the only incident in which you

16 were accused of stealing a government car or

17 anything with a government car?

18     A.   Yes.

19     Q.   And Lieutenant Atcheson is the one who

20 made those accusations against you?

21     A.   Yes.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

52

1      Q.   Did you talk to Lieutenant Atcheson

2   about this?

3      A.   Yes.  Oh, yes.

4      Q.   Tell me about the conversation you had

5   with him.

6      A.   He called me to his office like he

7   usually do at 4:45, and I had to get a union

8   rep.  And he gave me a Q and A.  And before he

9   could give me a Q and A I just happened to be

10  with my lawyer.  And he said he had to give me a

11  reverse garrity (phonetic).

12          And when I came up there he told me,

13  he pointed to my face and he said, I know you

14  did it.  And he said, I want you to go in the

15  next room.  I want you to write down you did it,

16  and you're sorry, and you won't do it again.

17  That's all I will accept.

18          Other than that, you've got adverse

19  actions.  And you don't want to go and get tried

20  by the three wise men.  And he said something

21  about my incident in North Carolina.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

53

1        So I was like, what did my incident in

2   North Carolina have to do with this situation?

3        So he said, you need to go in there

4   and you need to just write a statement and say

5   that you did it, because we know you did it.  He

6   said, I went to your house.  I saw the house

7   there.  I got pictures of the car being at your

8   house.

9        Q.   When Lieutenant Atcheson called you to

10  come down to his office as it relates to this

11  particular incident, did he tell you why he

12  wanted you to come down there?

13       A.   Yes.

14       Q.   And is that why you were with the --

15       A.   Union rep, yes.

16       Q.   Through the FOP?

17       A.   Yes.

18       Q.   Now you said he had you do a Q and A.

19  What's a Q and A?

20       A.   Question and answer.

21       Q.   Is that a specific form or questions?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

54

1    A.    Yes.  Statements, questions that he

2    asks me in reference to an investigation.

3    Q.    And he asked you questions and you

4    gave him answers?

5    A.    Yes.

6    Q.    Did you have the opportunity to write

7    a report of your own statement absent Lieutenant

8    Atcheson asking you questions?

9    A.    No, I did not.

10    Q.    And you said that Lieutenant Atcheson

11    said that you don't want to be tried by the

12    three wise men.  Who are the three wise men?

13    A.    The trial board.

14    Q.    Why are they referred to as the three

15    wise men?

16    A.    I guess -- I don't know.  You have to

17    ask him why he called them that way.

18    Q.    You also indicated that Lieutenant

19    Atcheson told you he had pictures.  Did you see

20    the pictures?

21    A.    No, I did not.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

55

1    Q.    Did you ask to see the pictures?

2    A.    Yes, I did.

3    Q.    What did he say?

4    A.    No.

5    Q.    So when Lieutenant Atcheson made these

6    allegations that you had stolen a government car

7    what did you say to him?

8    A.    It wasn't true.

9    Q.    Did you say anything else?

10    A.    Yeah.  I told him if he gave me the

11    option, he said, either go in the room and write

12    this statement or I'm going to give you -- he

13    said the minimum you can get is adverse action.

14        So my FOP rep said, well, he didn't do

15    it.

16        But he said, well, I'm not going to

17    accept anything.  He said, my supervisor won't

18    accept anything but adverse action.

19    Q.    Who was Lieutenant Atcheson's

20    supervisor?

21    A.    At that time Captain Brito.