DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

100

1    Q.    Was Paul Kurgan in the ECU?

2    A.    Yes.

3    Q.    And you mentioned the warrant squad.

4    Who was in the warrant squad?

5    A.    The warrant squad, he had an overtime

6    warrant squad that consists of all whites, that

7    I know of.  It was all whites.

8    Q.    When you say he we're talking about

9    Lieutenant Atcheson?

10    A.    Lieutenant Atcheson, yes.

11        (Discussion off the record.)

12    BY MR. JACKSON:

13    Q.    Was there anything else about the car

14    before we go on?

15    A.    No.

16    Q.    Now getting back to 2002, denying

17    access to the breathing apparatus, tell me about

18    that.

19    A.    We were told that we were supposed to

20    go over to the SOD, special operations division,

21    to get breathing apparatus.  The reason why we

101

1    need breathing apparatus is to help us to do our

2    job in reference to, if we have a hazardous

3    situation, we are able to go into the hazardous

4    situation.

5            And if we have to be totally

6    incapsulated, we can because we have breathing

7    apparatus.  Without those we're not allowed to

8    go into those situations because we don't have

9    the proper equipment.  There have been times

10   when we have needed breathing apparatus and we

11   have to use the fire department breathing

12   apparatus.

13           Whereas Paul Kurgan and Carl Ruleman

14   had their own.  They had already had them and

15   everything.

16           So we went over to SOD to get our

17   breathing apparatus.  And we saw a sergeant over

18   there which was white.

19           And he said, oh, no, you all can't get

20   it.

21           And we are like, why can't we get the

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

102

1    breathing apparatus that we needed to do our

2    job?

3          He said, Lieutenant Atcheson said you

4    all was not allowed to get it and go back and

5    see him.

6          So, we went back.  We talked to the

7    sergeant -- I mean Lieutenant Muslim.  We asked

8    him -- we told him that we were not allowed to

9    get them.

10         And he said, Lieutenant Atcheson said

11    we couldn't have them.

12     Q.   You started off by saying that you

13    were told to go over to ask for them.  Who told

14    you to go over there?

15     A.   When I said that, Sergeant Muslim, he

16    was sergeant back then.  Sergeant Muslim had

17    told us to go there.

18     Q.   And for the purposes of being assigned

19    or picking up the breathing equipment?

20     A.   Right.

21     Q.   When did Paul Kurgan -- was assigned

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

103

1    to the ECU?

2        A.   Me -- Officer Greg Johnson and myself

3    was the first one assigned.  We were assigned.

4    Paul Kurgan and Carl Ruleman were detailed.  And

5    they were like maybe 2 or 3 months, maybe

6    4 months later.

7        Q.   After you?

8        A.   Right.  They were detailed.

9        Q.   Prior to Paul Kurgan and Carl Ruleman

10   being detailed to the ECU, did you have

11   breathing apparatus, breathing equipment?  Prior

12   to them coming did you have breathing equipment?

13       A.   No.  I wasn't in the environmental

14   crimes either.

15       Q.   Where were you at that point?

16       A.   Before then I was over at the training

17   academy before I came to the environmental crime

18   unit.  So would be no require -- it's not a

19   requirement to have it.

20       Q.   Perhaps my question wasn't clear.  Who

21   was in the ECU first, you or Kurgan or Ruleman?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

104

1    A.    Officer Greg Johnson and myself was in

2    the unit first.

3    Q.    Then I thought you said 3 or 4 months

4    later Kurgan and Ruleman came?

5    A.    Right.

6    Q.    During that 3 or 4 months did you have

7    the breathing?

8    A.    Oh, no.  Uh-uh.  No, no.  It was after

9    we got trained and certified.  You have to be

10   certified to -- to wear a breathing apparatus.

11   And we had got certified through the fire

12   department to wear breathing apparatus.

13   Q.    Do you know how many breathing

14   apparatuses the MPD had available?

15   A.    No.  But they did have them available.

16   We just couldn't get them.

17   Q.    When you returned to the ECU and

18   talked to Sergeant Muslim, what did he tell you?

19   A.    He just told us that -- we told him

20   that they denied us, that the lieutenant said we

21   couldn't get them.  So I mean he just -- I don't

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

105

1    know.  He didn't do anything.  I don't know.  I

2    don't know what he did after that or if he

3    called the lieutenant or what.  I don't know.

4        Q.    Did you receive them at some point

5    after that?

6        A.    No.  We never received them.

7        Q.    At the time that you left the ECU, did

8    you have breathing apparatuses assigned to you?

9        A.    No.  We made so much -- we had filed

10   an EEO complaint and stuff like that so they

11   took them back from Paul and Carl Ruleman.  They

12   took them back.

13       Q.    When did Investigators Ruleman and

14   Kurgan receive their breathing apparatuses?

15       A.    You have to ask them that.  I don't

16   know.

17       Q.    Is that a piece of equipment that had

18   to stay at the station or could you take it

19   home?

20       A.    You have to ask them.

21       Q.    Well, I'm talking about in general.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

106

1  If you had had the breathing apparatus would you

2  have been allowed to take it home?

3      A.    It would probably -- how delicate it

4  is probably -- I would probably have kept it in

5  the car.

6      Q.    Did you ever find out even as of today

7  why Lieutenant Atcheson would not allow you to

8  have the breathing apparatus?

9      A.    The reason why?

10     Q.    Yes.

11     A.    Because he did not like me.  He made

12  it perfectly clear he didn't like me.  He made

13  it perfectly clear that he would do anything he

14  could to get me fired.  And he made it perfectly

15  clear that he would do it for Officer Greg

16  Johnson.  And he had no doubt about it that I

17  did not deserve to be on his police department.

18          So, he did everything he could to stop

19  me from doing anything to achieve -- he stopped

20  me from doing my job to the best of my ability.

21     Q.    You said that he did it for Officer

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

107

1    Johnson.   Did what for Officer Greg Johnson?

2         A.    Discriminated against him as well.

3         Q.    Did not having the breathing apparatus

4    interfere with your ability to investigate

5    illegal dumping?

6         A.    Oh, yeah.  I mean as far as we could

7    go into the scenes that -- we could actually go

8    into the scenes, and we didn't have to wait for

9    the fire department.  We could just go right

10   into it then, because we had the incapsulated

11   suits.  All we needed was to have the breathing

12   apparatus to go into the scene.

13         Like different scenes, like for

14   instance if there was a turned-over truck and we

15   didn't know what that truck had, we could be

16   incapsulated and actually go into that scene.

17        Q.    Were there times that there was

18   something that occurred where you were on the

19   scene and had you to wait for the fire

20   department to show up?

21        A.    Oh, yeah.  There was a lot of scenes

Case 1:05-cv-01120-JR    Document 50-13    Filed 11/15/2007    Page 9 of 55


DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

108

1    we actually had to wait for the fire department

2    to come before we did anything yes.

3        Q.    Were there times or events where the

4    reason why you had to wait was because you

5    didn't have your breathing apparatus?

6        A.    Yeah.  What we did was we stopped us

7    going into it because they didn't know the

8    criminal aspect that pointed to a scene and

9    taking chances, that we needed for a criminal

10   prosecution.  So we would let them go in and

11   tell us that the scene was safe, and then we

12   would go in.

13       Q.    Officer, is there anything else that

14   you want to tell me as it relates to the

15   breathing apparatus?

16       A.    Not at this time, no.

17       Q.    Paragraph 20 says that, "Between

18   January 2001 and December 2003, Defendant

19   Atcheson denied Plaintiff's numerous requests

20   for overtime while authorizing overtime for

21   similarly situated Caucasian officers."

PRECISE REPORTING SERVICES
(301) 210-5092   (877) 4 A STENO

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

109

1          Is that true?

2      A.    Yes.

3      Q.    How often would that happen?

4      A.    Quite often we would ask for overtime

5   early in the morning.  We used to go to -- to

6   the transfer stations that they had in the

7   morning.  And we would, you know, like see

8   people who were unlicensed or who would dump

9   illegal trash and stuff like that, and we could,

10   you know, actually lock them up or, you know,

11   issue them citations.

12          Tractor trailers that didn't have the

13   right tags or didn't belong into DC, we could

14   write them tickets, $500 tickets.  He stopped

15   that.  He said that we could no longer do it.

16          But Officer Paul Kurgan would do

17   overtime with the warrant squad.  He was not in

18   the warrant squad, but he would go over there

19   and he would work overtime.  And even in the

20   evening time we would see Paul Kurgan working

21   overtime, and we were not allowed to work

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

110

1    overtime.

2              MR. JACKSON:   Mark this Exhibit 3

3    please.

4         (Squires Deposition Exhibit Number 3 was

5         marked for identification and attached to

6         the transcript.)

7              (Discussion off the record.)

8    BY MR. JACKSON:

9         Q.   Officer Squires, you have in front of

10   you a document marked Exhibit Number 3.  Just

11   for the record it is a Settlement Agreement

12   Environmental Crimes Unit/Acting Pay, (Johnson

13   Kurgan, Ruleman, Squires) FOP 01-23.

14             Do you see that?

15        A.   Yes.

16        Q.   Is your signature on that document?

17        A.   Yes, it is.

18        Q.   And the date of this document is what?

19        A.   I guess it's six -- mine says 6/19/02.

20        Q.   Okay.  And ask you to take a minute to

21   read it.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

111

1     A.    Okay.

2     Q.    Now under your signature there are

3     three additional names with signatures.   Could

4     you just for the record read those names?

5     A.    Carl Ruleman, Greg Johnson, and Paul

6     Kurgan.

7     Q.    This appears to be a settlement

8     agreement concerning the four of you being

9     yourself, Officer Squires, Ruleman and Johnson

10    regarding complaints that you were not being

11    paid according to the compensation that other

12    investigators were being paid?

13    A.    Right.

14    Q.    So is it true that Ruleman and Kurgan

15    also were not being paid what other

16    investigators were being paid?

17    A.    Yes.

18    Q.    Can you explain to me how it was or

19    what are the circumstances that the four of you

20    got together and challenged the differences in

21    pay?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

112

1      A.    How did we go about doing this?

2      Q.    Tell me what were the circumstances

3  that brought this on.

4      A.    Me and Greg -- actually Greg Johnson

5  initiated it and me and Greg pursued it.  And

6  because they were a part of the environmental

7  crimes unit we included them in it.

8      Q.    So according to this they weren't

9  getting paid what the other investigators were

10  getting paid as well; is that correct?

11      A.    I guess.  I don't know.  Because I

12  never asked Paul or Carl, what were they getting

13  paid.  I never asked them that before.

14      Q.    How much were you being paid in

15  overtime?

16      A.    Overtime?

17      Q.    Yes.

18      A.    Weren't getting no overtime.

19      Q.    You never got any overtime?

20          MR. TEMPLE:  Objection.  Never?  Are

21  you talking about a certain period of time or

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

113

1   are you talking about the universe?

2           MR. JACKSON:  No.  We're talking about

3   the period of time that Lieutenant Atcheson was

4   Officer Squires' lieutenant.

5       A.   Okay, at first we was.  And then he

6   found out about us doing early morning transfer

7   and getting paid and stopped --

8       Q.   You said early morning what?

9       A.   Early morning transfer, working at the

10  transfer station.

11      Q.   What's the transfer station?

12      A.   That's where the trucks come in and

13  they actually dump the trash at a building and

14  they take it out.  They take that trash out to a

15  landfill.  Like a regular service center or

16  something like that --

17           Like a regular commercial company

18  could come there, drop off their trash, pay for

19  it.  And you can dump it and they'll take it to

20  the landfill.  And that's where we would find

21  the people who would have these violations, the

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

114

1    tractor-trailers, the unlicensed haulers, and

2    stuff like that.

3        Q.    When were your hours?  Or did you say

4    6 a.m. to 2 p.m.?

5        A.    No, not there.  When I used to work at

6    environmental crime it was different.  We had

7    different hours.

8        Q.    Oh, I'm sorry.  What were your hours

9    at environmental crime?

10        A.    Environmental crime it was just --

11    initially we started off with 8:00 to 4:00, and

12    then we moved from 10:00 to 6:00.  You know, at

13    different times your shifts will change because

14    we had a re-deployment so you have to go out

15    into the street and be a regular officer.  So

16    our shift was all the time changed.

17        Q.    Is it fair to say that your

18    environmental crimes it wasn't like a shift like

19    a midnight shift?

20        A.    No.  It wasn't a midnight shift.  Only

21    the people who were on call were supposed to

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

115

1    come back on midnight shift.  But it didn't stop

2    Paul Kurgan.  And Paul Kurgan worked all the

3    time, any time they want on anything they want.

4    We couldn't do that.

5        Q.   At the time that you were requesting

6    overtime, what time would you show up at the

7    transfer station in the morning?

8        A.   4:00 in the morning.

9        Q.   And before you worked overtime, did

10   you have to get approval?

11       A.   Yes.  Yes, we did.

12       Q.   And then when did Lieutenant Atcheson

13   stop according to you approving overtime for

14   you?

15       A.   I would say probably in 2002.  I think

16   it was sometime in 2002 I think it was.  I'm not

17   sure from 2002, but I think it was 2002 or 2003.

18   I'm not quite for sure.

19       Q.   How many -- when you were working the

20   overtime what was the average number of hours

21   per week you would work?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

116

1      A.    It would vary.

2      Q.    What would be the high and what would

3  be the low?

4      A.    I don't know.  I cannot give you -- I

5  don't know.

6      Q.    How about this.  Would it be fair to

7  say that the low would probably be an hour?

8      A.    Let's say the low would be -- let's

9  say 4 hours would be the low.

10     Q.    And what would be the approximate

11 high?

12     A.    Are you saying per day or are you

13 saying --

14     Q.    No.  I'm saying average per week.

15     A.    Oh, per week?  I don't know.  It

16 varies.  It depends what we have going.  Like we

17 have -- we would have a joint net where we would

18 do it with 8 different states and everybody

19 would stop trucks.  So it just depends on what's

20 going on.

21     Q.    Do you remember the most hours that

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

117

1  you ever worked overtime during that period of

2  time?

3      A.    No.

4      Q.    In one week, no?

5      A.    No.

6      Q.    After this settlement agreement,

7  Exhibit 3, was signed in December -- I mean June

8  of 2002 -- did your pay improve?

9      A.    June of 2001, no, it didn't.  Oh, no.

10  This was years later.

11      Q.    What is years later?

12      A.    Years later before we got this.

13      Q.    I'm confused.

14      A.    This is a just a settlement agreement,

15  but this settlement agreement went back to 2001.

16  But we did not get this until -- I want to say

17  we got this settlement -- we won the settlement

18  in mediation in 2003 or 2004.

19      Q.    When you say you got the settlement,

20  are you talking about actually receiving the

21  money?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

118

1      A.   Yeah.

2      Q.   Okay.  So when you got your money

3  in --

4      A.   But we didn't get the petition.  We

5  were not officially investigated.  This gives

6  you the June of 2001 we were investigators.

7  This gives you the impression that in June of

8  2001 that we were investigators.  We were not.

9          We had to file a grievance to get

10  this, and it took like 2 or 3 years, maybe

11  4 years before we even got it to this point

12  where you could call us investigators, that we

13  could go and get our investigator badge.

14      Q.   Do you see Paragraph Number 3?

15      A.   Right.

16      Q.   Reads, "The demand for promotion is

17  hereby withdrawn."

18          Do you see that?

19      A.   Right.

20      Q.   Was that the promotion from officer to

21  investigator?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

119

1    A.   No.  We did not get it then.  No, we

2  did not get it right off the bat.

3    Q.   But is that what the promotion is

4  referring to, from an officer to investigator?

5    A.   Supposed to be officer to detective.

6  We did not get that.  Supposed to be -- there is

7  no -- the only -- before -- I think in -- I want

8  to say 2002 or 2003, there was no such thing

9  as -- technically as investigator.  There was

10  just officers to detective.

11         Chief Ramsey is the one that

12  implemented investigators, because usually you

13  go from officer to detectives.  And that's what

14  we're fighting for to be detectives, not

15  investigators.

16    Q.   That's all I wanted to know.  The

17  topic of promotion was referring to from an

18  officer to detective?

19    A.   To detectives, not investigators.

20    Q.   Because there were no investigating

21  positions at that time?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

120

1    A.   No.  (Shaking head.)

2    Q.   Money that was available for overtime,

3 do you know where that money came from?

4    A.   Which overtime are you referring to?

5    Q.   I'm referring to the overtime that you

6 are referring to in Paragraph 20, where you said

7 between January 2001 and December of 2003

8 Defendant Atcheson denied Plaintiff numerous

9 requests for overtime, while authorizing

10 overtime for similarly situated Caucasian

11 officers."

12    A.   Police department.

13    Q.   Do you know whether or not there was

14 any federal money allocated or directed by the

15 FBI or under any federal law enforcement agency

16 for overtime?

17    A.   I don't know.  I wouldn't know that.

18    Q.   Paragraph 21, In 2003 -- oh, I'm

19 sorry.  Before I go on is there anything else

20 you want to tell me about the overtime that you

21 have not talked about so far?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

121

1    A.    I can't recall at this moment, no.

2    Q.    Paragraph 21 reads, "In 2003 Defendant

3 Atcheson lowered Plaintiff Squires' performance

4 evaluation while giving higher ratings to

5 similarly situated Caucasian officers."

6         Is that correct?

7    A.    No.  What he did was he had threatened

8 Sergeant Muslim and Sergeant White at different

9 times that if they did not lower mine and Greg

10 Johnson's, guys of color, their rating, that he

11 would give them a lower rating.  And Sergeant

12 Muslim, as well as Sergeant White, said they

13 would not do that.

14    Q.    Do you know whether or not they did

15 that?

16    A.    No.  They did not do it.

17    Q.    They did not lower your performance

18 rating?

19    A.    No.

20    Q.    Did Sergeant Muslim ever lower your

21 performance rating?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

122

1    A.    Not to my knowledge.  No, he didn't.

2    Q.    Did Sergeant Louie White ever lower

3  your performance rating?

4    A.    Not to my knowledge.  If they had I'm

5  not aware of it.  It could be possible that they

6  could have, but I am not aware of it.  I know

7  they were threatened that if they did not, that

8  he would give them a bad rating.

9          MR. JACKSON:  Mark this as Exhibit 4

10  please.

11      (Squires Deposition Exhibit Number 4 was

12      marked for identification and attached to

13      the transcript.)

14  BY MR. JACKSON:

15    Q.    Officer Squires, you have been handed

16  a document that is marked as Exhibit 4.  The

17  title of the document is, Metropolitan Police

18  Department, Washington, DC, Officer Performance

19  Rating Form.

20          Do you have one?

21    A.    Yes.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

123

1      Q.    I would ask you to take a look at that

2   and tell me if you recognize it.

3      A.    Yes.

4      Q.    And is this your performance rating?

5      A.    Yes.

6      Q.    And this was completed by Sergeant

7   Louie White; is that correct?

8      A.    Yes.

9      Q.    And the rating period is from 9/03 to

10   10/04; is that correct?

11      A.    Yes.

12      Q.    And it indicates that it's an annual

13   performance rating?

14      A.    Yes.

15      Q.    And the overall rating at the bottom

16   is just an average; is that correct?

17      A.    Yes.  Is that average?  Yes, it was.

18   What is that?  What is that -- I can't see that.

19   Do you know what that is?

20      Q.    I'm not sure what you're referring to.

21      A.    It says, rating total.  I don't know

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

124

1    what that is.  I cannot see what the score is.

2    Can you tell me what that score is?

3         Q.   Sure.  Here's the way you do it.  You

4    see A?

5         A.   Right.

6         Q.   Job knowledge?

7         A.   Right.

8         Q.   With 4 circled?

9         A.   Right.

10         Q.   Converting the rating now way over to

11    the far right.  Now it has the Number 4 there?

12         A.   Right.

13         Q.   So if you just go down and count up

14    the numbers, this total rating is going to give

15    you a total score number.

16         MR. TEMPLE:  Point of inquiry.  Is

17    this a complete rating sheet, these 2 pages

18    which constitute this exhibit?

19         MR. JACKSON:  As far as I understand

20    it is.

21         THE WITNESS:  Okay.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

125

1    BY MR. JACKSON:

2        Q.    Do you have that number now?

3        A.    Yes.

4        Q.    What do you believe that number is?

5        A.    Looks like 20.

6        Q.    Well, A is 4, B is 3.  That's 7.  C is

7    3 so that would be 10.  D is 4, so there's 14.

8    E is 3.  That would be 17.  F is 4, so that

9    would be 21.  G is 3, so that would be 24.

10       A.    Okay.  That's average.

11       Q.    If you go down to the overall rating,

12   average.  And the average is someone who falls

13   in between the numbers of 21 and 27; is that

14   correct?

15       A.    Right.  Um-hmm.

16       Q.    We talked about this earlier, and I

17   believe you said you don't recall -- well, let

18   me rephrase that.  Do you recall seeing a

19   similar performance evaluation form that would

20   have been completed by Sergeant, now Lieutenant,

21   Muslim?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

126

1    A.   No, I do not.  And as a matter of

2    fact, if I'm not correct, most of this time I

3    was out with surgery.  I was out on surgery.  I

4    had a foot surgery, so most of this time I was

5    out.

6    Q.   Okay.  Did you ever talk with Sergeant

7    White as to why your rating was only average?

8    A.   No, I did not.  But I pretty much knew

9    if I was out on surgery then I wasn't able to do

10   my job so I wouldn't expect above average if I

11   wasn't able to do my job.

12   Q.   Tell me which performance rating

13   period are you referring to in Paragraph 21 when

14   you say that in 2003 Defendant Atcheson lowered

15   Plaintiff Squires' performance evaluation while

16   giving higher ratings so similarly situated

17   Caucasian officers.  Which rating period are you

18   talking about?

19   A.   What I'm saying is and based upon my

20   ratings versus Carl and Paul's rating, at all

21   times, from 2001 to 2004 they had a high rating

127

1    and we all did the same job.  We all did the

2    same job.  We all spent the same amount of time

3    doing the same job.  And their rating was always

4    higher than our rating.  That's what I'm saying.

5            And Lieutenant Atcheson would not

6    stand for anything less than above average for

7    them.  And now even though I had a lower rating

8    here, if I'm out for surgery I don't expect my

9    rating to be up because I was out.

10           But, their rating even though when we

11   were -- if you look and see how many lock-ups

12   and how many things that Paul Kurgan has done, I

13   have done just as much and not even more, and my

14   rating was still the same.  And it's based upon

15   Lieutenant Atcheson's intimidation and scare

16   tactics that he does.

17       Q.   Paragraph 22, "According to an EEOC

18   determination Defendant Atcheson frequently

19   subjected Plaintiff to excessive and

20   disproportionate discipline."

21           What EEOC determination are you

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

128

1    referring to?

2        A.    The EEO complaint that I had against

3    him, Lieutenant Atcheson.

4        Q.    Did you receive some document that

5    said that the EEOC had determined that Defendant

6    Atcheson frequently subjected you to excessive

7    and disproportionate discipline?

8        A.    No.   I gave that to them, the

9    information to them.

10       Q.    Who is them?

11       A.    To the EEO counsel.

12       Q.    Paragraph 23 reads, "Defendant

13   Atcheson also verbally harassed Plaintiff

14   Squires repeatedly and continuously and harassed

15   Plaintiff during aggressive interrogation

16   sessions."

17       A.    Yes.

18       Q.    Let's start with the verbal

19   harassment.   How did he verbally harass you?

20       A.    The things that he said about the

21   situation in North Carolina, the things that he

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

129

1    said that he would do, that he would write me

2    down for adverse action, that I was going to get

3    fired.  Every time I tried to do my job I had to

4    look over my back based upon him saying that I

5    wasn't coming to work on time.

6            If I was one minute late he would

7    write me up, where if my counterpart, if they

8    came in one minute late that was fine.  He

9    harassed me by trying to say that I was not

10   allowed to give my FOP representatives or he

11   said I couldn't.  He also used profanity.

12           I'm trying to think of other things he

13   did.  He would threaten us and say that we

14   didn't do our job, that we would have to leave

15   the environmental crime unit.  He would hang up

16   the phone on us.  He would say -- order us to

17   his office.  If we didn't do it we would be

18   reprimanded for it.

19       Q.  When you were explaining all this to

20   me you kept saying us.  And I assume us includes

21   you as well?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

130

1    A.    Me, Officer Greg Johnson, and the

2  sergeants as well, that are of color, yes.

3    Q.    And I said that because all I'm

4  interested in is you, how he harassed you.

5    A.    Yes.

6    Q.    And all those things he did to you?

7    A.    Yes, he did.

8    Q.    How often would he do that?

9    A.    As much as he could.

10    Q.    You said that if you were late one

11  minute he would write you up.

12    A.    Yes.

13    Q.    How many write-ups did you get for

14  being late?

15    A.    None.

16    Q.    So then he never wrote you up for

17  being late?

18    A.    No.  But we knew it was there because

19  he had mentioned it to the sergeant, if they're

20  late, I want you to write them up.  He wanted us

21  to be written up for whatever.  And he told the

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

131

1    sergeants that.  He made it perfectly clear that

2    he was trying to find a way to fire me.  He made

3    it perfectly clear.

4           He told the sergeant.  He told other

5    people that he wanted me fired.

6        Q.    Although Lieutenant Atcheson would

7    tell the sergeant to write you up if you were

8    one minute late, I believe your testimony is to

9    the best of your knowledge you were never

10   written up; is that fair?

11       A.    Never written up for being late, no.

12   No, not for being late.

13       Q.    Tell me about the aggressive

14   interrogation sessions.  What are you referring

15   to there?

16       A.    How he would do the Q and A.  He would

17   say that I was lying to an official.  He would

18   say that I'm lying, that I'm lying to an

19   official, that I deserve to be locked up, that I

20   deserve to be fired, that I need to go into the

21   other room and write a confession that wasn't

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

132

1    true that was criminal in nature.

2            He would use loud verbal things as far

3    as, you need to do this.  You need to go in a

4    room and write this statement.  You know that

5    you're a criminal.  You know that you don't

6    deserve to be on the police department.  You

7    know that it's just a matter of time before you

8    get adverse action.

9            There's just numbers of things he

10   would do.

11       Q.   How frequently were these statements

12   or comments were they made?

13       A.   Quite a bit, quite a bit.

14       Q.   What's that mean, quite a bit?

15       A.   I used to joke with Greg Johnson that

16   we used to take turns.  He would get on me.

17   Then he would turn around and get on Officer

18   Greg Johnson.  I would say out of a month at

19   least maybe 4 or 5 times a month, if not more.

20       Q.   This was at the time that Lieutenant

21   Atcheson was the lieutenant at the ECU?

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

133

1      A.   Oh, yeah.  And even after he was the

2  lieutenant he would use other people to get us.

3      Q.   Okay.  Paragraph 24, it reads,

4  "Defendant Atcheson continuously exhibited

5  hostile treatment towards Plaintiff and other

6  minorities.  In one instance when a North

7  Carolina police officer wrongly charged the

8  Plaintiff with a criminal offense, Lieutenant

9  Atcheson intentionally gave false information to

10  North Carolina police knowing that it would be

11  detrimental to Plaintiff Squires."

12      A.   Yes.

13      Q.   Tell me about North Carolina.

14      A.   There's not too much to tell about

15  that.  Every year I usually go from -- on my

16  birthday -- as a matter of fact my birthday is

17  next week -- I usually take off on a Sunday and

18  for the whole week I fish.  I start from the

19  Chapton (phonetic) River, which is in Cambridge,

20  and I travel all down the East Coast until I get

21  to my mom's house.  Then I go all the way back

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

134

1    up.

2        Q.   And so that's from where to where?

3        A.   From Maryland all the way to North

4    Carolina.  That's where my home is.  And me and

5    my brother were fishing out on the peer and we

6    was catching finish.

7        Q.   This was in North Carolina?

8        A.   In North Carolina.  Me and my brother

9    was on the peer fishing.  And it's early in the

10   morning.  And we're fishing and the police comes

11   up and said, hey, want to see your license.

12            I'm like, license.  Do we need a

13   permit?

14            And he said, no, no.

15            We're standing out like 150 feet to

16   175 feet out in the water here.

17            And I said, you need a license?

18            He says, no, you don't need a license.

19   I want to see your driver's license.

20            I said, driver's license.

21            He's a white guy.  He's dressed in all

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

135

1    dark clothing, and I could see a badge and a

2    gun.

3              So I said, I don't have my license on

4    me.

5              At that time I had sweat pants on with

6    no pockets.  I had just a T-shirt, muscle shirt

7    on with the -- you know, the cutoff right here.

8    So I'm saying I don't have my license on me.

9         Q.   Was your license in the vehicle?

10        A.   Yes, it was.

11             So he says, man, you won't give me

12   your license?

13             I said, sir, I don't have my license

14   on me.

15             So he asked me, was that my car?

16             And I said, yeah.  I said, sir, did we

17   do something wrong?

18             And he said, yeah.  You all were

19   tampering with a vehicle.

20             I said, us?

21             He says, yeah.  You all were tampering

136

1    with a vehicle.

2          I said, come on, you're joking.

3          He says, no.  He says, I need to see

4    your license.

5          I said, sir, I don't have my license.

6    I said, look, are we under arrest?  No.  Are we

7    free to go?  Yes.

8          So me and my brother went back

9    fishing.  He walked to the car I guess and ran

10   the tags and found out that it was a rental car,

11   came back --

12   Q.   I'll just ask you one question.  When

13   you said you didn't have your license on you,

14   did you say but it's in the car?

15   A.   Never got a chance to because he

16   walked away.  And plus I asked him, are we under

17   arrest?  No.  Are we free to go?  Yes.

18          So, me and my brother went back to

19   fishing.

20          He comes back and says, I want to see

21   your license.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

137

1        I said, you know what, I feel like

2   you're harassing us.  I said, look, all we're

3   doing is just fishing.

4        Q.   Did you tell him you were a police

5   officer?

6        A.   No, never did.  So -- I thought you

7   weren't going to interrupt me until I'm

8   finished.

9        Q.   Well, because at the appropriate time

10  I just had a question.

11       A.   Okay.

12       Q.   Go ahead.

13       A.   But anyway, so he said, well, I need

14  to see your license.

15            Sir, I don't have my license.  You're

16  harassing us.

17            He said, well, I can order you off out

18  of this town.

19            I said, sir, you can't do that.  We

20  didn't do nothing wrong.

21            So he says, well, I can order you off

138

1    of this pier.

2              So I said, okay, so I go off the pier.

3    So we start putting our stuff in the car.  Once

4    we put our stuff in the car, I'm getting ready

5    to get in the car.

6              He says, well, if you get in that car

7    I can demand your license and registration.

8              I said, you know what, you're

9    harassing us and I just don't feel comfortable.

10   I need to see your supervisor.

11             He said, for all practical purposes I

12   am the supervisor.

13             I said, you know what, no problem.

14             So I told my brother.  Come on let's

15   go.  We start walking and I start looking for a

16   telephone.

17             About 3 blocks away in front of a

18   store, I find a telephone, call the police.  I

19   said, look, I got this guy.  I don't feel

20   comfortable, me and my brother, 3:00 in the

21   morning.  Don't feel comfortable.  Can you give

139

1   me some assistance out here because I don't feel

2   safe?

3           So he says, well, we'll call the

4   sheriff's department because, you know, we're in

5   a rural area in North Carolina.  And he says,

6   well, the sheriff can't come.  He says, well,

7   let me give you a number to the State.

8           So he gave me a number to the state

9   and called the state police.  And he said, well,

10  stay on.  We're going to send a state trooper

11  there.  And the next thing I know this real,

12  real big white guy, he comes.

13          And I say, well, here comes a guy in

14  an unmarked car and they're keeping my -- both

15  of them are in plain clothes.  The guy that's

16  talking to me is in all black.

17          So he talked to this guy who's in

18  plain clothes and I'm still on the phone.  So

19  the white guy comes up to me and says, hang

20  that phone up, and he used profanity.

21          And I hung the phone up.  The next

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

140

1    thing I know, I was on my way to jail.

2           So based upon that, I was locked up.

3    And the reason why I was locked up they say,

4    interfering with a police in the line of duty is

5    an obstruction of justice.

6           So I said, what did I do?

7           He say, I did not give him my license.

8    And because he asked me for my license I was

9    interfering with an investigation.  That was it.

10   BY MR. JACKSON:

11       Q.   Before you go on.  As a police

12   officer, if you had stopped somebody in the

13   District of Columbia, stopped them whether

14   driving or walking and asked for some

15   identification, are they required to give you

16   identification?

17       A.   I'm glad you said that.  No.

18       Q.   They're not?

19       A.   No.  Your constitution says that you

20   don't have to do that.  That means -- that means

21   I can stop anybody and say, hey, give me your

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

141

1   license.  Can't do that.

2        Q.   If you stopped somebody suspicious,

3   who could have committed a crime or was about to

4   commit a crime, can you ask for them to show you

5   some identification?

6        A.   About to?  No, no.  Definitely no.

7   How is somebody about to commit a crime?  No.

8        Q.   So after you're locked up what

9   happened?

10       A.   They called -- I asked them for one

11   phone call and called my sister.  They notified

12   the police department.  And basically my whole

13   vacation was ruined so I came back up here.

14            So that Monday I came in and they took

15   my badge and gun.  And Lieutenant Atcheson did

16   the investigation.

17       Q.   How long were you locked up down in

18   North Carolina?

19       A.   No.  Just they hold me, hold me for --

20   I don't know, an hour.  I don't know how long it

21   was.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

142

1    Q.   At some point did you tell them that

2    you were a police officer?

3    A.    Oh, yeah.  So they -- because he went

4    through my car.  He took the key and went

5    through the car.

6    Q.    Then you said that the police

7    department was notified.

8    A.    Right.

9    Q.    Who notified them?

10    A.    I think they called.  I think I told

11    them that I was a police in Washington, DC.

12    Q.    And based on the fact that you then

13    told them that you were a police officer, did

14    they give you a break?

15    A.    A break?  What's that?  What's a

16    break?  I don't understand what that means.

17    Q.    They didn't just let you go without

18    charging you with anything?

19    A.    Because I'm a police officer?  I think

20    that's criminal, isn't it?  I mean if you commit

21    -- if I committed a crime and you can tell me I

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

143

1    can get away because I'm a police officer,

2    that's not a reasonable action.

3        Q.    Did you commit a crime?

4        A.    No, I did not.

5        Q.    Once you told them you were a police

6    officer and you had not committed a crime, did

7    they let you go?

8        A.    No.  When I went in front of the

9    magistrate, my brother put up his house.  And we

10   went for that.  They gave me a court date.

11       Q.    Tell me what happened once you

12   returned to the District of Columbia.

13       A.    Nothing until the next day until that

14   Monday.  They took my badge, my gun.  And

15   Lieutenant Atcheson did the investigation.

16       Q.    Who took your badge and gun?

17       A.    I think Sergeant Muslim.

18       Q.    What I really want you to do is run

19   through for me the events of Monday morning.

20   When you walked through the door of ECU, what

21   happens?  I take it that you arrived with your

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

144

1    badge and gun on you that morning.

2        A.    Right.

3        Q.    Just tell me what happened.

4        A.    I think I talked to Sergeant Muslim on

5    that Sunday and I told him what had happened and

6    stuff like that.  But I don't know if the

7    Defendant told them to take my gun or not.  Only

8    he can tell you that.

9            That morning I -- they took my badge

10    and gun and that was it.

11        Q.    From your understanding as a police

12    officer, is that normal or standard procedure?

13        A.    Yes.

14        Q.    Tell me about the subsequent

15    interactions or conversations that you had with

16    Lieutenant Atcheson regarding the situation in

17    North Carolina?

18        A.    On which occasion?

19        Q.    Let's start with the first one that

20    you recall and just work through them.

21        A.    The first interaction was I was

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

145

1    sitting at my desk.  And Lieutenant Atcheson

2    said, oh, did you get that page?

3            I said, page?

4            Oh, you know I just paged you.

5            I was like, you paged me?

6            Yeah, I paged you.

7        Q.    Is this Monday morning?

8        A.    No.  I don't think it's Monday

9    morning.  I think it's a couple of days later or

10   something.  I'm on noncontact.  If you have

11   noncontact you're working day work from 8:00 to

12   4:00.

13       Q.    So I don't have to interrupt you just

14   tell me as you go from one event to the next

15   event and just say, well, 2 weeks, 3 weeks

16   later, a month later this happened or that

17   happened.

18       A.    Okay.  Let's say the first week or I

19   think it was the first week or the second week.

20   I'm sitting at my desk.  Lieutenant Atcheson

21   calls and says, did you receive the page?

146

1         And I said, what page?

2         And he said, oh, don't worry about it.

3         I was like, huh?  And he -- I didn't

4    worry about it and hung up the phone.  The next

5    thing you know I was called down to his office

6    to receive a 62-E.

7         I'm like, what's this for?

8         He says, you didn't answer a page.

9         I said, Lieutenant Atcheson, you know

10   I'm sitting at my desk.  I can't go nowhere,

11   don't have my gun.

12        Why you should answer the page.

13        I'm like, why should I answer a page

14   when you know I'm sitting at my desk?  You call

15   me at my desk, but yet you gave me a 62-E.  So

16   anyway that's the first one.

17        And the next thing I know he was doing

18   the investigation about -- about my incident in

19   North Carolina.  And he would call them all the

20   time.

21        And I would hear him on the phone

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

147

1   saying, oh, you know, I was in the military.  I

2   was in the marines.  Oh, yeah, I used to go down

3   to Cherry -- Cherry Point all the time.  You

4   know I was a marine.  I used to go down to Nuben

5   (phonetic), North Carolina and all that, you

6   know.

7       Q.   When he's saying I he's referring to

8   himself?

9       A.   Yes -- no.  He's talking to the

10  sheriff.

11      Q.   Right.  But when he says, I used to,

12  is he saying I, Lieutenant Atcheson?

13      A.   Yes.  Lieutenant Atcheson is saying

14  this to the sheriff, police department down

15  there.

16      Q.   Okay.

17      A.   And they're having a conversation like

18  they're buddies.  And the next thing you know

19  Lieutenant Atcheson has me down there to talk to

20  me in reference to the case.

21           And I said, well, I can't talk to you.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

148

1          And he was like, why?

2          I said, because this criminal.

3          He says, no, you can talk to me.

4          I'm like, I can't talk to you.  You

5    have to talk to my lawyer.

6          No.  I'm going to talk to you.

7          I said, you're not going to talk to

8    me.

9          So I had to call Robert Aiden

10   (phonetic) and stuff like that, get a lawyer.

11   But I had to wait until this case was over.  And

12   basically the case was -- like I say it was

13   unconstitutional.  And they have a

14   constitutional lawyer in North Carolina.

15          And he said it was unconstitutional.

16   It should have never happened.  And they went

17   with a case that was a guy with dreadlocks and

18   wearing high heels or some heels and he was just

19   walking around.  And the police who were

20   stopping him said, you don't have no business in

21   this neighborhood.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

149

1    He said, I'm just walking around.

2    And the next thing you know they had

3    locked him up.  He took it all the way to the

4    Supreme Court and won.

5    And they said it's unconstitutional.

6    You are not required by law to have an ID on

7    you.

8    But basically from there Lieutenant

9    Atcheson called me up to his office and says,

10   hey, you're a criminal.  You deserve to be

11   locked up.  And the incident with the car -- I

12   know there's another incident in there, but

13   Lieutenant Atcheson called me up to his office.

14   He would call me up to the office and

15   say something.  Would have to be -- first it was

16   the car.  He called me up there first to get a

17   119.  That's the statement of facts.

18       Q.   Related to the car?

19       A.   Yes.

20       Q.   And that's the incident we talked

21   about earlier this morning?

150

1      A.   Right.  But I went up there just --

2   first to do the 119 so --

3        And he would -- he would tell me, I

4   know you don't want to be tried by the three

5   wise men.  So the best thing for you to do is

6   to, you know, just go ahead and plead because

7   they're going to lock you up.  They already told

8   me that they was going to lock you up.

9        So basically, you know, you can get

10  another job.  But right now you don't want to

11  get any more trouble and all that.  I just can't

12  see you getting out of it at all.  Just write

13  the statement.

14       So I had to write the statement and

15  talk to him.

16     Q.   How often did Lieutenant Atcheson make

17  a comment to you about the situation in North

18  Carolina?

19     A.   Every time I saw him, every single

20  time.

21     Q.   How long was the situation in North

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

151

1   Carolina pending for?

2        A.    It went from July to August.

3        Q.    July of 2003?

4        A.    '01.

5        Q.    July of 2001 to August of 2001?

6        A.    Yes.

7        Q.    How did that case down there in North

8   Carolina resolve or was it dismissed?

9        A.    Oh, it was dropped.  But it was

10  dropped because it was unconstitutional and they

11  had violated my constitutional rights, which I

12  sued them civilly and won money.

13       Q.    Is there anything else that you want

14  to tell me about as it relates to Lieutenant

15  Atcheson and the situation in North Carolina?

16       A.    Yes.  As the incident closed, the

17  criminal part became the civil part.  And we got

18  a copy of everything on the investigation from

19  them and my lawyer had it, and found out that

20  Lieutenant Atcheson had told them that I did not

21  get along with my coworkers and I had a bad

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

152

1    attitude.

2        Q.   Do you have a copy of those papers?

3        A.   No.  I think that was in the North

4    Carolina papers.  It should be in the North

5    Carolina.  It should be in there.  When he's

6    talk to -- his conversation with Joe Mally

7    (phonetic), Sergeant Joe Mally.

8            MR. JACKSON:  Mr. Temple, do you have

9    a copy of that?

10           MR. TEMPLE:  I don't know for sure.

11           (Discussion off the record.)

12           THE WITNESS:  And the officer actually

13   wrote that down in his statement that Lieutenant

14   Atcheson told him that.

15   BY MR. JACKSON:

16       Q.   Did you see anything else regarding

17   anything Lieutenant Atcheson might have told the

18   North Carolina officers?

19       A.   Only what I heard and it wasn't good,

20   that he -- he just said that, hey, you know,

21   they didn't have to worry about anything, that I

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

153

1    would lose my job.  You know, he just made it

2    perfectly clear that he wanted to get me fired.

3    There was no doubt about it, that he wanted me

4    fired.

5              And he also said that I don't belong

6    on this police department.

7              MR. JACKSON:  We've been going for

8    2 hours.  Do you need a break?

9         (Whereupon, a short recess was taken.)

10   BY MR. JACKSON:

11        Q.   Officer Squires, you said that at one

12   point Lieutenant Atcheson asked you, did you get

13   the page?

14        A.   Right.

15        Q.   Was there a page that was sent to you

16   from Lieutenant Atcheson?

17        A.   I don't know.  I didn't have my pager

18   on.

19        Q.   And you didn't have your pager on?

20        A.   No.  Because I knew I was going to be

21   in the office.

DEPOSITION OF RANDY SQUIRES
Conducted on July 10, 2007

154

1    Q.   Are you required to answer a -- is it

2    an MPD-issued page?

3    A.   It's an MPD pager.

4    Q.   Okay.

5    A.   We use it for like if you're on call

6    or something like that that they need to contact

7    with you.  But because we have a cellphone, you

8    know, they can just call us right on the phone.

9    But just in case they don't have a cellphone

10   they would use the pager.

11   Q.   Is the cellphone that you have or had

12   one that was issued by MPD?

13   A.   It was issued by DPW for MPD purposes.

14   Q.   It wasn't your personal cellphone?

15   A.   No.  No, it wasn't.  It was a

16   government-issued cellphone.

17   Q.   Is there anything else that you want

18   to tell me as it relates to North Carolina and

19   Lieutenant Atcheson?

20   A.   I feel that Lieutenant Atcheson

21   singled me out because I was an African